IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA;<br>DISTRICT OF COLUMBIA;<br>STATE OF CALIFORNIA;<br>STATE OF DELAWARE;<br>STATE OF FLORIDA;<br>STATE OF HAWAII;<br>STATE OF ILLINOIS;<br>STATE OF INDIANA;<br>STATE OF IOWA;<br>COMMONWEALTH OF MASSACHUSETTS;<br>STATE OF MINNESOTA;<br>STATE OF MONTANA;<br>STATE OF NEVADA;<br>STATE OF NEW JERSEY;<br>STATE OF NEW MEXICO;<br>STATE OF NORTH CAROLINA;<br>STATE OF RHODE ISLAND;<br>STATE OF TENNESSEE;<br>STATE OF VERMONT;<br>COMMONWEALTH OF VIRGINIA;<br>CITY OF CHICAGO;<br>COUNTY OF BROWARD; and<br>COUNTY OF MIAMI-DADE,<br><br>*ex rel.* John Kurzman,<br><br>      Plaintiffs,<br><br>v.<br><br> MICROSOFT CORP.;<br> MICROSOFT LICENSING, G.P.;<br> AERIE CONSULTING, LLC;<br> ALVAREZ & ASSOCIATES, LLC;<br> ARCTIC INFORMATION TECHNOLOGY, INC.;<br> CDW CORP.;<br> CDW GOVERNMENT, LLC, F/K/A<br> CDW GOVERNMENT, INC.;<br> CHAMPION SOLUTIONS GROUP, INC.;<br> COMPUCOM SYSTEMS, INC.;<br> CORNERSTONE IT, INC.; | Case No. 1:19-cv-04270-LGS<br><br>JURY TRIAL DEMANDED |

CRAYON SOFTWARE EXPERTS LLC;
DELL MARKETING, L.P.;
ECS FEDERAL, LLC;
EN POINTE TECHNOLOGY SALES, LLC;
THE HENSON GROUP, INC.;
IMAGER SOFTWARE, INC., D/B/A ISC;
INFORELIANCE LLC, F/K/A INFORELIANCE CORP.;
INSIGHT PUBLIC SECTOR, INC.,
A/K/A INSIGHT ENTERPRISES, INC.;
INTRAPRISE TECHKNOWLOGIES LLC;
LIFTOFF, LLC;
LILIEN, LLC, A/K/A LILIEN SYSTEMS;
MINBURN TECHNOLOGY GROUP LLC;
PCM, INC.;
PCMG, INC., D/B/A PCM GOV, INC.;
PLANET TECHNOLOGIES, INC.;
PROCENTRIX, INC.;
PROSUM INC., A/K/A PROSUM TECHNOLOGIES;
SHI INTERNATIONAL CORP.,
F/K/A SOFTWARE HOUSE INTERNATIONAL, INC.;
SOFTCHOICE CORP.;
SOFTWARE ONE, INC.;
SOLID NETWORKS INC.;
SYSOREX GOVERNMENT SERVICES, INC.;
T4 TECHNOLOGIES, INC.; and
VENTECH SOLUTIONS INC.,

     Defendants.

## FIRST AMENDED QUI TAM COMPLAINT

## TABLE OF CONTENTS

I. INTRODUCTION..................................................................................................... 1

II. JURISDICTION AND VENUE.............................................................................. 4

III. GOVERNMENT PLAINTIFFS ........................................................................... 4

IV. RELATOR JOHN KURZMAN ............................................................................ 5

    A. **Relator's Background and Discovery of the Alleged Fraudulent Scheme** ...... 5

    B. **Original Source; No Disclosures**.................................................................. 12

V. DEFENDANTS ...................................................................................................... 13

    A. **Microsoft**........................................................................................................ 13

        1. Microsoft Corporation ....................................................................... 13

        2. Microsoft Licensing, G.P. .................................................................. 13

    B. **Reseller Defendants** ...................................................................................... 14

        1. Aerie Consulting, LLC........................................................................ 14

        2. Alvarez & Associates, LLC ................................................................ 15

        3. Arctic Information Technology, Inc. .................................................. 15

        4. CDW Corporation .............................................................................. 16

        5. CDW Government, LLC....................................................................... 17

        6. Champion Solutions Group, Inc. ....................................................... 18

        7. CompuCom Systems, Inc. ................................................................... 18

        8. Cornerstone IT, Inc. ........................................................................... 19

        9. Crayon Software Experts LLC............................................................ 20

        10. Dell Marketing, L.P. ........................................................................ 20

        11. ECS Federal, LLC............................................................................ 22

        12. En Pointe Technologies Sales, LLC ................................................. 22

        13. The Henson Group, Inc..................................................................... 23

14.     Imager Software, Inc., d/b/a ISC .................................................... 24

15.     InfoReliance LLC, f/k/a InfoReliance Corporation ...................... 24

16.     Insight Public Sector, Inc., a/k/a Insight Enterprises, Inc. ......... 24

17.     Intraprise TechKnowlogies LLC .................................................. 26

18.     Liftoff, LLC ................................................................................. 26

19.     Lilien, LLC, a/k/a Lilien Systems ............................................... 27

20.     Minburn Technology Group LLC ................................................. 27

21.     PCM, Inc. ..................................................................................... 27

22.     PCMG, Inc., d/b/a PCM Gov, Inc. .............................................. 28

23.     Planet Technologies, Inc. ............................................................. 29

24.     Procentrix, Inc. ............................................................................. 29

25.     ProSum Inc., a/k/a ProSum Technologies .................................. 30

26.     SHI International Corporation, f/k/a Software House International, Inc. .. 30

27.     Softchoice Corporation ................................................................ 33

28.     Software One, Inc. ....................................................................... 34

29.     Solid Networks Inc. ..................................................................... 35

30.     Sysorex Government Services, Inc. .............................................. 35

31.     T4 Technologies, Inc. .................................................................. 36

32.     Ventech Solutions Inc. ................................................................. 36

**VI.    RESPONDEAT SUPERIOR AND VICARIOUS LIABILITY** ................................... 36

**VII.   BACKGROUND** ............................................................................ 37

    **A.    Cloud Computing** ......................................................................... 37

    **B.    Microsoft Cloud Products & Services** ..................................... 40

        1.     Microsoft Azure ........................................................... 41

        2.     Enterprise Mobility & Security Suite ("EMS") ......................... 42

        3.     Microsoft Office 365 ................................................................ 43

**C.**     **Contracts**................................................................................................ **45**

**D.**     **Certifications** ........................................................................................ **45**

        1.     Compliance with Applicable Laws ............................................. 45

        2.     Conformity with Representations .............................................. 47

**VIII.**  **DEFENDANTS' FRAUD ON THE GOVERNMENT** ................................. **47**

**A.**     **Defendants fraudulently induced the Government Plaintiffs
to enter into contracts based on false information about GCC,
the cloud service at issue**........................................................................ **48**

        1.     False Representations in Marketing and Presentations........................... 49

        2.     Higher Vulnerability ................................................................ 52

        3.     "Fake SKU" ............................................................................. 52

        4.     Fake Government Log-in Portal ............................................... 53

        5.     False Representation of FedRAMP and CJIS Compliance...................... 53

        6.     Abandoned Migration Plans and Continued Concealment...................... 54

        7.     Microsoft's Internal Suppression of Information ..................... 59

**B.**     **Defendants made false statements in their contracts and agreements
with the Government Plaintiffs**............................................................ **62**

**C.**     **Defendants made false certifications in their contracts and agreements
with the Government Plaintiffs**............................................................ **64**

**IX.**    **CAUSES OF ACTION** .................................................................................... **64**

**A.**     **Federal False Claims Act (31 U.S.C. §§ 3729 *et seq.*)**........................... **64**

**B.**     **District of Columbia Procurement Reform Amendment Act
(D.C. CODE §§ 2-381.01 *et seq.*)** ..................................................... **70**

**C.**     **California False Claims Act (CAL. GOV'T CODE §§ 12650 *et seq.*)** ............ **73**

**D.**     **Delaware False Claims and Reporting Act
(6 DEL. CODE ANN. §§ 1201 *et seq.*)** ............................................... **78**

**E.**     **Florida False Claims Act (FLA. STAT. §§ 68.081 *et seq.*)**................................ **82**

F.    Hawaii False Claims Acts
(HAW. REV. STAT. §§ 661-21 *et seq.*; 46-171 *et seq.*)......................................... 87

G.    Illinois False Claims Act (740 ILL. COMP. STAT. §§ 175/1 *et seq.*) ............. 92

H.    Indiana False Claims and Whistleblower Protection Act
(IND. CODE §§ 5-11-5.5-1 *et seq.*)......................................................................... 96

I.    Iowa False Claims Act (IOWA CODE §§ 685.1 *et seq.*) ................................. 100

J.    Massachusetts False Claims Act
(MASS. GEN. LAWS ANN. ch. 12, §§ 5A *et seq.*)............................................. 104

K.    Minnesota False Claims Act (MINN. STAT. ANN. §§ 15C.01 *et seq.*)......... 109

L.    Montana False Claims Act (MONT. CODE ANN. §§ 17-8-401 *et seq.*)....... 113

M.    Nevada False Claims Act (NEV. REV. STAT. §§ 357.010 *et seq.*)................ 117

N.    New Jersey False Claims Act (N.J. STAT. ANN. §§ 2A:32C-1 *et seq.*)........ 122

O.    New Mexico Fraud Against Taxpayers Act
(N.M. STAT. ANN. §§ 44-9-1 *et seq.*) ................................................................. 126

P.    North Carolina False Claims Act
(N.C. GEN. STAT. ANN. §§ 1-605 *et seq.*)........................................................ 131

Q.    Rhode Island False Claims Act
(R.I. GEN. LAWS ANN. §§ 9-1.1-1 *et seq.*) ...................................................... 135

R.    Tennessee False Claims Act
(TENN. CODE ANN. §§ 4-18-101 *et seq.*)......................................................... 139

S.    Vermont False Claims Act
(VT. STAT. ANN. TIT. 32, §§ 630 *et seq.*) ....................................................... 145

T.    Virginia Fraud Against Taxpayers Act
(VA. CODE ANN. §§ 8.01-216.1 *et seq.*) .......................................................... 149

U.    Chicago False Claims Act
(Chicago, Ill. Mun. Code §§ 1-21-010 *et seq.*) ................................................ 153

V.    False Claims Ordinance of Broward County, Florida
(Code of Broward County, Florida, §§ 1-276 *et seq.*) .................................... 158

W.    Miami-Dade County False Claims Ordinance
(Code of Miami-Dade County, Florida §§ 21-255 *et seq.*) ............................ 162

X.    DEMAND FOR JURY TRIAL................................................................................ 166

iv

## FIRST AMENDED QUI TAM COMPLAINT

1.      On behalf of the United States of America; the District of Columbia; the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Iowa, Minnesota, Montana, Nevada, New Jersey, New Mexico, North Carolina, Rhode Island, Tennessee, and Vermont; the Commonwealths of Virginia and Massachusetts; the City of Chicago; and the Counties of Broward and Miami-Dade, Florida (hereinafter "Government Plaintiffs"), Plaintiff/Relator John Kurzman brings this action pursuant to the Federal False Claims Act, 31 U.S.C. §§ 3729–3732, and the analogous *qui tam* statutes of the above-captioned jurisdictions, and seeks to recover, on behalf of the Government Plaintiffs and on his own behalf, all damages, penalties, and other remedies established by those statutes.  Relator would respectfully show the following:

## I.      INTRODUCTION

2.      Defendants Microsoft Corporation, Microsoft Licensing, G.P., and their licensed resellers (collectively "Defendants") defrauded the Government Plaintiffs out of hundreds of millions of dollars and put government data at risk.

3.      Specifically, Defendants fraudulently induced the Government Plaintiffs and their agencies to enter into contracts and pay for cloud computing services that, contrary to Defendants' representations, do not operate exclusively within a secure "government cloud" but instead operate partially within Microsoft's general "commercial cloud."  The "fake" government cloud services at issue—known as "GCC"—put government data at an increased risk of hacking or other security breaches.

4.      Defendants worked in tandem to procure contracts, and payment under them, from the Government Plaintiffs and their agencies.  Defendants Microsoft Corporation and Microsoft Licensing, G.P. (collectively "Microsoft") do not sell products or services directly to customers.

Instead, sales are made through licensed Microsoft resellers—in this case, Defendants Aerie Consulting, LLC, Alvarez & Associates, LLC, Arctic Information Technology, Inc., CDW Corporation, CDW Government, LLC, Champion Solutions Group, Inc., CompuCom Systems, Inc., Cornerstone IT, Inc., Crayon Software Experts LLC, Dell Marketing, L.P., ECS Federal, LLC, En Pointe Technologies Sales, LLC, The Henson Group, Inc., Imager Software, Inc., InfoReliance LLC, Insight Public Sector, Inc., Intraprise TechKnowlogies LLC, Liftoff, LLC, Lilien, LLC, Minburn Technology Group LLC, PCM, Inc., PCMG, Inc., Planet Technologies, Inc., Procentrix, Inc., ProSum Inc., SHI International Corporation, Softchoice Corporation, Software One, Inc., Solid Networks Inc., Sysorex Government Services, Inc., T4 Technologies, Inc., and Ventech Solutions Inc. (collectively, the "Reseller Defendants").

5.      The Government Plaintiffs and their agencies contracted with the Reseller Defendants to purchase Microsoft products and services, including GCC and its "add-on" services. Concurrently, Microsoft entered into agreements with the Government Plaintiffs and their agencies as part of these contracts, including licensing agreements and business agreements.

6.      In obtaining these contracts and agreements, Defendants made false statements about GCC, via marketing material, websites, and other statements made to representatives of the Government Plaintiffs and their agencies.   In short, Defendants fraudulently induced the Government Plaintiffs to contract with them.

7.      Namely, Microsoft's marketing materials emphasize that its cloud services for government customers (Azure Government)—and its associated datacenters—are exclusive to the government and operate within a segregated "government cloud."  This is true for customers like U.S. Department of Defense contractors.  However, GCC also used Azure Commercial, a "public cloud" which is available to all commercial users within the United States, in non-exclusive

datacenters.  While this alone would put the lie to Microsoft's marketing, the situation is much worse than that.  GCC interfaces with Azure Commercial for some of its *most security-critical* functions, such as identity (username and password) management, password validation, data encryption, and activity logging, putting those at greater risk of breach than Azure Government's government-exclusive cloud.

8.    Azure Commercial's datacenters are global, which also means that GCC customers' data and key GCC operations left the continental United States.  It is particularly troubling that some Azure Commercial datacenters are located in the People's Republic of China and other countries where foreign government actors might improperly view Government Plaintiffs' identity information and/or use it to access their data.

9.    Relying on Defendants' misrepresentations, and attracted by the security purportedly offered by GCC, the Government Plaintiffs and their agencies entered into contracts and agreements with Defendants.  The contracts and agreements themselves further perpetuate Defendants' fraud, stating that GCC interfaces with a government-exclusive "government community cloud", when, in fact, it does not (due to its use of Azure Commercial for key functions).

10.    The deception did not end with the contracts, however.  Microsoft actively hid GCC's partial use of Azure Commercial from Government Plaintiff agency customers.  For example, government users' login portal for GCC appeared to be for Microsoft Azure Government users.  But, had users attempted to log in via the Azure Commercial portal website, they would have seen the truth—that GCC was using the commercial cloud for identities (usernames and passwords).

11.     The Government Plaintiffs have paid hundreds of millions of dollars for "fake" government cloud services that are not as secure and government-exclusive as represented.

12.     Defendants have damaged the Government Plaintiffs by causing them to enter into contracts and pay claims under those contracts for cloud computing services, which they would not have done had they known that GCC was not a true "government cloud."

## II.    JURISDICTION AND VENUE

13.     Jurisdiction and venue are proper in the Southern District of New York pursuant to the False Claims Act (31 U.S.C. § 3732(a)) because Relator seeks remedies on behalf of the United States for multiple violations of the federal False Claims Act, some of which occurred in the Southern District of New York.  Defendants engage in business in the Southern District of New York and are subject to general and specific personal jurisdiction pursuant to 31 U.S.C. § 3732(a) in that the claims for relief in this action are brought on behalf of the United States for multiple violations of the federal False Claims Act.  Pendent jurisdiction is also proper over Relator's state claims under 18 U.S.C. § 3732 and 28 U.S.C. § 1367.

## III.    GOVERNMENT PLAINTIFFS

14.     The Government Plaintiffs in this lawsuit are: the United States of America; the District of Columbia; the States of California, Delaware, Florida, Hawaii, Illinois, Indiana, Iowa, Minnesota, Montana, Nevada, New Jersey, New Mexico, North Carolina, Rhode Island, Tennessee, and Vermont; the Commonwealths of Massachusetts and Virginia; the City of Chicago; and the Counties of Broward and Miami-Dade, Florida.

## IV.    RELATOR JOHN KURZMAN

### A.    Relator's Background and Discovery of the Alleged Fraudulent Scheme

15.    Relator John Kurzman ("Relator" or "Kurzman") worked in information technology security for more than a decade.[1]  Relator worked for Defendant Microsoft Corporation as a Security Global Black Belt ("GBB") for Enterprise Mobility & Security[2] in New York and New Jersey from January 4, 2016 until his termination July 5, 2017 (effective September 4, 2017).

16.    As a Security Global Black Belt, Relator was responsible for being knowledgeable about Microsoft's Enterprise Mobility & Security Suite ("EMS") and two main products within it, Azure Information Protection ("AIP")[3] and Cloud Application Security ("CAS").[4]  EMS, AIP, and CAS were considered "add-ons" for GCC, the cloud service at issue.  Relator was also responsible for identifying and removing "blockers."  A "blocker" in Microsoft's terminology is anything that prevents a sale from occurring or a contract from being signed—either tactically for individual accounts or for an entire market segment, such as Finance, Federal, or State & Local Government ("SLG").

17.    During the relevant period, Relator's acting supervisor was Kevin Bognar ("Bognar"), Senior Director of Solution Sales, and his direct supervisor was Amrit Pal "Roger" Singh ("Singh"), who earlier had been head of Enterprise Mobility & Security Sales for the Americas, and later became the Director of Solution Sales for the Enterprise and Partner Group. Singh worked under Bognar.

---

[1] Relator held a Certified Information Systems Security Professional ("CISSP") certification during the time period at issue.
[2] Relator worked as a Financial GBB initially, until July of 2016.
[3] A complete glossary of acronyms is provided at the end of this document.
[4] Microsoft cloud product offerings are described further *infra* in greater detail.  Relator previously worked for Israeli company Secure Islands—developer of what would become AIP—until that company was acquired by Microsoft.

18.    Relator was tasked primarily with helping to sell AIP and CAS, as part of EMS, to government customers, including customers in the State and Local Government ("SLG") and Federal ("FED") sectors.

19.    Relator's superiors and Microsoft's government sales teams misrepresented to Relator that federal and state government customers for GCC—Microsoft's "fake" government cloud service—were aware that their identities (i.e., usernames and other credentials) were stored in the commercial cloud.

20.    Microsoft markets a "government cloud" product typically under the name "Azure Government" that is exclusive to government users and totally segregated from the general commercial cloud, not all products or services operate exclusively within the government cloud. Often, GCC is lumped in in as a service "for government," and discussed in conjunction with "Azure Government."    GCC was falsely marketed as leveraging Azure Government as an exclusive government cloud separate from the commercial cloud, when in fact GCC interfaced with both Azure Government and the public cloud, Azure Commercial.

21.    Relator first learned about GCC's true nature in August of 2016, but he was continually told by superiors that customers knew the truth or that the contractual language stated the truth.    However, as Relator would eventually discover, this was not the case—Microsoft's deceptive marketing and representations to the Government Plaintiffs misleadingly referenced government-exclusive services and Azure Government, without truthfully disclosing GCC's partial use of Azure Commercial.

22.    Relator reported and sought to stop security issues with GCC and its EMS add-ons beginning in September of 2016.    On September 2, 2016, Relator emailed Adrian Michels and others in response to a query about "blockers" for CAS.    **Ex. 16** (email with Michels and others

(Sept. 2, 2016)), at 2.  Relator reported that CAS could not be sold to government customers because it did not operate completely within a government community cloud, and because it put government data at risk by operating as it did—within Azure Commercial.  Relator went on to describe the exact information put at risk by CAS's use of Azure Commercial:  Social Security numbers, credit card numbers, and employee identification numbers.  *See id.*  Within this same email, Relator reported other issues regarding GCC's operations in Azure Commercial, including that government customers "most concerned about Security/Govt requirements cannot use Commercial Cloud for identity."  *Id.*, at 3.

23.    During October of 2016, Relator communicated with relevant product and sales teams at Microsoft regarding the need to get AIP and CAS working entirely within Azure Government, instead of interfacing with Azure Commercial.  On October 12, 2016, Relator learned from Program Manager Rue Limones ("Limones") that government customers "would have to give explicit consent" in order to install CAS because it effectively leaks data into the commercial cloud.  **Ex. 17** (emails with Limones (Oct. 13, 2016)), at 3.  After learning this, Relator suggested to Limones: "rather than getting the customer to explicitly consent to additional risk, what about actually running CAS in the Government cloud so that they don't have to be notified of this [security] gap?"  *Id.*, at 1.

24.    In November of 2016, Singh and Bognar traveled to Israel to meet with Adallom and Secure Islands management regarding CAS and AIP.  Although Relator had discussed with Singh that the security issues with CAS and AIP for GCC customers were a priority, Relator learned on November 15, 2016 that neither Singh nor Bognar had discussed these issues at their meetings in Israel.  *See* **Ex. 18** (email with Singh (Jan. 17, 2017)), at 3.

25.    In January of 2017, Microsoft selected the Port Authority of New York and New Jersey ("PANYNJ") to be a "test" customer for AIP and other Enterprise Mobility and Security features.

26.    AIP operates partially in Azure Commercial.  At that time, for PANYNJ or any GCC customer to use AIP, its administrator would have to log in through the Azure Commercial cloud portal.  Around January 17, 2017, Relator, Azure RMS Senior Program Manager Michael Levin ("Levin"), and Microsoft's NYC Cloud Strategist Mohammed Abdelhadi ("Abdelhadi") spoke to PANYNJ via telephone about installing AIP.  Relator and Levin directed PANYNJ's administrator to log in to the Azure Commercial portal in order to install AIP.  On this call, PANYNJ was shocked to find that the identities of its users were stored in Azure Commercial after logging in.  *See* **Ex. 19** (emails with Singh and others).  PANYNJ reacted with surprise that their alleged "government-only" username and password allowed them to log in to Azure Commercial, and that their alleged "government-only" user information appeared there.  Microsoft's PANYNJ contacts then asked where their identities were kept, and how they could tell.  They also questioned what other services were not in the government cloud (Azure Government).  This initially caused difficulties, and Relator was blamed for "unselling" EMS to PANYNJ.

27.    Relator followed up on the PANYNJ issue with Singh, Levin, and other Microsoft employees in a January 18, 2017 email:

> Port Authority was asking where their identities were being kept as well as how they could tell, and what else was not in the government cloud that they were seeing [in] their Gcc.us portal.
>
> Michael Levin confirmed (internally) that there is NO copy of their identities in Fairfax [the true government cloud], their identities are purely in commercial cloud.
>
> And when I look at items such as [a public Microsoft website describing GCC offerings] which show 'YES' for "Cloud Identity" in all flavors of US Government Community offerings without notice of 'not in government cloud', I could now understand the customer's confusion.  They see it all in their .us government portal

as if it[']s in the government cloud, as well as in the [Microsoft GCC website], and only because they also see the data when they authenticate into the commercial .com portal to access CAS or AIP for instance, can they see that obviously it is in the public cloud (or a copy). . . .  Need to discuss how to respond to Port Authority, and what this may mean to other customers.

**Ex. 19** (emails with Singh and others (Jan. 22, 2017)), at 2.

28.     Around this time, Microsoft directed Relator and others to put marketing and sales of AIP and CAS to GCC customers "on hold"—not because of security issues, but because installing these products would cause GCC customers to realize that their identities resided in the commercial cloud.  However, sales of GCC and EMS continued—despite the fact that those services also utilize Azure Commercial for identities.  Furthermore, EMS automatically includes CAS—it just requires activation by the customer.

29.     On January 24, 2017, Relator received an email raising concerns about another possible "Port Authority Moment," referencing what had occurred with PANYNJ.  **Ex. 66** (emails with Kelbley and others (Jan. 24, 2017)), at 3.  Relator responded, inquiring whether customers truly knew if their identities were in the commercial cloud, and suggesting that this issue be "covered up front" to avoid deception.  *Id.*, at 2.  John Kelbley ("Kelbley"), Cloud Solution Specialist for the SLG team, replied:

> Please let me be clear, WE NEED TO STOP MAKING A BIG DEAL ABOUT THE AIP PORTAL BEING IN COMMERCIAL . . .
>
> Sashimi is raw fish, but that's not how it is 'presented' to customers.  How identities are stored and accessed is a fact not a question, and this is the available deployment mode for AIP. . . .  We do not need to create unnecessary conflict [and] controversy in the minds of our customers.

*Id*, at 1–2.

30.     On January 25, 2017, at a meeting with Relator and Singh, Bognar attacked Relator for his lack of sales and told Relator that the security issues with selling AIP and CAS to

government customers "are 'bigger than us[.]'" **Ex. 20** (emails with Singh and others (Feb. 3, 2017)), at 4.

31.    On February 10, 2017, another Microsoft employee relayed to Relator an instruction from Singh to Relator not to sell AIP to government customers because it was not worth the risk of the customer discovering that identities were stored in the commercial cloud.

32.    On February 16, 2017, Relator emailed Kelbley regarding the issue with PANYNJ:

> The issue is we must tell them they are logging into the non-gcc commercial Cloud to administer [a]ip from a safety and honesty perspective. They then are told they can use their gcc id/password to do So. . . . Then they login to that commercial Cloud and see the rest of their identities. Another flag for them. We were operating this whole time on the understanding that customers knew their identities were in the commercial Cloud, and the big question is whether other customers would freak out similarly. What do you think?

**Ex. 23** (emails with Kelbley (Feb. 16, 2017)), at 2–3.

33.    On February 21, 2017, Relator sent an extensive summary of potential safety and security issues with AIP and CAS to a group including Villinski, Duddu, Levin, West, and Limones. *See* **Ex. 25** (emails with Villinski and others (Feb. 21, 2017)), at 1–2. Relator stressed the importance of informing GCC customers that some data might leak into the commercial cloud (Azure Commercial), utilizing splashscreens or other warnings to alert GCC users when they leave the government cloud (Azure Government), and to make sure that GCC customers understood which components operated in Azure Commercial. *See id.*

34.    On March 31, 2017, Relator emailed Director of Product Marketing Adam Baron ("Baron") about a presentation Baron had recently given about EMS. *See* **Ex. 27** (emails with Baron (Mar. 31, 2017)), at 1–2. Relator outlined how certain slides in Baron's PowerPoint could mislead government customers as to how AIP, CAS, and other EMS components operate. *See id.* Relator noted that customers should be informed about those products' partial Azure Commercial usage "to minimize surprise and issues[.]" *Id.*, at 1. Relator also discussed the security issue with

CAS leaking data into the commercial cloud and the need to notify customers when they leave a secure area of the government cloud.  *See id*, at 2.

35.    Relator reported more potential security and compliance risks with CAS to Singh and others on April 3, 2017, questioning whether customer content was leaving the United States and the government cloud, and whether customers were aware of that.  *See* **Ex. 28** (emails with Meyer and others (Apr. 3, 2017)), at 1–4.  Most GCC customers are subject to requirements that forbid their data from leaving the continental United States.

36.    On April 6, 2017, Relator, Singh, and Baron discussed GCC in a Skype teleconference.  Relator was told by Singh and Baron that AIP revealed issues with GCC that Microsoft did not want exposed to the customer, and that as a result, they would postpone sales of AIP.  At that time, Relator realized for certain that what the SLG and FED teams had told him was false—**Microsoft had not told government GCC customers that their identities resided in the commercial cloud (Azure Commercial).**

37.    Throughout 2017, Relator continued to email key players at Microsoft regarding potential safety, security, compliance, and mis-marketing issues with AIP, CAS, and GCC.  *See* **Ex. 20**, at 2–3; **Ex. 21** (emails with West and others (Jan. 31, 2017)); **Ex. 23**, at 2–3; **Ex. 25**, at 1–2; **Ex. 28**, at 1–4; **Ex. 29** (email with Singh (May 24, 2017)), at 1–2.  Relator noted in one of those emails that Microsoft "has a chance to get ahead of these issues before sensitive customer data is leaked because of this; . . . or States/Fed make issues for refunds or damages, etc." **Ex. 29**, at 2.

38.    One of Relator's last emails to Singh makes Defendants' fraud on the Government Plaintiffs as clear as day:

> Identities for GCC customers – this has been a big project.  Moving [identities to the true government cloud] was considered.  I'm not dictating where or how this is resolved, the issue is that

i. [W]e SHOW CUSTOMERS THEIR IDENTITIES ARE IN THE GOV[ERNMENT] CLOUD IN THE GOV[ERNMENT] CONSOLE, WHICH IS NOT TRUE

ii. datasheets and marketing materials and [Microsoft's website] reflect same, which is not true, comingling gcc and [Azure] defense[, the true government cloud,] information together.

**Ex. 1** (email with Singh & Case (June 23, 2017)), at 1.  However, no corrective action was taken.

39.    Relator's position was eliminated, as well as the positions of some other Microsoft employees, on July 6, 2017, effective September 4, 2017.  All eliminated employees in Relator's team except for Relator were offered new positions within Microsoft.

40.    Between July 6, 2017 and his termination date of September 4, 2017, Relator continued to receive a salary, but was told that he did not need to perform any work for Microsoft. Despite his pending termination, Relator strove to stop the ongoing fraud on the Government Plaintiffs (emailing several high-level Microsoft executives about the ongoing security issues with GCC. *See, e.g.*, **Ex. 33** (emails with Bharat Shah (July 6, 2017)), at 1; **Ex. 36** (emails with Bharat Shah and Dan Plastina (July 6, 2017)), at 1–2.[5]

41.    Despite Relator's continued reports of and efforts to stop both security issues with GCC and deceptive marketing and statements regarding Microsoft's government cloud offerings, Defendants' fraudulent scheme continued.

**B.    Original Source; No Disclosures**

42.    There are no bars to recovery under 31 U.S.C. § 3730(e), or in the alternative, Relator is an original source as defined therein.  Relator has direct and independent knowledge of the information on which he bases his allegations.  To the extent that any allegations or transactions herein have been publicly disclosed, Relator has independent knowledge that materially adds to

---

[5] At that time, Bharat Shah was Microsoft's Vice President of Security and Dan Plastina was Microsoft's Partner Director of Threat Protection.

any publicly disclosed allegations or transactions and provided this information to the United States and the Government Plaintiffs prior to filing his original Complaint.

## V.    DEFENDANTS

**A.    Microsoft**

**1. Microsoft Corporation**

43.    Microsoft Corporation is incorporated in the State of Washington and conducts business nationwide.  Its principal executive office is located at 1 Microsoft Way, Redmond, WA 98052-6399.  It also maintains a corporate sales office at 11 Times Square, New York, NY 10036.

44.    Microsoft Corporation is publicly traded on the New York Stock Exchange under the ticker symbol "MSFT."

45.    Microsoft Corporation entered into agreements with the Government Plaintiffs and their agencies related to cloud computing services, licenses, and products, described in further detail *infra*.

**2. Microsoft Licensing, G.P.**

46.    Microsoft Licensing, G.P. is a Nevada general partnership which does business nationwide.  Its executive office is located at 6100 Neil Road, Suite 100, Reno, NV 89511.

47.    Microsoft Licensing, G.P. entered into agreements with some of the Government Plaintiffs and their agencies and subdivisions related to the cloud computing services, licenses, and products at issue, as shown below:

| Government Plaintiff | Contracting Subdivision or Agency of Government Plaintiff | Licensed Microsoft Reseller Defendant Affiliated with Associated Sale(s) | Agreement Name | Approximate Agreement Date |
|---|---|---|---|---|
| State of Florida | Charlotte County | SHI International, Inc. | Enterprise Enrollment | Late 2014 |
| State of Florida | Manatee County | SHI International, Inc. | Enterprise Enrollment | 2016 |
| State of Nevada | City of Las Vegas Metro Police Dep't | SHI International, Inc. | Enterprise Vol Licensing Agreement | Aug. 1, 2016 |
| State of New Mexico | Los Alamos County | SHI International, Inc. | Enterprise Enrollments | July 2014; June 2015 |

**B.    Reseller Defendants**

48.    Microsoft Corporation and Microsoft Licensing, G.P. do not sell products; instead, Microsoft products are sold by licensed resellers.  All invoices and price quotes for Microsoft products issued to the Government Plaintiffs were issued by licensed resellers on their letterhead. The following defendants (collectively, "Reseller Defendants") were Microsoft's licensed resellers for the contracts at issue in this case, issued all price quotations and invoices, and entered into contracts with the Government Plaintiffs and their agencies for the sale of Microsoft cloud computing products and services.  These contracts are described further *infra*.

49.    Under their contracts with the Government Plaintiffs, the Reseller Defendants listed below often sold additional products and GCC "add-ons" to the Government Plaintiffs, including but not limited to Microsoft's Windows 10 operating system, Microsoft Office 365, and Microsoft's Enterprise Mobility and Security Suite ("EMS").

**1.    Aerie Consulting, LLC**

50.    Aerie Consulting, LLC ("Aerie") is a Vermont limited liability company.  Its principal executive office is located at 110 West Canal Street, Suite 201, Winooski, VT 05404. Aerie is a licensed Microsoft reseller.

51.     From at least 2016 to the present, Aerie entered into contracts with and sold GCC to the State of Vermont and its local governments, totaling approximately 700 GCC "seats" (users). Under these contracts, Aerie also sold approximately 365 EMS licenses to the State of Vermont.

### 2.     Alvarez & Associates, LLC

52.     Alvarez & Associates, LLC ("Alvarez") is a Virginia limited liability company which does business nationwide.  Its principal place of business is 8251 Greensboro Drive, Suite 230, Tysons Corner, VA 22102.  Alvarez is a licensed Microsoft reseller.

53.     From at least 2016 to the present, Alvarez entered into contracts with and sold approximately 46,854 seats of GCC and approximately 6,885 EMS licenses to the federal Department of Energy.  These contracts are described *infra* in further detail.

### 3.     Arctic Information Technology, Inc.

54.     Arctic Information Technology, Inc. is an Alaska corporation which does business nationwide.  Its principal executive office is at 375 West 36th Avenue, Suite 300, Anchorage, AK 99503.  Arctic Information Technology is a licensed Microsoft reseller.

55.     Arctic Information Technology, Inc. executed contracts with and sold approximately 12,004 seats of GCC and 8,700 EMS licenses to the United States Department of Housing and Urban Development ("HUD") from at least 2015 to the present.

56.     Arctic Information Technology, Inc., executed contracts with and sold approximately 65,256 seats of GCC and approximately 9,530 EMS licenses to the United States Department of Commerce, from at least 2016 to the present.

57.     Arctic Information Technology, Inc. executed contracts with and sold over 850 seats of GCC to the United States Department of the Interior from at least 2016 to the present.

Under those contracts, Arctic Information Technology, Inc. also sold EMS to the Department of the Interior.

### 4. CDW Corporation

58. CDW Corporation ("CDW") is a Delaware corporation which does business nationwide. Its principal executive office is located at 75 Tri-State International, Lincolnshire, IL 60069. CDW is a licensed Microsoft reseller.

59. CDW entered into contracts with the following Government Plaintiffs and their agencies and subdivisions, and sold GCC to those Government Plaintiffs, agencies, or subdivisions from at least 2016 to the present. Under those contracts, CDW also sold additional cloud products to the following Government Plaintiffs, as indicated:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| United States | Broadcasting Board of Governors | 1,600 | Intune |
| United States | Dep't of Energy Headquarters | 12,325 | EMS |
| United States | Dep't of Justice | 155 | EMS |
| United States | Dep't of State | 480 | Cloud Application Security ("CAS"), EMS, RMS |
| United States | Government Printing Office | 400 | EMS |
| United States | National Aeronautics & Space Administration (NASA) | 20 | EMS, RMS |
| State of California | Local Governments | 7,732 | Intune, EMS, RMS |
| State of Indiana | County of Hamilton | 1,100 | EMS |
| State of Minnesota | Local Governments | 3,233 | Intune, EMS, RMS |
| State of Vermont | Department of Buildings & General Services | 10,525 | EMS |
| | **TOTAL** | 39,820 | |

CDW's contracts are described *infra* in further detail.

5.    **CDW Government, LLC[6]**

60.    CDW Government, LLC, is an Illinois limited liability company doing business nationwide.  Its principal office is located at 200 North Milwaukee Avenue, Vernon Hills, IL 60061.  CDW Government, LLC, is a licensed Microsoft reseller.

61.    CDW Government, LLC, entered into contracts with and sold GCC to the Pension Benefit Guaranty Corporation, a federal agency, from approximately 2012 to 2014.

62.    Since 2012, CDW Government, LLC, has entered into contracts with and sold approximately 34,222 seats of GCC to the City of Chicago, Illinois, pursuant to a statewide contract with the State of Illinois' Central Management Services.

63.    Since October 1, 2015, CDW Government, LLC, has entered into contracts with and sold approximately 31,957 seats of GCC to the State of Illinois and its political subdivisions.

64.    CDW Government, LLC, entered into contracts with and sold GCC to the following Government Plaintiffs and their agencies and subdivisions from at least 2016 to the present.  Under those contracts, CDW Government, LLC also sold additional cloud products to the following Government Plaintiffs, as indicated:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| United States | National Institutes of Health | 28,851 | Intune, EMS |
| United States | United States Agency for International Development (USAID) | 200 | EMS |
| State of Florida | Lee County | 136 | AIP |
| State of Florida | City of Cape Coral | 1,182 | |
| State of Florida | City of Gainesville | 2,000 | |
| State of Florida | City of Melbourne | 870 | |
| State of Illinois | Local Governments | 4,293 | Intune, EMS, RMS |
| State of Illinois | Cook County | 16,700 | EMS |
| State of Illinois | DuPage County | 405 | |
| State of Illinois | Lake County | 3,387 | |

---

[6] Formerly known as CDW Government, Inc.

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| State of Illinois | City of Bloomington | 50 | |
| State of Illinois | City of Joliet | 451 | |
| State of Illinois | City of Peoria | 750 | |
| Commonwealth of Massachusetts | n/a | 320 | EMS |
| Commonwealth of Massachusetts | City of Cambridge | 1,650 | |
| State of Minnesota | Three Rivers Park District | 500 | EMS |
| State of New Jersey | Bergen County | 12 | |
| | **TOTAL** | 61,757 | |

CDW Government, LLC's contracts are described *infra* in further detail.

### 6.    Champion Solutions Group, Inc.

65.    Champion Solutions Group, Inc. ("Champion") is a Delaware corporation doing business nationwide.  Its principal office is located at 791 Park of Commerce Boulevard, Suite 200, Boca Raton, FL 33487.  Champion is a licensed Microsoft reseller.

66.    Champion entered into a contract with and sold approximately 1,715 seats of GCC to Brevard County, Florida from at least 2016 to the present.

### 7.    CompuCom Systems, Inc.

67.    CompuCom Systems, Inc. ("CompuCom") is a Delaware corporation doing business nationwide.  Its corporate headquarters are located at 8106 Calvin Hall Road, Fort Mill, SC 29707.  CompuCom is a licensed Microsoft reseller.

68.    Since 2012, CompuCom has entered into contracts with the City of Palo Alto, California and sold it 1,100 seats of GCC.

69.    Since 2014, CompuCom has entered into contracts with and sold over 800 seats of GCC (including Office 365) to the Alameda-Contra Costa Transit Authority ("AC Transit").

70.     Since 2014, CompuCom has entered into contracts with and sold over 765 seats of GCC to the City of Fairfield, California.

71.     Since November of 2014, CompuCom has entered into contracts with and sold approximately 804 seats of GCC to the City of San Mateo, California.

72.     Since April of 2015, CompuCom has entered into contracts with and sold approximately 6,179 seats of GCC to the City of Sacramento, California.

73.     From at least 2016 to the present, CompuCom entered into contracts with the following subdivisions or agencies of the State of California.  Under these contracts, CompuCom sold GCC and additional cloud products to the State of California as indicated below:

| Subdivision or Agency of the State of California | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
| --- | --- | --- |
| City of Salinas | 750 | |
| City of Santa Monica | 1,332 | EMS |
| **TOTAL** | 2,082 | |

CompuCom's contracts are described *infra* in further detail.

**8.     Cornerstone IT, Inc.**

74.     Cornerstone IT, Inc. ("Cornerstone") is an Ohio corporation doing business nationwide.  Its principal office is located at 7333 Corporate Boulevard, Mentor, OH 44060.  Cornerstone is a licensed Microsoft reseller.

75.     Cornerstone entered into a contract with and sold approximately 4,433 seats of GCC to the State of Florida and its local governments from at least 2016 to the present.  Under those contracts, Cornerstone also sold RMS and EMS to Florida state local governments.

### 9. Crayon Software Experts LLC

76.    Crayon Software Experts LLC ("Crayon") is a Delaware limited liability company doing business nationwide.  Its principal executive office is located at 12221 Merit Drive, Suite 800, Dallas, TX 75251.  Crayon is a licensed Microsoft reseller.

77.    On or around May 16, 2017, Crayon entered into a contract with and sold approximately 150 seats of GCC to Stanislaus County, California.  This contract is described further *infra*.

### 10. Dell Marketing, L.P.

78.    Dell Marketing, L.P. (hereinafter "Dell Marketing") is a Texas limited partnership which does business nationwide.  Its principal executive office is located at 1 Dell Way, Round Rock, TX 78682.  Dell Marketing is a licensed Microsoft reseller.

79.    From 2012 to the present, Dell Marketing has entered into contracts with and sold over 47,000 seats of GCC to the United States Air Force Air Combat Command.

80.    Since June 1, 2012, Dell Marketing has entered into contracts with and sold over 900 seats of GCC to the Delaware River Port Authority, an agency of the State of New Jersey.

81.    Dell Marketing entered into a statewide contract with the State of North Carolina in 2014, which expired on June 30, 2017.  Under that contract, Dell Marketing sold GCC to the State of North Carolina and its local governments.

82.    Since August 1, 2015, Dell Marketing has entered into contracts with and sold over 815 seats of GCC and over 900 EMS licenses to Camden County, New Jersey.

83.    Since at least September 1, 2015, Dell Marketing has entered into contracts with the State of Rhode Island and the Operational Services Division of the Commonwealth of Massachusetts and sold GCC to them.  Under those contracts, Dell Marketing has sold the State of Rhode Island over 8,508 seats of GCC, over 100 Intune licenses, and over 1,286 EMS licenses.

Under those contracts, Dell Marketing has also sold over 4,438 seats of GCC to the Commonwealth of Massachusetts, as well as EMS, AAD, and RMS.

84.    Since 2017, Dell Marketing has entered into contracts with and sold over 1,300 seats of GCC and over 1,300 EMS licenses to Middlesex County, New Jersey.

85.    Dell Marketing entered into contracts with and sold GCC to the following Government Plaintiffs and their agencies and subdivisions from at least 2016 to the present. Under these contracts, Dell Marketing also sold the following Government Plaintiffs the additional cloud products indicated below:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| United States | U.S. Army | 180 | |
| United States | U.S. Coast Guard | 560 | |
| United States | Central Intelligence Agency | 300 | |
| United States | Dep't of Defense: Army & Air Force Exchange Services (AAFES) | 25 | EMS |
| United States | Dep't of Education | 6,450 | |
| United States | Dep't of Homeland Security Headquarters | 59,000 | |
| United States | Dep't of Veterans Affairs | 12,300 | |
| United States | Federal Emergency Management Agency (FEMA) | 29,850 | |
| United States | Office of Personnel Management | 7,175 | |
| United States | Railroad Retirement Board | 378 | |
| United States | Transportation Security Administration (TSA) | 100 | |
| District of Columbia | Office of the Chief Technology Officer | 300 | EMS |
| State of California | Dep't of General Services | Over 100,000 | |
| State of California | City of Fresno | 10 | EMS |
| State of Indiana | Dep't of Administration | 4,682 | EMS |
| State of Indiana | Local Governments | 1,342 | EMS, RMS |
| State of Indiana | City of Indianapolis & Marion County | 9,226 | |

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| Commonwealth of Massachusetts | City of Worcester | 1,500 | |
| State of Montana | Local Governments | 36 | AIP, EMS, RMS |
| State of New Jersey | n/a | 31,802 | EMS |
| State of New Jersey | Local Governments | 2,706 | EMS, RMS |
| State of New Jersey | Essex County | 800 | |
| State of New Jersey | Morris County | 1,300 | EMS |
| State of North Carolina | Brunswick County | 261 | EMS |
| State of North Carolina | City of Fayetteville | 1,310 | |
| State of North Carolina | City of Greensboro | 150 | |
| State of North Carolina | City of Rocky Mount | 1,450 | |
| State of Tennessee | Dep't of General Services | 38,836 | EMS, RMS |
| State of Tennessee | Davidson County and City of Nashville | 300 | EMS |
| State of Tennessee | Rutherford County | 125 | |
| State of Tennessee | City of Memphis | 8,018 | |
| | **TOTAL** | Over 327,236 | |

Dell Marketing's contracts are described *infra* in further detail.

**11.    ECS Federal, LLC**

86.    ECS Federal, LLC ("ECS") is a Delaware limited liability company doing business nationwide.  Its corporate headquarters are located at 2750 Prosperity Avenue, Suite 600, Fairfax, VA 22031.  ECS is a licensed Microsoft reseller.

87.    Defendant InfoReliance LLC (formerly known as InfoReliance Corporation) has been a wholly-owned subsidiary of ECS since April of 2017.

**12.    En Pointe Technologies Sales, LLC**

88.    En Pointe Technologies Sales, LLC ("En Pointe") is a Delaware limited liability company doing business nationwide.  Its corporate headquarters are located at 1940 East Mariposa Avenue, El Segundo, CA 90245.  En Pointe is a licensed Microsoft reseller.

89.    En Pointe entered into contracts to sell GCC to the following Government Plaintiffs and their agencies and subdivisions from at least 2016 to the present.  Under these contracts, En Pointe also sold additional cloud products as indicated below:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| State of California | City and County of San Francisco | 45,923 | EMS |
| State of California | City of Oakland | 3,827 | |
| State of Hawaii | City and County of Honolulu | 2,630 | |
| State of Hawaii | County of Hawaii | 1,600 | |
| State of Hawaii | County of Maui | 123 | |
| State of Nevada | City of Sparks | 745 | |
| State of Rhode Island | Local Governments | 223 | |
| | **TOTAL** | 55,071 | |

90.    En Pointe was acquired by Defendant PCM, Inc. in 2015 and became its subsidiary.

**13.    The Henson Group, Inc.**

91.    The Henson Group, Inc. ("Henson") is a New York corporation that does business nationwide.  Its principal executive office is located at 1 World Trade Center, 85th Floor, New York, NY 10018.  Henson is a licensed Microsoft reseller.

92.    Henson entered into contracts with the State of New Jersey and its local governments, and sold GCC to them from at least 2016 to the present.  Under these contracts, Henson also sold the State of New Jersey and its local governments the additional cloud products indicated below:

| Subdivision of the State of New Jersey | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|
| Atlantic County | 1,001 | EMS |
| Burlington County | 200 | |
| Jersey City | 678 | |
| **TOTAL** | 1,879 | |

14. **Imager Software, Inc., d/b/a ISC**

93.     Imager Software, Inc. (hereinafter "ISC") is a Florida corporation doing business as ISC.  Its principal office is located at 3122 Mahan Drive, Tallahassee, FL 32308.  ISC is a licensed Microsoft reseller.

94.     ISC entered into a contract with and sold approximately 113,875 seats of GCC to the State of Florida and its agencies from at least 2016 to the present.  Under these contracts, ISC also sold RMS and EMS to the State of Florida.

15. **InfoReliance LLC, f/k/a InfoReliance Corporation**

95.     InfoReliance LLC, formerly InfoReliance Corporation ("InfoReliance"), is a Virginia limited liability company which formerly operated as a Virginia corporation.  Its principal executive office is located at 2750 Prosperity Avenue, Suite 600, Fairfax, VA 22031.  InfoReliance is a licensed Microsoft reseller.

96.     From at least 2014 to the present, InfoReliance entered into contracts with and sold approximately 18,960 seats of GCC to the federal Department of Labor.

97.     From at least 2014 to the present, InfoReliance entered into contracts with and sold approximately 13,863 seats of GCC, over 11,069 EMS licenses, and over 1,800 RMS licenses to the federal Department of Health and Human Services.

98.     InfoReliance was acquired by and is now a wholly-owned subsidiary of Defendant ECS Federal, LLC.

99.     InfoReliance's contracts are described *infra* in further detail.

16. **Insight Public Sector, Inc., a/k/a Insight Enterprises, Inc.**

100.    Insight Public Sector, Inc. ("Insight"), also known as Insight Enterprises, Inc., is an Illinois corporation that does business nationwide.  Its principal executive office is located at 6820

South Harl Avenue, Tempe, AZ 85283.  Insight also maintains a satellite sales office at 1450 Broadway, 21st Floor, New York, NY 10018.  Insight is a licensed Microsoft reseller.

101.    Since 2012, Insight has entered into contracts with Riverside County, California and sold the County approximately 18,125 seats of GCC and over 17,890 EMS licenses.

102.    On August 29, 2013, Insight entered into a contract with the United States Postal Service ("USPS").    To date, Insight has sold approximately 41,726 seats of GCC and approximately 49 EMS licenses to USPS.

103.    Since December of 2014, Insight has entered into contracts with and sold approximately 3,892 seats of GCC to Monterey County, California.  Under those contracts, Insight also sold AIP and EMS to Monterey County.

104.    Since May 2, 2017, Insight has entered into contracts with and sold GCC to Miami-Dade County, Florida.

105.    Since January 1, 2017, Insight entered into contracts with and sold approximately 21,618 seats of GCC to Orange County, California.    Under those contracts, Insight also sold Orange County Intune, EMS, and RMS.

106.    Additionally, from at least 2016 to the present, Insight entered into contracts with and sold GCC to the following Government Plaintiffs and their agencies and subdivisions.  Under those contracts, Insight also sold the following Government Plaintiffs additional cloud products as indicated:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| United States | Environmental Protection Agency | 63,040 | EMS |
| United States | Federal Reserve System | 4,419 | EMS |
| United States | Department of the Navy | 727 | EMS |
| State of California | City of Orange | 800 | |

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| State of Iowa | n/a | 630 | Intune, AIP, EMS, RMS |
| State of Iowa | Polk County | 5 | |
| State of Iowa | City of Cedar Rapids | 35 | |
| State of Iowa | City of Des Moines | 473 | |
| State of Iowa | City of West Des Moines | 590 | |
| Commonwealth of Virginia | Fairfax County | 15,270 | EMS |
| | **TOTAL** | 85,989 | |

Insight's contracts are described *infra* in further detail.

### 17.    Intraprise TechKnowlogies LLC

107.    Intraprise TechKnowlogies LLC ("Intraprise") is a Hawaii limited liability company.  Its principal office is located at 1110 Nuuanu Avenue #18, Honolulu, HI 96817.  Intraprise is a licensed Microsoft reseller.

108.    Intraprise entered into contracts with and sold over 700 seats of GCC to the State of Hawaii and its agencies and local governments from at least 2016 to the present.

### 18.    Liftoff, LLC

109.    Liftoff, LLC ("Liftoff") is a Delaware corporation that does business nationwide.  Its corporate headquarters are located at 2138 Priest Bridge Court, Suite 120, Crofton, MD 21114.  Liftoff is a licensed Microsoft reseller.

110.    From at least 2016 to the present, Liftoff entered into contracts with and sold: (1) over 920 seats of GCC to the State of Tennessee and its local governments; and (2) over 1,703 seats of GCC to the Commonwealth of Virginia and its local governments.  Liftoff also sold approximately 32 EMS licenses to the State of Tennessee and approximately 250 EMS licenses to the Commonwealth of Virginia and its local governments.

### 19.     Lilien, LLC, a/k/a Lilien Systems

111.     Lilien, LLC ("Lilien"), also known as Lilien Systems, is a Delaware limited liability company which does business nationwide.  Its principal executive office is located at 17 East Sir Francis Drake Boulevard, Suite 110, Larkspur, CA 94939-1708.  Lilien is a licensed Microsoft reseller.

112.     From at least 2016 to the present, Lilien entered into contracts with and sold approximately 545 seats of GCC to Sacramento County, California.

113.     Lilien is a subsidiary of Sysorex Government Services, Inc., a Virginia corporation.

### 20.     Minburn Technology Group LLC

114.     Minburn Technology Group LLC ("Minburn") is a Virginia limited liability company that does business nationwide.  Its principal executive office is located at 10113 Minburn Street, Great Falls, VA 22066.  Minburn is a licensed Microsoft reseller.

115.     From at least 2016 to the present, Minburn entered into contracts with and sold GCC to the following Government Plaintiffs:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold |
|---|---|---:|
| United States | Department of the Treasury | 150 |
| United States | Internal Revenue Service | 186,000 |
| United States | Securities and Exchange Commission (SEC) | 6,000 |
| United States | Small Business Administration | 3,500 |
| United States | Special Operations Command | 4,000 |
|  | **TOTAL** | 199,650 |

Minburn's contracts are described *infra* in further detail.

### 21.     PCM, Inc.

116.     PCM, Inc. is a Delaware corporation doing business nationwide.  Its corporate headquarters are located at 1940 East Mariposa Avenue, El Segundo, CA 90245.  It also maintains

a satellite sales office at 1 Penn Plaza, 36th Floor, New York, NY 10119. PCM, Inc. is publicly traded on the New York Stock Exchange under the ticker symbol "PCM."

117.    Defendants En Pointe Technologies Sales, LLC and PCMG, Inc. are subsidiaries of PCM, Inc.

**22.    PCMG, Inc. d/b/a PCM Gov, Inc.**

118.    PCMG, Inc. ("PCMG") is a Delaware corporation that does business nationwide as PCM Gov, Inc.  Its corporate headquarters are located at 13755 Sunrise Valley Drive, Suite 750, Herndon, VA 20171.  PCMG is a licensed Microsoft reseller.

119.    Beginning in September of 2015, PCMG entered into contracts with and sold approximately 108,936 seats of GCC and over 23,371 EMS licenses to the City and County of Los Angeles, California, pursuant to a contract with the Los Angeles County Community Development Commission.  These contracts were paid with federal funds provided by the U.S. Department of Housing and Urban Development.

120.    From at least 2016 to the present, PCMG entered into contracts with the States of California and Minnesota and their local governments, and sold GCC to them, as shown below. Under those contracts, PCMG also sold the following Government Plaintiffs additional cloud products as indicated:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---:|---|
| State of California | Fresno County | 30 | |
| State of California | San Mateo County | 6,022 | EMS |
| State of California | Tuolumne County | 642 | |
| State of California | City of Roseville | 1,100 | |
| State of California | City of San Jose | 9,195 | |
| State of Minnesota | Washington County | 35 | EMS |
| State of N.Carolina | City of Winston-Salem | 130 | |
| | **TOTAL** | 17,154 | |

PCMG's contracts are described *infra* in further detail.

121.    PCMG is a subsidiary of Defendant PCM, Inc.

**23.    Planet Technologies, Inc.**

122.    Planet Technologies, Inc. ("Planet") is a Delaware corporation that does business nationwide.  Its corporate headquarters are located at 20400 Observation Drive, Suite 107, Germantown, MD 20876.  It also maintains a satellite sales office in New York City.  Planet is a licensed Microsoft reseller.

123.    From at least 2016 to the present, Planet entered into contracts with and sold GCC to the following Government Plaintiffs and their agencies and subdivisions.  Under those contracts, Planet also sold the following Government Plaintiffs additional cloud products as indicated:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| United States | Dep't of Defense: Defense Commissary Agency (DeCA) | 200 | |
| State of California | State Government Operations | 3,343 | |
| State of California | Madera County | 50 | |
| State of California | San Joaquin County | 297 | |
| State of Florida | City of Clearwater | 100 | |
| State of Florida | City of Daytona Beach | 4 | |
| State of New Jersey | Cape May County | 650 | |
| State of N. Carolina | Buncombe County | 1,690 | |
| State of N. Carolina | Orange County | 157 | |
| State of N. Carolina | Surry County | 655 | |
| State of N. Carolina | City of Greenville | 530 | EMS |
| | **TOTAL** | 8,419 | |

Planet's contracts are described *infra* in further detail.

**24.    Procentrix, Inc.**

124.    Procentrix, Inc. ("Procentrix") is a Virginia corporation.  Its corporate headquarters are located at 2201 Cooperative Way, Suite 550, Herndon, VA 20171.  Procentrix is a licensed Microsoft reseller.

125.    From at least 2016 to the present, Procentrix entered into contracts with and sold approximately 901 seats of GCC to the United States Courts.

**25.    ProSum Inc., a/k/a ProSum Technologies**

126.    ProSum Inc. ("ProSum"), also known as ProSum Technologies, is a California corporation.  Its principal executive office is located at 2201 Park Place, Suite 102, El Segundo, CA 90245.  ProSum is a licensed Microsoft reseller.

127.    From at least 2016 to the present, ProSum entered into contracts with and sold approximately 1,035 seats of GCC to Kern County, California.

**26.    SHI International Corporation, f/k/a Software House International, Inc.**

128.    SHI International Corporation ("SHI"), formerly known as Software House International, Inc., is a New Jersey corporation doing business nationwide.   Its corporate headquarters are located at 290 Davidson Avenue, Somerset, NJ 08873.  It also maintains a satellite sales office at One Penn Plaza, Suite 2705, New York, NY 10119.  SHI is a licensed Microsoft reseller.

129.    From 2012 to the present, SHI has entered into contracts with and sold over 4,857 seats of GCC to the Commonwealth of Virginia (through the Virginia Information Technology Agency, an agency of the Commonwealth), and approximately 325 seats of GCC to Loudoun County, Virginia.  Under those contracts, SHI also sold over 270 EMS licenses to Loudoun County and over 4,884 EMS licenses to the Commonwealth of Virginia.

130.    From 2012 to the present, SHI has entered into contracts with and sold over 62,145 seats of GCC to the State of North Carolina.  Under those contracts, SHI has also sold EMS to the State of North Carolina.

131.    From 2013 to the present, SHI has entered into contracts with and sold over 249 seats of GCC to Indian River County, Florida.

132.    From September 16, 2013 to the present, SHI has entered into contracts with and sold over 430 seats of GCC to the State of Delaware and its local governments.  Under these contracts, SHI also sold the State of Delaware EMS.

133.    From at least 2014 to the present, SHI entered into contracts with and sold approximately 2,652 seats of GCC to the City of St. Petersburg, Florida.

134.    Since April 1, 2015, SHI has entered into contracts with and sold approximately 2,310 seats of GCC to the Pension Benefit Guaranty Corporation, a United States federal agency.

135.    Since June of 2015, SHI has entered into contracts with and sold over 750 seats of GCC and EMS to Los Alamos County, New Mexico.

136.    From at least 2015 to the present, SHI entered into contracts with and sold GCC to the State of Minnesota's Department of Information Technology Services.

137.    From at least 2015 to the present, SHI entered into contracts with and sold GCC to the Florida Housing Finance Corporation, a Florida state agency.

138.    From at least 2015 to the present, SHI entered into contracts with and sold approximately 3,300 seats of GCC and over 250 EMS licenses to Pinellas County, Florida.

139.    From at least 2016 to the present, SHI entered into contracts with and sold GCC to the following Government Plaintiffs and their agencies and subdivisions. Under those contracts, SHI also sold the following Government Plaintiffs additional cloud products as indicated:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| United States | Bureau of Indian Affairs | 80 | Intune, EMS |
| United States | Federal Commissions Boards Councils | 8,186 | Intune, EMS |
| State of Delaware | City of Wilmington | 1,025 | EMS |
| State of Florida | South Florida Water Management District | 1,800 | EMS |

31

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---:|---|
| State of Florida | Southwest Florida Water Management District | 600 | EMS |
| State of Florida | Broward Health | 3,678 | |
| State of Florida | Broward County | 5,825 | Intune, EMS |
| State of Florida | Charlotte County | 2,009 | EMS |
| State of Florida | Collier County | 376 | |
| State of Florida | Hillsborough County | 7,035 | EMS |
| State of Florida | Lake County | 1,040 | EMS |
| State of Florida | Manatee County | 1,800 | |
| State of Florida | Marion County | 1,035 | |
| State of Florida | Miami-Dade County | 19,028 | EMS |
| State of Florida | Orange County | 525 | EMS |
| State of Florida | Osceola County | 1 | EMS |
| State of Florida | Palm Beach County | 445 | |
| State of Florida | Pasco County | 1,557 | |
| State of Florida | Sarasota County | 182 | |
| State of Florida | Seminole County | 1,300 | |
| State of Florida | St. Johns County | 165 | EMS |
| State of Florida | City of Coral Springs | 100 | |
| State of Florida | City of Fort Myers | 976 | |
| State of Florida | City of Jacksonville and Duval County | 475 | |
| State of Florida | Town of Jupiter | Unknown | |
| State of Florida | City of Miami | 2,900 | EMS |
| State of Florida | City of Miramar | 1,000 | |
| State of Florida | City of Ocala | 705 | EMS |
| State of Florida | City of Pensacola | 750 | |
| State of Florida | City of Port St. Lucie | 370 | |
| State of Florida | City of Tampa | 200 | EMS |
| Commonwealth of Massachusetts | Barnstable County | 300 | EMS, RMS |
| State of Minnesota | Anoka County | 2,176 | |
| State of Minnesota | Blue Earth County | 488 | |
| State of Minnesota | Ramsey County | 700 | |
| State of Minnesota | Scott County | 860 | EMS |
| State of Minnesota | Sherburne County | 7 | |
| State of Minnesota | City of Minneapolis | 5,252 | EMS |
| State of Minnesota | Metropolitan Area of Minneapolis | 10 | |
| State of Minnesota | City of Rochester | 25 | |
| State of Minnesota | City of St. Paul | 5,650 | |
| State of Montana | n/a | 6,111 | RMS |

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---:|---|
| State of Nevada | City of Henderson | 1,580 | EMS |
| State of Nevada | City of Las Vegas | 450 | EMS |
| State of New Mexico | General Services Department | 5,718 | EMS |
| State of New Mexico | Local Governments | 605 | EMS |
| State of New Mexico | Bernalillo County | 661 | EMS, Intune |
| State of New Mexico | City of Albuquerque | 65 | EMS, Intune |
| State of N. Carolina | Local Governments | 4,927 | AIP, EMS |
| State of N. Carolina | Durham County | 200 | |
| State of N. Carolina | City of High Point | 1,400 | EMS |
| State of Virginia | Henrico County | 4,241 | |
| State of Virginia | City of Charlottesville | 700 | |
| State of Virginia | City of Lynchburg | 1,278 | |
| State of Virginia | City of Norfolk | 7,792 | EMS |
| State of Virginia | City of Portsmouth | 1,750 | |
| State of Virginia | City of Richmond | 3,800 | EMS |
| State of Virginia | City of Virginia Beach | 4,486 | |
| | **TOTAL** | 126,629 | |

SHI's contracts are described *infra* in further detail.

**27.    Softchoice Corporation**

140.    Softchoice Corporation ("Softchoice") is a New York corporation that does business nationwide.  The headquarters for Softchoice's government contracting division is 7800 Westpark Drive, Suite T400, McLean, VA 22102.  Softchoice maintains a satellite sales office at 50 Broad Street, Suite 701, New York, NY 10004.  Softchoice is a licensed Microsoft reseller.

141.    From at least 2013 to the present, Softchoice executed contracts with and sold over 100 seats of GCC and over 180 EMS licenses to the federal Farm Credit Administration.

142.    From at least 2016 to the present, Softchoice executed contracts with and sold over 2,800 seats of GCC to the Federal Communications Commission ("FCC").  Under these contracts, Softchoice also sold RMS to the FCC.

143.     From at least 2016 to the present, Softchoice executed contracts with and sold approximately 4,296 seats of GCC and approximately 550 EMS licenses to the Federal Small Independent Agencies.

144.     Softchoice's contracts are discussed *infra* in further detail.

**28.     Software One, Inc.**

145.     Software One, Inc. is a Wisconsin corporation doing business nationwide.   Its principal executive office is located at 20875 Crossroads Circle, Suite 1, Waukesha, WI 53186.   It maintains a satellite sales office at 401 Park Avenue South, 10th Floor, New York, NY 10016. Software One, Inc., is a licensed Microsoft reseller.

146.     Since 2012, Software One, Inc. has entered into contracts with San Bernardino County, California and sold it approximately 3,800 seats of GCC and 600 EMS licenses.

147.     Since 2015, Software One, Inc. entered into contracts with and sold approximately 18,169 seats of GCC and over 5,465 EMS licenses to San Diego County, California.

148.     From at least 2016 to the present, Software One, Inc. entered into contracts with and sold GCC to the following Government Plaintiffs.  Under those contracts, Software One, Inc. also sold the following Government Plaintiffs additional cloud products as indicated:

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| United States | Federal Deposit Insurance Corporation | 9,300 | EMS |
| State of California | Dep't of Justice & Public Safety | 250 | EMS |
| State of California | Health and Human Services Agency | 860 | Intune, EMS |
| State of California | East Bay Regional Park District | 845 | |
| State of California | Alameda County | 9,701 | |
| State of California | Contra Costa County | 1,550 | EMS |
| State of California | Marin County | 150 | EMS |
| State of California | San Luis Obispo County | 2,700 | |
| State of California | Santa Cruz County | 929 | |

| Government Plaintiff | Subdivision or Agency | Approx. Seats of GCC Sold | Additional Products Sold Pursuant to Contracts |
|---|---|---|---|
| State of California | Shasta County | 858 | |
| State of California | Solano County | 3,694 | |
| State of California | Sonoma County | 50 | |
| State of California | Ventura County | 10,050 | EMS, RMS |
| State of California | City of Anaheim | 2,100 | |
| State of California | City of Irvine | 1,134 | |
| State of California | City of Long Beach | 4,277 | EMS |
| State of California | City of Pasadena | 175 | EMS |
| State of California | City of San Diego | 8,279 | |
| State of California | City of Santa Clara | 1,045 | |
| State of California | City of Stockton | 1,600 | |
| State of California | City of Sunnyvale | 200 | |
| State of California | City of Vallejo | 450 | |
| State of N Carolina | Mecklenburg County | 6,565 | EMS |
| State of N Carolina | City of Charlotte | 300 | EMS |
| | **TOTAL** | 67,062 | |

Software One, Inc.'s contracts are described *infra* in further detail.

**29.   Solid Networks Inc.**

149.    Solid Networks Inc. is a California corporation headquartered at 5686 Pirrone Road, Salida, CA 95368.  Solid Networks Inc. is a licensed Microsoft reseller.

150.    From at least 2016 to the present, Solid Networks Inc. entered into contracts with and sold approximately 4,500 seats of GCC to the State of California.  Under these contracts, Solid Networks Inc. also sold the State of California over 22,310 EMS licenses.

**30.   Sysorex Government Services, Inc.**

151.    Sysorex Government Services, Inc. is a Virginia corporation headquartered at 13880 Dulles Corner Lane, Suite 175, Herndon, VA 20171.  Sysorex Government Services, Inc. is a licensed Microsoft reseller.

152.    Defendant Lilien, LLC, also known as Lilien Systems, is a subsidiary of Sysorex Government Services, Inc.

**31.    T4 Technologies, Inc.**

153.    T4 Technologies, Inc. is a Minnesota corporation.  Its principal executive office is located at 3322 Stinson Boulevard Northeast, Minneapolis, MN 55418.  T4 Technologies, Inc. is a licensed Microsoft reseller.

154.    From at least 2015 to the present, T4 Technologies, Inc. entered into contracts with and sold approximately 35,018 seats of GCC to the State of Minnesota.  Under those contracts, T4 Technologies, Inc. also sold approximately 33,980 EMS licenses to the State of Minnesota.

**32.    Ventech Solutions Inc.**

155.    Ventech Solutions Inc. ("Ventech") is a Delaware corporation that does business nationwide.  Its principal executive office is located at 8425 Pulsar Place, Suite 300, Columbus, OH 43240.  Ventech is a licensed Microsoft reseller.

156.    From at least 2016 to the present, Ventech entered into contracts with the federal Centers for Medicare and Medicaid Services ("CMS").  Under these contracts, Ventech sold CMS approximately 10,000 seats of GCC.

## VI.    *RESPONDEAT SUPERIOR* AND VICARIOUS LIABILITY

157.    Any and all acts alleged herein to have been committed by the Defendants were committed by officers, directors, employees, representatives, or agents, who at all times acted on behalf of the Defendants and within the course and scope of their employment, or by corporate predecessors to whom successor liability applies.

158.    Defendants Microsoft Corporation and Microsoft Licensing, G.P. (collectively "Microsoft") are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under theories of *respondeat superior*.

159.    Defendant CDW Corporation and Defendant CDW Government, LLC (formerly known as CDW Government, Inc.) are related entities sharing common employees, offices, and

business names such that they are jointly and severally liable under theories of *respondeat superior*.

160.    Defendants ECS Federal, LLC and InfoReliance LLC are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under theories of *respondeat superior*.

161.    Defendants En Pointe Technologies Sales, LLC, PCMG, Inc., and PCM, Inc. are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under theories of *respondeat superior*.

162.    Defendants Lilien, LLC and Sysorex Government Services, Inc. are related entities sharing common employees, offices, and business names such that they are jointly and severally liable under theories of *respondeat superior*.

## VII.    BACKGROUND

### A.    Cloud Computing

163.    Cloud computing provides software, data storage and hosting, services, networks, and applications over the Internet.  It enables "ubiquitous, convenient, on-demand network access to a shared pool of configurable computing resources . . . that can be rapidly provisioned and released with minimal management effort or service provider interaction."  **Ex. 3** (NIST Special Publication 800-145 (2011)), at 6.

164.    There are three types of cloud computing service models: Software as a Service ("SaaS"), Platform as a Service ("PaaS"), and Infrastructure as a Service ("IaaS").  *See id.*, at 6–7.  SaaS allows a customer to use the cloud provider's applications in a cloud infrastructure.  *Id.*, at 6.  PaaS allows customers to deploy their own applications utilizing program languages, services, and tools from the cloud provider.  *Id.*, at 6–7. IaaS provides customers with "fundamental

computing resources" such as processing, storage, and networks so that the customers can run their own operating systems, applications, or other arbitrary software. *Id.*, at 7.

165.    No matter which service model is utilized, cloud services are provided via one of four types of deployment models: private cloud, community cloud, public cloud, or hybrid cloud. Private cloud services are provisioned for use by one organization. *Id.*  Community cloud services are provisioned for use by a specified community of consumers "from organizations that have shared concerns (e.g., mission security requirements, policy, and compliance considerations)." *Id.* Public cloud services are provisioned for use by the general public. *Id.*  Hybrid cloud services are a combination of private, community, or public cloud deployment models. *Id.*  For example, under this hybrid deployment model, sensitive data could be stored in a private cloud while less sensitive data and operations are in a public cloud.[7]

166.    When a state, local, or federal government entity seeks a cloud services provider, it must make sure that sensitive government data will be protected.  To do this, state and local entities will typically consult security standards propagated by the FBI's Criminal Justice Information Services Division ("CJIS").  Federal entities, in contrast, will examine standards and certifications issued by the Federal Risk and Authorization Management Program ("FedRAMP").

167.    While the CJIS standards provide technical information regarding the assessment of different security issues and a framework for doing so, they do not explicitly set a preference or requirement for one type of deployment model over another, leaving such determinations up to the individual government entity.

---

[7] Some Microsoft marketing materials refer to "hybrid" deployment models as those which combine physical, on-premises infrastructure with cloud services.  This is not the same definition of "hybrid cloud" utilized by the National Institute of Standards and Technology ("NIST") and elsewhere in this document.

168.    Some cloud providers sign "CJIS agreements" with states, which attest that the signatory has procedures and systems in place for safeguarding criminal justice information and screening personnel with access to that information.  These agreements, unlike the CJIS standards, do set out requirements which the signatory provider must comply with.  To date, Microsoft has signed CJIS agreements covering Microsoft Azure and Office 365 with the District of Columbia and forty-five states, including the Government Plaintiff states of California, Florida, Hawaii, Illinois, Indiana, Iowa, Minnesota, Montana, New Jersey, Nevada, North Carolina, Rhode Island, Tennessee, and Vermont, as well as the Commonwealths of Massachusetts and Virginia.[8]  Among other requirements, CJIS agreements require that employees of the Microsoft datacenters which relate to the cloud services at issue undergo comprehensive background checks, which are not required for Microsoft's non-government datacenter employees.

169.    FedRAMP is a United States government-wide program which allows federal agencies to adopt cloud solutions more quickly and easily, providing a "marketplace" of products which have already gained FedRAMP accreditation at the "low," "moderate," or "high" security levels.[9]  Federal agencies can assess their security needs with FedRAMP tools, and choose providers that allegedly meet those needs on the FedRAMP online marketplace.

170.    A cloud provider's FedRAMP certification does not preclude the possibility of fraud related to the security of the cloud offering—it only means that the provider has passed the certification test.  FedRAMP certification tests also do not examine whether the cloud product offered actually conforms to its marketing or contractual promises.  FedRAMP certification also does not reflect compliance with state standards or CJIS agreements.

---

[8] *See* Microsoft, *Criminal Justice Information Services (CJIS) Security Policy* (Apr. 23, 2020), https://www.microsoft.com/en-us/trustcenter/Compliance/CJIS (last accessed Nov. 10, 2023).
[9] Referred to as "FedRAMP Low", "FedRAMP Moderate", and "FedRAMP High".

171.    GCC was certified "FedRAMP Moderate" during the period at issue.

172.    Some state, local, or federal government entities have their own cloud frameworks for assessment of cloud providers, which set out specific requirements rather than a set of guidelines for evaluation.  Others bar certain cloud deployment models.  For example, the U.S. Postal Service at the time specifically barred processing or storing sensitive information in a public cloud.[10]

173.    Services or data stored within a public cloud, rather than a community or private cloud, are more vulnerable to breach.  According to CJIS, when cloud services "reside within a shared infrastructure[,] . . . [t]his increases the risk of data spillage across logical (customer) boundaries either by intentional manipulation . . . or unintentional spillage due to administrator error . . . or data manipulation operations."  **Ex. 5** (CJIS Recommendations for Implementation of Cloud Computing Solutions (Aug. 10, 2012)), at 3.  For this reason, many government agencies prefer to utilize a "government community cloud" deployment model, in which the infrastructure is only shared by governments and certain trusted government service providers bound by government security or compliance standards.

## B.    Microsoft Cloud Products & Services

174.    Microsoft does not sell products or cloud services directly to government customers.  Instead, it sells through authorized resellers such as the Reseller Defendants.  The reseller enters into contracts with customers, and Microsoft enters into "agreements" with those same customers—including licensing agreements and business agreements.  The licensed reseller also issues all price quotations and invoices to customers on its letterhead.

---

[10] United States Postal Service, Information Security Handbook AS-805 § 3-5.3 (Nov. 2019), *available at* https://www.nalc.org/workplace-issues/resources/body/as805.pdf (last accessed Nov. 11, 2023).

175. Microsoft provides over 200 cloud services, which are hosted in Microsoft's cloud infrastructure. The most prominent cloud services at issue in this case are discussed in more detail below.

176. Microsoft has provided cloud services "for government," which purport to offer segregated cloud services to a specified community of government users (in Azure Government), since 2012.

### 1. Microsoft Azure

177. Microsoft Azure ("Azure") is a cloud service which provides all three service models of cloud computing: SaaS, PaaS, and IaaS. The services at issue in this matter mainly fall within the SaaS and PaaS service models.

178. Azure's default deployment model for businesses in the United States is "Azure Commercial," a public cloud that is generally geographically limited to the United States with regard to customers, data storage, and management. However, its datacenters are global.

179. Microsoft also offers "Azure Government," a cloud service that purportedly has a government community cloud deployment model. Microsoft allegedly offers Azure Government only to federal, state, local, and tribal government entities and their partners. GCC was marketed as interfacing with Azure Government exclusively, but it also used Azure Commercial, as explained further below.

180. GCC utilizes the Azure Active Directory ("AAD") as a "keyring" to manage users' identities—usernames and passwords. AAD also manages user permissions—what services, products, and data users can access. AAD comes in two varieties: AAD Basic, which is the default

for GCC, and AAD Premium, which is a more expensive "upgrade" to AAD Basic. **Both versions of AAD operate only in Azure Commercial**, even for GCC customers.[11]

### 2.    Enterprise Mobility & Security Suite ("EMS")

181.    EMS is a bundle, or "suite" of products and services offered by Microsoft alongside its cloud services. It includes products such as Intune, AIP, and CAS that provide identity protection, security, file encryption, device and application management, and mobile device management. It is best described as an "add-on" to GCC.

182.    Azure Information Protection ("AIP") classifies and then encrypts files so that files that are stolen or accessed by unauthorized persons will be unreadable. A user must log in to the Azure network and be given the proper permissions in order to view files encrypted by AIP. AIP was developed by Secure Islands, which was Relator's employer prior to Microsoft.

183.    AIP utilizes a Microsoft technology called Rights Management System ("RMS") to encrypt files and documents. RMS also stores critical information regarding rights, and the encryption keys themselves, inside of AAD. When utilized with GCC, this implementation of AIP with RMS operates **entirely in Azure Commercial**, including the encryption keys themselves.

184.    Cloud Application Security ("CAS") is a product developed by Adallom, an Israeli company that was acquired by Microsoft in September of 2015. CAS is given credentials to log into an organization's various cloud services. It looks for sensitive files and data that should not be located within certain parts of the cloud. If CAS finds such files and data, it will show the user

---

[11] Beginning in 2017, Microsoft began to offer two government community cloud services that are more private and secure, and are specifically for the U.S. Department of Defense and certain other federal agencies, defense contractors, and the intelligence community. These products are referred to internally as "Azure Trailblazer," "Azure Government DoD," "Azure Government Defense," "Azure Government High," or "Azure PathFinder." These services operate under a true government community cloud framework and are not at issue in this case. After Relator's employment, Microsoft also began offering "GCC High," which appears to be a service that actually provides what GCC never did, interfacing only with Azure Government and not Azure Commercial.

where they are located, log the location, and save related information.  CAS helps track who has files and where the files are.  CAS also operates and stores data in Azure Commercial.

185.    During Relator's employment, Microsoft had plans to integrate CAS with AIP, so that sensitive files located by an unauthorized person using CAS could be automatically encrypted by AIP.

186.    EMS automatically includes AIP and CAS, but those two products must be activated in order for a customer to use them.

187.    Microsoft Intune ("Intune") is a device management tool that enables organizations to apply application, data, and device management controls across iOS, Windows, Android, and MacOS devices.  Intune appeared in and was operated from the Azure Government console for GCC users, but this was purely cosmetic—the GCC iteration of Intune operates and stores information **entirely within Azure Commercial.**

### 3.    Microsoft Office 365

188.    Microsoft Office 365 is a monthly SaaS subscription service that provides software—including Microsoft Word, Outlook, PowerPoint, OneNote, and Excel—alongside online collaboration capabilities, file hosting, and other associated services.

189.    GCC, the main product at issue here, is a version of Office 365, and is often called "O365 GCC" in internal documentation.  GCC utilizes Azure Commercial AAD for management of user credentials, passwords, and user permissions, even for government users.[12]  However, government GCC customers were misled by Microsoft's marketing and promotional materials into thinking otherwise. *See*, *e.g.*, **Ex. 70** ("Microsoft Azure Goes into General Availability" (Dec. 11,

---

[12] In 2018, Microsoft introduced "Microsoft Office 365 GCC High", which appears to be a true government community cloud version of Office 365—unlike GCC, which partially utilizes the commercial cloud.  Microsoft Office 365 GCC High was not provided to any of the Government Plaintiffs in this case and is not at issue here. Furthermore, that product is not made available to state and local government customers.

2014)), which quotes a 2014 blog post in which Tom Keane, partner director for program management for Microsoft Azure, states "Specifically for government, Azure Active Directory for Government offers a physical and logically isolated namespace partition, allowing the identities of users to be stored at rest in Microsoft Azure Government. At the same time, identities can be used to authenticate with on-premises solutions, as well as single sign-on to Microsoft cloud offerings." Keane fails to mention that for GCC customers, Microsoft would utilize 'fake SKUs' and put those customers in Commercial rather than Government Azure.

190.    In a December 2014 "Azure Government Overview," the company not only failed to mention the GCC exception, but also explicitly made the following false statements: "Identity Management within the Azure Government environment is a separate instance of Azure Active Directory . . . . Azure AD and on premise AD can be synchronized to provide single sign-on for users and cloud applications such as Office 365 and O365 GCC." In reality, this combination of capabilities is not available to GCC and Office 365 customers within the separate instance of Azure Active Directory for Government. **Ex. 6**, at 5, 16.

191.    In another 2014 document, Microsoft stated that "[Azure Government's] datacenters, located in Iowa and Viriginia, are isolated from other Azure datacenters and are operated by pre-screened employees based in the United States. Data stored in the Azure Government cloud will also remain in the United States." **Ex.71** ("Microsoft Updates Government Focused Cloud Offerings" (Dec. 19, 2014)). And yet internal documents make clear that GCC is actually operating inside of Office 365 datacenters, **not** separate Government datacenters at all. *See, e.g.*:

- **Ex. 28**, 2017 email to Relator, Limon and others from Adir Didi, Operations Project Manager, Microsoft Cloud App Security ("GCC is just a name reference to the Office gov SKU running in the commercial cloud").

- **Ex. 36**, 2017 email to Relator and Singh from Dave Case, Global Black Belt, Worldwide Devices and Mobility / Enterprise & Partner Group ("GCC is really just a private little corner in O365").

- **Ex. 72**, 2017 email thread in which Brian Levenson, Product Marketing Manager asks, "By GCC cloud do you mean Azure Gov or Office GCC (which is public cloud)? Or just that it works with Office GCC?" Michael Levin (IP) responds: "It's public azure (I'm not sure which datacenters of azure) on which O365 is running VMs to create an instance of O365. This O365 instance is called GCC and only customers who are "gov" are allowed to put data into this instance. RMS has a separate instance right next to O365, also running in public azure, connected to this specific instance of O365 and nothing else. This is called RMS in GCC."

## C.    Contracts

192.    **Table A** sets out the contracts at issue in this matter that are currently known to Relator.  Statewide contracts are denoted by the addition of an asterisk (*) after the name of the Government Plaintiff.  All municipality and agency contracts entered into pursuant to those statewide contracts are bound by their certifications, terms, and conditions.

193.    Defendants' alleged violations of the False Claims Act, and state and local False Claims Acts, concern more contracts than those listed below.  The Reseller Defendants entered into additional contracts, the details of which are unknown to Relator, to make the sales of GCC and "add-on" products described *supra* in Section V(B).

194.    The Reseller Defendants issued all price quotations and invoices associated with these contracts.

## D.    Certifications

195.    Defendants made the following certifications in their contracts and agreements with the Government Plaintiffs.

### 1.    Compliance with Applicable Laws

196.    Defendants certified their compliance with applicable laws, rules, and regulations in the contracts at issue.

197.    For example, Defendant SHI's contract ADSPO-16-130651 with the State of Delaware, Miami-Dade County, the State of Montana, the State of Nevada, the State of New Mexico, and the State of North Carolina contains the following certification: "18. Laws and Regulations[:] Any and all products offered and furnished shall comply with solicitation section 5.10, Compliance with Applicable Laws." **Ex. 38** (NASPO Multistate Contract), at 29.   The appropriate section of the lead state's solicitation[13] states: "The materials and services supplied under this Contract shall comply with all applicable Federal, state and local laws, and the Contractor shall maintain all applicable license and permit requirements." *Id.*, at 56.

198.    The contracts and agreements in **Table B** between the Government Plaintiffs and Defendants also include certifications as to compliance with applicable laws, rules, and/or regulations.

199.    Similarly, the State of Iowa's statewide Master Agreement with Defendant Insight Public Sector, effective May 1, 2016 to April 30, 2019,[14] includes the following compliance certification: "Contractor agrees . . . All work and services [are] rendered in strict conformance to all laws, statutes, and ordinances and the applicable rules, regulations, methods and procedures of all government boards, bureaus, offices and other agents."  **Ex. 44** (Iowa Statewide & Fairfax County, Virginia Contract), at 55.

200.    Defendant SHI, in its October 4, 2007 statewide contract VA-070907-SHI with the Commonwealth of Virginia, certified the following:  "Contractor agrees to comply with all provisions of the then current security procedures of VITA and the appropriate Authorized User(s)

---

[13] Section 5.10 of the solicitation from the lead state addresses another issue, so the reference appears to be mis-numbered.  The quoted solicitation language is from the appropriate section, which bears a different paragraph number.

[14] Subsequently renewed until April 30, 2021. This contract is shared between the State of Iowa and Fairfax County, Virginia.

as are pertinent to Contractor's operation and have been supplied to Contractor by VITA and the Authorized User(s) and further agrees to comply with all applicable federal, state and local laws." **Ex. 47** (Virginia Statewide Contract VA-070907-SHI), at 17.  Virginia's follow-up contract with SHI from 2013 contains a nearly identical certification.  *See* **Ex. 48** (Virginia Statewide Contract VA-131017-SHI), at 18–19.

201.    Defendants made similar representations in other contracts, currently unknown to Relator, under which the sales described in Section V(B) *supra* took place.

### 2.    Conformity with Representations

202.    In Illinois statewide contract CMS2595580, Defendant CDW Government, LLC certified that "supplies furnished under [the] contract" would "conform to the standards, specifications, drawing, samples or descriptions furnished by the State or furnished by the Vendor and agreed to by the State." **Ex. 43** (Bloomington & Illinois Statewide Contract), at 30.  This certification is binding on all contracts entered into under statewide contract CMS2595580.

203.    Defendants made similar representations in other contracts, currently unknown to Relator, under which the sales described in Section V(B) *supra* took place.

## VIII.    DEFENDANTS' FRAUD ON THE GOVERNMENT

204.    Defendants have fraudulently caused the Government Plaintiffs to pay hundreds of millions of dollars for cloud computing services that operate partially within the public "commercial cloud" (Azure Commercial) while representing to the Government Plaintiffs that **all** of those products and services operate securely within an exclusive "government cloud" (Azure

Government).  These "fake" government cloud services put government data at an increased risk of breach.[15]

205.    In particular, Defendants: (1) fraudulently induced the Government Plaintiffs and their agencies to enter into contracts and agreements and purchase "fake" government cloud services via false or misleading marketing; (2) made false statements in their contracts and agreements with the Government Plaintiffs; and (3) made false certifications in their contracts and agreements with the Government Plaintiffs.

## A.    Defendants fraudulently induced the Government Plaintiffs to enter into contracts based on false information about GCC, the cloud service at issue.

206.    Microsoft advertises that GCC purportedly operates entirely within Azure Government (a cloud that is exclusive to U.S. government agencies), and is segregated from non-government users.

207.    In reality, the only services Microsoft offered at the time that were truly government-exclusive were never provided to the GCC customers at issue.  These "true" government cloud services are targeted at the U.S. Department of Defense and other high-security government agencies (and were referred to internally as "Azure Government High," "Trailblazer," "PathFinder," "Azure Defense," or "Azure Government DoD").  These services use only Azure Government or a special Department of Defense cloud, not Azure Commercial, and are not at issue here.

208.    GCC, in contrast, is a "fake" government cloud."[16]  While it partially uses Azure Government, it uses Azure Commercial—the general "commercial cloud" that Microsoft offers to

---

[15] They also caused violation of CJIS and other standards required to protect the confidentiality of certain kinds of documents and data (including court records and criminal and law enforcement data) expected to be in a government-only environment.  Microsoft attested that GCC was compliant with CJIS standards.
[16] "Azure Government" officially became available to government customers on December 9, 2015.  However, GCC has been available to government customers since 2012 in one form or another.

all commercial consumers in the United States—for user identities and many crucial security functions, while falsely displaying that it is operating only in Azure Government.

209.    Despite this key difference, Microsoft marketing materials and representations to the Government Plaintiffs during the time period at issue consistently and misleadingly stated that GCC was operating in Azure Government, implying the same level of security as the Department of Defense without explaining that it was not really in the same government cloud at all. *See*, *e.g.*, **Ex. 9** (misleadingly showing "cloud identity" as the same for both "Office 365 US Government Community" and "Office 365 US Government *Defense*").

210.    Defendants entered into procurement contracts and agreements with the Government Plaintiffs and their agencies and subdivisions, as previously outlined.  Defendants procured the contracts via the fraudulent conduct described herein, including false marketing and advertising, false representations and communications to the Government Plaintiffs regarding GCC's cloud deployment model, and false statements about GCC within the contracts and agreements themselves.

### 1.    False Representations in Marketing and Presentations

211.    Microsoft marketing materials, websites, and PowerPoint presentations targeted towards government customers have made the following false representations about the exclusivity and characteristics of GCC specifically, or Microsoft's services "for government" in general (including GCC), as far back as 2012 and continuing to the present day.  These representations often refer to "Azure Government" or services "for government" as umbrella terms that encompass GCC, despite GCC's partial use of Azure Commercial.  They also fail to distinguish Microsoft's "true" government cloud services (which never used Azure Commercial):

- "Microsoft Azure Government delivers a *physical and network-isolated instance* of Azure, including most of the hyper-scalable IaaS and PaaS services that Azure offers

and the security and compliance standards needed for Public Sector."[17] **Ex. 35** (Azure Government Slide with Speaker Notes (2012)), at 1.

- "Azure Government is a government-community cloud (GCC)[.] . . . The Azure Government environment *is a completely separate instance from Microsoft Azure public* and *only used* by qualified U.S. government organizations and solution providers. . . . Identity Management within the Azure Government environment is a separate instance of Azure Active Directory." **Ex. 6** (Microsoft Azure Government Overview (Dec. 2014)), at 3–4 (emphasis added).

- "Identity Management within the Azure Government environment *is a separate instance* of Azure Active Directory." *Id.*, at 5 (emphasis added).

- "Public Sector entities receive *a physically isolated instance* of Microsoft Azure that employs world-class security and compliance services critical to U.S. government *for all systems and applications built on its architecture*." **Ex. 7** (Microsoft Azure Government Information Sheet (2016)), at 1 (emphasis added).

- "The most trusted cloud for mission-critical government workloads . . . A *physically isolated instance* of Microsoft Azure, built *exclusively for government customers* and their solution providers." *Id.*, at 1 (emphasis added).

- "The Azure Government cloud *is dedicated to* our United States based government customers." **Ex. 8** (Microsoft Azure Government PowerPoint (June 29, 2016)), at 3 (emphasis added).

- "Your [government] organization's customer content[18] *is logically segregated from* customer content in Microsoft's commercial Office 365 services." **Ex. 9**, Office 365 US Government Service Description (Feb. 14, 2017), at 1 (emphasis added). "Cloud identity" and "Azure Active Directory services" are marked "yes" on the chart of available offerings, with no footnotes or explanations that these products were not fully available in the actual government cloud. *Id.* (Office 365 Service Description Feb. 2017), at 9–10.

- "The Microsoft Government Cloud provides screened personnel, *physical isolation*, and commitments to public sector compliance." **Ex. 67** (Microsoft CJIS Implementation Guidelines (July 2016)), at 3 (emphasis added).

---

[17] The "slide script" accompanying this PowerPoint slide further states: "Customer data, applications, and hardware reside in the continental United States (CONUS) in specially constructed datacenters . . . physically isolated from Azure commercial services[.]" **Ex. 35**, at 1. The script also mentions a commitment to meet "rigorous compliance demands (i.e. FedRAMP, CJIS, and HIPAA) of a government only cloud." *Id.* The reference to both CJIS and FedRAMP compliance means that these representations are targeted towards both federal and state GCC customers.
[18] Including identities (usernames and passwords).

- "Microsoft has made a commitment to U.S. Public Sector by providing cloud solutions *that can only be utilized by U.S. government entities* and/or customers subject to government compliance regulations." *Id.*, at 9 (emphasis added).

- "Secure and compliant cloud for US government only . . . Physically separated instance of Microsoft Azure." **Ex. 10** (Ignite PowerPoint (Sept. 2017)), at 2.

- "Your data is segregated from commercial data[.]" **Ex. 11** (Office 365 Government Plans Description (Oct. 2017)), at 3.

- In AAD, customer data is stored "at rest" in the United States. "No exceptions." **Ex. 68**, AAD Data Security Considerations (June 2020).

- Office 365 for Government plans "provide all the features and capabilities of Office 365 services *in a segmented government cloud community*[.]"[19]

- "Only US federal, state, local, and tribal governments and their partners have access to this *dedicated instance* with operations controlled by screened US citizens." **Ex. 69**, at second unnumbered page.

- "Azure Government is a government-only cloud you can trust, *exclusively for US federal, state, local, and tribal government agencies* and their partners. A physical and logical *network-isolated instance* of Microsoft Azure . . . specifically designed to meet the needs of US government agencies and their partners." **Ex. 13** (Microsoft Azure Government Contact Form), at 1 (emphasis added).

212.    In truth, GCC is neither government-exclusive nor separated completely from commercial data, because GCC partially utilizes Azure Commercial and its non-government-exclusive datacenters. Microsoft's misrepresentations in this regard continue to this day.

213.    The following "add-on" products for GCC also stored data or ran either partially or completely in Azure Commercial: AAD Premium, RMS, AIP, CAS, and Intune. The default, "non-Premium" AAD for GCC also used Azure Commercial. Microsoft, however, marketed and licensed these products and components to government customers without revealing their use of Azure Commercial. *See, e.g.*, **Ex. 9**, at 9–10 (noting that RMS and AAD are available in a government community cloud without mentioning Azure Commercial).

---

[19] https://products.office.com/en-us/government/compare-office-365-government-plans (last accessed Nov. 10, 2023) (emphasis added).

214.    In fact, one Microsoft document even falsely states that a separate instance of AAD ran "within the Azure Government environment."  **Ex. 6**, at 5.  In truth, a "true" separate government cloud version of AAD could not be used with GCC at all.  GCC used Azure Commercial AAD.

### 2.    Higher Vulnerability

215.    GCC's partial use of Azure Commercial, rather than Azure Government only (*i.e.*, a true segregated government cloud), makes government data more vulnerable to breach and hacking.  *See, e.g.*, **Ex. 5**, at 3, 7.  Placement of user identities in Azure Commercial AAD presents a particularly high risk of breach because user identities are used to log in to GCC and view secured or encrypted data and documents.  User identities are typically a hacker's first target, as they secure and allow access to other parts of a network.

216.    Furthermore, the Government Plaintiffs use GCC for confidential and highly sensitive government documents and data, including but not limited to police body camera footage, court records, criminal justice information, and healthcare records.  This data is vulnerable to misuse because GCC uses the commercial cloud (Azure Commercial) for identities.

### 3.    "Fake SKU"

217.    Microsoft sold GCC to government customers with what Microsoft employees referred to as a "fake SKU."  This SKU, or product identification code,[20] actually sold the customer Microsoft's regular commercial cloud product (Azure Commercial) alongside Azure Government.

218.    Microsoft planned to eventually migrate the Azure Commercial components of GCC into an actual government community cloud framework (Azure Government), but did not divulge to government customers that GCC was not yet a true "government community cloud."

---

[20] "SKU" is an acronym for Stock-Keeping Unit, a tool for inventory management.
https://en.wikipedia.org/wiki/Stock_keeping_unit.

219.    Microsoft utilized the "fake SKU" so that it would not have to execute new agreements or sales contracts once it implemented a "true" government community cloud for GCC customers—something that never occurred while Relator was employed by Microsoft.  *See* **Ex. 53** (emails with Phil West and others (Oct. 21–25, 2016)), at 2.  As of the filing of this First Amended Complaint, no true government community cloud version of GCC exists.[21]

### 4.    Fake Government Log-in Portal

220.    Once a government customer contracted for and began using GCC, the deception continued.  The government agency's users would see a "government portal" whenever they logged in to Azure, perpetuating the myth that everything within Azure took place within a segregated "government cloud" (Azure Government).[22]  However, in reality, if those users were to log in to Azure's commercial portal with their government cloud username and password, they would discover that their identities—and many Azure cloud functions—were actually in Azure Commercial.

221.    The use of a fake government portal further misled GCC customers, who would believe what they saw in the console to be accurate, given the "WYSIWIG" (What You See is What You Get) environment common in such applications.

### 5.    False Representation of FedRAMP and CJIS Compliance

222.    Microsoft also falsely claimed that the entirety of Microsoft Azure was "FedRAMP High" certified,[23] when in reality, during the time period at issue only Azure Government was "FedRAMP High."

---

[21] Although GCC High was later released, it does not meet the key capabilities of GCC such as CJIS or IRS1075 or what those standards signify.

[22] Identities which showed up in the "government portal" were not even Azure Government copies—they were in Azure Commercial.

[23] *See* Microsoft, Government Cybersecurity Imperative, Washington Post (May 8, 2016), *available at* https://www.washingtonpost.com/sf/brand-connect/microsoft/wp/enterprise/government-cybersecurity-imperative-a-microsoft-perspective/?noredirect=on (last accessed Nov. 10, 2023).

223.   Similarly, Microsoft signed CJIS agreements with many of the Plaintiff states, attesting that its cloud service product (GCC) was compliant with those agreements.  *See, e.g.*, **Ex. 9**, at 1.  However, Microsoft documentation regarding CJIS plainly and simply falsely states that GCC utilizes the Government Cloud, and depends on that untruth for CJIS certification.  That documentation indicates Azure Government is used in CJIS implementation, *see* **Ex. 67** ("Each law enforcement agency with a cloud subscription has a tenant for Azure Government, Office 365 Government, and/or Dynamics CRM Online Government."), when in fact Azure Commercial is used. Microsoft told the FBI and others to analyze Azure Government to show GCC compliance, thereby pointing to the wrong cloud to be examined.  GCC's partial use of the commercial cloud rendered it noncompliant with the CJIS agreements and evaluations.

224.   For example, GCC's partial use of Azure Commercial meant that the Government Plaintiffs' data could leave the continental United States and be accessed by datacenter employees who had not undergone CJIS-mandated background checks.[24]  This is prohibited not only by some of the Plaintiff states' CJIS agreements but also some of their cloud computing laws and requirements.[25]

### 6.   Abandoned Migration Plans and Continued Concealment

225.   While some *internal* Microsoft documents reveal that GCC partially operated and stored some data in Azure Commercial, the marketing material referenced above does not reveal this, and government customers appeared to be unaware of this fact.  An August 2016 Microsoft internal PowerPoint presentation illustrates an intent to eventually migrate GCC completely into Azure Government; however, GCC was marketed and sold to government customers *long before*

---

[24] It is particularly troubling that some Azure Commercial datacenters are located in the People's Republic of China and other countries where foreign government actors might improperly access Government Plaintiffs' data.
[25] *See, e.g.*, Fla. Admin. Code Ann. r. 60GG-4.002(6) (remote access to data from outside the continental U.S. is prohibited without prior approval).

this migration occurred.  In fact, as of the filing of this First Amended Complaint no such migration had occurred.[26]

226.    Virtually all of the contracts and agreements between Defendants and the Government Plaintiffs in this case lack any indication of or reference to GCC's partial use of Azure Commercial, as explained further below.

227.    Even the contracts that make some disclosure do not tell the whole truth.  For example, Exhibit 4 to Appendix A to the June 15, 2017 statewide contract (contract # 1-17-70-50B) between Dell Marketing and the State of California's Department of General Services discloses that some GCC operations occur within Azure Commercial:

> For clarity, as of the effective date of [this] Government Contract, certain Microsoft Azure Plans (and License Suite Plans) that contain "public cloud" versions of Microsoft Azure Services . . . may be purchased under the [State of California's] Enterprise Agreement for the purpose of managing or enhancing one or more other Microsoft Online Services.  Examples include, but are not limited to, SKUs for the Microsoft Enterprise Mobility and Security suite ("EMS"). . . .   For clarity, Microsoft:
>
> 1.  Does not represent such public cloud version of Azure Services . . . as "FedRAMP High" (they have FedRAMP Moderate ATO);
>
> 2.  Does not represent such services to be "Azure Government Services" for sale under the Government Contract. . . .
>
> [S]ome same-named Services . . . may be available for the State [of California] to consume for other purposes under the Government Contract as Azure Government Services.  Such services may include, but not be limited to, Azure Active Directory Premium.

**Ex. 12** (California Statewide Dell Contract), at 37–38.  In particular, the contract notes that Azure Active Directory (AAD) "*may* be available for the State to consume . . . *as Azure Government Services*."  *Id.*, at 38 (emphasis added).  However, AAD was *not* a "government service" in the

---

[26] Relator also learned from another Microsoft employee that such a migration would be nearly impossible to perform – like "changing airplane engines while the plane is in flight." This would also be what customers would experience if they were to try to leave GCC for a competitor; thus, customers were essentially "hooked" by the initial fraud.

GCC iteration sold to the State of California because it used Azure Commercial. In other words, while California's statewide contract alerted users that the add-on EMS partially used Azure Commercial, as shown above, the contract made no such disclosure regarding AAD or GCC as a whole. And it only indicated the *possibility* of acquiring commercial AAD, rather than alerting the customer that GCC *already used* commercial AAD (and that Azure Government AAD was not even an option).

228. To provide another example, a March 3, 2015 Enterprise Enrollment Amendment to the Volume Licensing Agreement entered into between Microsoft Corporation and the State of Minnesota's information technology department—part of Minnesota's statewide contract 6089180 with SHI International—states:

> "Community" means the community consisting of one or more of the following: (1) a Government, (2) an Enrolled Affiliate using Azure Government Services to provide solutions to a Government or a qualified member of the Community, or (3) an Enrolled Affiliate with Customer Data that is subject to Government regulations for which the Enrolled Affiliate determines the use of Azure Government Services, and not Windows Azure Services, is the appropriate Microsoft service to meet the Enrolled Affiliate's regulatory requirements. . . .

> **EMS for Government Terms** . . .

> **c. Windows Intune.** Government Partner understands and acknowledges that Windows Intune, the third individual component of the EMS-G Suite, will not be provisioned in multi-tenant data centers for exclusive use by or for the Community.

> **d. [AAD Premium] for Government and Azure RMS for Government.** Government Partner understands and acknowledges that AADP-G [AAD Premium for Government] and RMS-G [RMS for Government] will not initially be provided in multi-tenant data centers for exclusive use by or for the Community. However, AADP-G and RMS-G will be provisioned in multi-tenant data centers for exclusive use by or for the Community at a future date. As soon as practicable following such future date, the AADP-G and RMS-G services Government Partner is acquiring on behalf of Enrolled Affiliate will be migrated to the Community multi-tenant data centers.

**Ex. 55** (Minnesota Enrollment Agreements (March 3, 2015)), at 18–19 (emphasis in original).

Despite these assurances, AAD and RMS were never migrated into a "true" government-exclusive

cloud (Azure Government) during Relator's employment at Microsoft. Thus, even though the excerpt above concedes that AAD Premium, RMS, and Intune are not "exclusive" to government users (due to their use of the Azure Commercial), it still makes a misleading statement regarding Microsoft's plans to migrate users into a "true" government cloud. Furthermore, the agreement does not explain that the lack of exclusivity is due to GCC's *existing* partial use of Azure Commercial; it restricts itself to EMS and AAD Premium, rather than discussing how the problem impacted AAD Basic and GCC as a whole. In other words, the contract gives the impression that one need worry about the risk of using Azure Commercial only if one wants to *upgrade* to AAD Premium or EMS—without any warning that standard GCC suffered from the same limitation without these add-ons.

229. Microsoft Corp. and Microsoft Licensing's Indirect Enterprise Enrollment Agreement with some local governments—including Manatee County, Florida—contain a similar "partial" disclosure. These agreements state that Office 365 for Government is offered in a government community cloud, but then acknowledge that "Other Office 365-branded or separately branded Online Services that may be made available as part of or in addition to Office 365 for Government are not included in the Government Community Cloud." **Ex. 56** (Manatee County Agreements), at 18. This is only a partial disclosure of the truth. GCC (what Manatee County would have received) is not truly offered in a government community cloud, because it uses Azure Commercial AAD to manage identities. Further, the agreement does not specify which "Online Services" are not included in the Government Community Cloud and only states that such services "*may* be made available." *Id.* (emphasis added).

230. While Microsoft, SHI, and Dell Marketing partially revealed the truth to a few select Government Plaintiffs as noted above, Defendants further concealed GCC and its add-ons'

partial use of Azure Commercial from the other Government Plaintiffs by not including parallel provisions in all contracts and agreements. This shows that Defendants knowingly defrauded the Government Plaintiffs.

231.    Microsoft was of course perfectly capable of crafting an agreement that would have informed government customers of the fact that a particular GCC add-on operated in Azure Commercial. In fact, the Company did so with regard to the product "Yammer." GCC customers who wished to purchase Yammer executed an amendment to their enterprise enrollment agreement with Microsoft which stated, in relevant part:

> Yammer Enterprise *is provided in a "public cloud," not in a "community cloud,"* as such terms are defined in NIST Special Publication 800-145. *It is neither part of, nor a component of, Office 365 for Government*.

> In the event that Microsoft integrates Yammer Enterprise features or functionality into any Office 365 for Government Online Service, Microsoft makes no representation or warranty that Enrolled Affiliate will be able to migrate its Customer Data from Yammer Enterprise to Office 365 for Government, nor that any such migration (if possible) will be performed by Microsoft at no cost.

**Ex. 57** (City of Sparks Enterprise Enrollments), at 15 (emphasis added). This shows that Microsoft's false statements that GCC used a government-exclusive "community cloud" were knowingly false.

232.    GCC's partial usage of Azure Commercial was acknowledged within Microsoft as an ongoing problem, as shown by a January 24, 2017 "OneList" issue tracker page accessible company-wide. *See* **Ex. 54** (GCC OneList Issue Tracker (Sept. 16, 2015)), at 1. The OneList page reads, in relevant part:

> --When will O365 GCC customers expect to have their [A]AD tenant provisioned in Azure Government [A]AD?

> --When will existing O365 GCC customers have their tenants moved into the Azure Government AD environment?

Impact: Selling EMS/ECS/[EMS] G5 to GCC customers is not possible.  It is impacting nationwide (USA) SLG/Federal accounts requiring GCC.

*Id.*  Although the document notes that selling EMS to GCC customers "is not possible" as a result of GCC's instance of AAD and EMS not residing in a true government cloud (Azure Government), Microsoft ignored this issue and sold GCC as-is.  *Id.*  Defendants encouraged sales of and actually sold EMS and GCC to hundreds of governments and government agencies, including the Government Plaintiffs, without disclosing this issue.

### 7.    Microsoft's Internal Suppression of Information

233.    Despite Relator's many efforts to stop Microsoft's deceptive marketing to government customers,[27] Defendants took no action to inform the Government Plaintiffs about GCC's partial use of Azure Commercial, placing sensitive government data at risk and perpetuating deception of the Government Plaintiffs.

234.    In fact, Microsoft concealed GCC's security flaws, specifically instructing Relator and others not to demonstrate AIP to GCC customers, because the demonstration process at the time required logging in to the Azure Commercial console and so would alert GCC customers to the fact that their identities were in Azure Commercial (rather than Azure Government).  Microsoft told Relator and others to simply not do these demonstrations or sales of AIP, to keep the Government Plaintiffs ignorant.

235.    Microsoft's actions after PANYNJ discovered that its identities were stored in Azure Commercial illustrate that Microsoft did not want the "truth" about GCC's use of Azure Commercial to be spread, or to affect ongoing sales.

236.    As noted previously, on January 17, 2017, when Relator and others were coaching PANYNJ through the installation of AIP, PANYNJ was shocked to find the identities of its users

---

[27] Described *supra* in Section IV(A) and *infra* in this Section.

in Azure Commercial.  *See* **Ex. 19**.  PANYNJ also questioned what other services were not provided in Azure Government.  This initially caused difficulties, and Relator was blamed for "unselling" EMS to PANYNJ.

237.    SLG Cloud Solution Specialist John Kelbley responded to Relator's concerns about the PANYNJ incident by dismissing the issue:

> WE NEED TO STOP MAKING A BIG DEAL ABOUT THE AIP PORTAL BEING IN COMMERCIAL . . .
>
> Sashimi is raw fish, but that's not how it is 'presented' to customers.  How identities are stored and accessed is a fact not a question, and that is the available deployment mode for AIP. . . .  We do not need to create unnecessary conflict controversy in the minds of our customers.

**Ex. 66**, at 1–2.

238.    On January 25, 2017, Relator met with his supervisors Bognar and Singh in Arizona.  Relator had organized the meeting in order to inform Bognar of Relator's progress in making AIP and CAS saleable to government customers while remaining in compliance with security standards.  Bognar attacked Relator for his lack of sales and told Relator that the security issues with selling AIP and CAS to government customers "are 'bigger than us[.]'"  **Ex. 20**, at 4.  Bognar advised Relator to look for a new job outside of Microsoft shortly afterwards, and Relator began to realize that Microsoft did not want the issues with GCC identities to be investigated any further.

239.    On February 3, 2017, Relator replied to an email from Singh and Bognar regarding the Arizona meeting.  *Id.*, at 1–4.  Relator reiterated his concerns about selling EMS to government customers, specifically that customers would discover GCC's use of Azure Commercial.  *See id.*, at 2–3.  Relator stated, "being attacked each time I even mention these things doesn't seem fair[.]"  *Id.*, at 2.

240.    On February 10, 2017, another Microsoft employee relayed from Singh instructions to Relator not to sell AIP to government customers because it was not worth the risk of the customer discovering that identities were stored in Azure Commercial.

241.    On February 17, 2017, Singh directed Relator to include Singh on as many future telephone calls as possible, both internal and external.  This further signaled to Relator that Microsoft was concerned about him spreading awareness of GCC's shortcomings and partial use of Azure Commercial.

242.    On April 6, 2017, Relator, Singh, and Baron teleconferenced via Skype and discussed GCC.  Relator was told by Singh and Baron that AIP revealed issues with GCC that Microsoft did not want exposed to the customer, and that as a result, they would postpone sales of AIP.  At that time, Relator realized for certain that what the SLG and FED teams had told him was false—**Microsoft had not told government customers that their identities resided in the commercial cloud.**

243.    Although Relator continued to email peers and superiors at Microsoft throughout 2017 regarding potential safety, security, compliance, and mis-marketing issues with AIP, CAS, and GCC, Microsoft never took any corrective action.  *See* **Ex. 20**, at 2–3; **Ex. 21**; **Ex. 23**, at 2–3; **Ex. 25**, at 1–2; **Ex. 28**, at 1–4; **Ex. 29**, at 1–2.

244.    Microsoft continues to sell GCC and its add-on EMS to government customers to this day, notwithstanding the fact that components of both products require the use of Azure Commercial and its non-government-exclusive datacenters.[28]  Microsoft has turned a blind eye to

---

[28] Only when Microsoft began to offer GCC High as an alternative did the company begin to disclose in the documentation for that product that GCC made partial use of the commercial cloud. But at that point, the customers were already locked in.

the harm its fraudulent scheme might cause, and continues to profit at the Government Plaintiffs'
expense.

245.    The Government Plaintiffs would not have entered into the contracts and
agreements at issue or paid claims under those contracts had they known that they were not
obtaining "true" government cloud services.  *See, e.g.*, **Ex. 50** (2016 Los Angeles County Contract,
at 27 (Statement of Work specifying that PCMG shall provide "Azure *for Government*"))
(emphasis added); United States Postal Service, Information Security Handbook AS-805 § 3-5.3
(Nov. 2019)[29] (prohibiting storing or processing sensitive information in a public cloud).

**B.      Defendants made false statements in their contracts and agreements
        with the Government Plaintiffs.**

246.    Defendants' contracts and agreements with the Government Plaintiffs contain
misleading or false information about the government exclusivity of the services provided.

247.    Microsoft Corporation's August 1, 2016 Enterprise Enrollment agreement with the
City of Vallejo, California, defines the term "Community" as:

> the community consisting of one or more of the following:  (1) a Government, (2)
> an Enrolled Affiliate using eligible Government Community Cloud Services to
> provide solutions to a Government or a qualified member of the Community, or (3)
> a Customer with Customer Data that is subject to Government regulations for which
> Customer determines and Microsoft agrees that the use of Government Community
> Cloud Services is appropriate to meet Customer's regulatory requirements.

**Ex. 58** (Vallejo Microsoft Agreement), at 5.    The amendment also defines "Government
Community Cloud" as "Microsoft Online Services that are provisioned in Microsoft's multi-tenant
data centers *for exclusive use* by or for the Community and offered in accordance with the National
Institute of Standards and Technology (NIST) Special Publication 800-145."  *Id.*, at 6 (emphasis
added).

---

[29] *Available at* https://www.nalc.org/workplace-issues/resources/body/as805.pdf. (last accessed Nov. 11, 2023).

248. The same or virtually identical definitions are put forth in the contracts and agreements between Defendants and the Government Plaintiffs shown in **Table C**.

249. NIST Special Publication 800-145 defines "community cloud" as a cloud which "is provisioned *for exclusive use* by a specific community of consumers from organizations that have shared concerns (e.g., mission, security requirements, policy, and compliance considerations)." **Ex. 3**, at 7 (emphasis added). In contrast, the same NIST Special Publication defines "public cloud" as a cloud which "is provisioned for open use by the general public," and a "hybrid cloud" as "a composition of two or more distinct cloud infrastructures (private, community, or public) that remain unique entities but are bound together by standardized or proprietary technology that enables data and application portability[.]"[30] *Id.*

250. GCC clearly does not meet the definition of "community cloud" in NIST Special Publication 800-145 as claimed, because AAD—used by all GCC services—operated and stored data in Azure Commercial, a *public* cloud. Some GCC add-ons—including EMS, RMS, Intune, and CAS—also used this public cloud.

251. Because GCC uses a "public cloud" in part, it is inaccurate to characterize the service Government Plaintiffs contracted for as a "community cloud" under NIST Special Publication 800-145. Microsoft Corporation therefore made false statements in its agreements with the Government Plaintiffs.

252. Furthermore, statements that the services are provisioned for the "exclusive" use of the community are false, as components of those services operated in the non-exclusive public cloud, Azure Commercial, which is definitely *not* "exclusive" to a government community.

---

[30] Some Microsoft marketing materials refer to "hybrid" services as those which combine on-site physical servers with cloud functionality. This is a different definition of "hybrid cloud" than that utilized by NIST.

253.    Defendants made similar or identical false statements in other contracts and agreements, currently unknown to Relator, under which the sales described in Section V(B) *supra* took place.

**C.    Defendants made false certifications in their contracts and agreements with the Government Plaintiffs.**

254.    Defendants' contracts and agreements with the Government Plaintiffs also contain false certifications.

255.    Defendants' certifications of compliance with laws, ordinances, and the rules and regulations of any government entity are false.  *See* Section VII(D) *supra*.  These certifications are false because Defendants' fraudulent conduct violated laws, ordinances, and/or government rules and regulations, including but not limited to federal, state, and local procurement laws and regulations.[31]

256.    Defendants' certifications that products furnished would conform with the descriptions furnished by Defendants (described *supra* in Section VII(D)) are false because of the aforementioned false statements in Microsoft's marketing and advertising materials concerning GCC.

257.    Defendants made similar false certifications in other contracts, currently unknown to Relator, under which the sales described in Section V(B) *supra* took place.

## IX.    CAUSES OF ACTION

**A.    Federal False Claims Act (31 U.S.C. §§ 3729 *et seq.*)**

258.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

---

[31] *See, e.g.*, 18 U.S.C. § 1001 (prohibiting false statements); Fla. Admin. Code Ann. r. 60GG-4.002(6) (remote access to data from outside the continental U.S. is prohibited without prior approval); Admin. Code of San Francisco Ch. 21 § 21.35 (prohibiting false claims to city and county of San Francisco).

259.    This is a *qui tam* action to recover damages and civil penalties on behalf of the United States and Relator arising from Defendants' violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3732.

260.    The FCA provides that any person who:

(A) knowingly presents, or causes to be presented, a false and/or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C) conspires to commit a violation of [the FCA,]

31 U.S.C. § 3729(a)(1), is liable to the United States for a civil penalty for each such claim, plus three times the amount of damages sustained by the United States, including consequential damages, sustained by the Government because of the FCA violation. *See id.*; 28 C.F.R. § 85.5.

261.    The FCA defines "claim" as:

any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

(i)    is presented to an officer, employee, or agent of the United States; or

(ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

(A)    provides or has provided any portion of the money or property requested or demanded; or

(IB)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

262.     The FCA allows any person having knowledge of a false and/or fraudulent claim against the United States to bring an action in a U.S. federal district court for himself and for the United States, and to share in any recovery, as authorized by 31 U.S.C. § 3730.

263.     Based on these provisions, Relator seeks through this action to recover damages and civil penalties arising from Defendants' violations of the FCA.

### 1.     Presentation of False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(A))

264.     From 2012 to the present, Defendants knowingly presented, or caused the presentment of, false and/or fraudulent claims for payment or approval to the United States.

265.     Defendants fraudulently induced the United States, the State of California,[32] and their agencies to enter into federally-funded contracts and agreements for cloud computing services known as "GCC" by making false statements regarding GCC's government exclusivity and security.  Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

266.     Defendants also made false certifications in the contracts and agreements at issue as to:  (1) compliance with laws; and (2) that Defendants provided the services at issue in conformity with descriptions they provided.

267.     Defendants submitted claims for payment under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

268.     By creating and carrying out their fraudulent scheme, Defendants knowingly and repeatedly violated the False Claims Act.  *See* 31 U.S.C. § 3729(a)(1)(A).

---

[32] Via the Los Angeles County Community Development Commission, who entered into a contract funded by the U.S. Department of Housing and Urban Development

269.   Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the United States' payment decision and was material to the United States' decision to pay the claims.

270.   Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the United States and the State of California contracted. Had the United States known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, the United States would not have paid the claims.

271.   Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the United States and the State of California was a foreseeable factor in the United States' loss and a consequence of Defendants' fraudulent scheme.  By virtue of Defendants' actions, the United States has suffered damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

## 2.   Making or Using False Records or Statements Material to False and/or Fraudulent Claims (31 U.S.C. § 3729(a)(1)(B))

272.   From 2012 to the present, Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the United States.  These false records or statements include those made on websites and in other marketing materials.

273.   Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the United States and the State of California to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the United States.

274.    By creating and carrying out their fraudulent scheme, Defendants knowingly and repeatedly violated 31 U.S.C. § 3729(a)(1)(B).

275.    Defendants' false statements or records, or causation of false statements or records, had the potential to influence the United States' payment decision and were material to the United States' decision to pay the claims.

276.    Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the United States and the State of California contracted.  Had the United States and the State of California known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the United States and the State of California would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

277.    Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the United States' loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

3.        **Conspiracy (31 U.S.C. § 3729(a)(1)(C))**

278.    From 2012 to the present, the Reseller Defendants conspired together with Defendants Microsoft Licensing, G.P. and Microsoft Corporation to:  (1) fraudulently induce the United States and the State of California to enter into the federally-funded contracts and agreements at issue; and (2) submit or cause the submission of false claims under those contracts and agreements to the United States and the State of California.

279.    Microsoft Corporation and Microsoft Licensing, G.P. (collectively "Microsoft") worked in tandem with the Reseller Defendants, entering into agreements with the United States and the State of California which are part and parcel of the actual contracts between the Reseller Defendants and the United States and the State of California.

280.    The Reseller Defendants are licensed resellers of Microsoft products. The Reseller Defendants executed all sales contracts for the cloud services at issue in this case, and issued all invoices associated with the contracts at issue.

281.    The Reseller Defendants, having issued the invoices for the specific products at issue, knew that cloud services denoted as "GCC" or "for Government" did not always use a government-exclusive cloud (Azure Government), as the "fake SKU" that Microsoft used for these services included both Azure Government and Azure Commercial.

282.    Defendants' conspiracy had the potential to influence the United States' payment decision because the United States and the State of California would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

283.    WHEREFORE, Relator prays that this Court enter judgment against Defendants and award the following:

a.  Damages in the amount of three times the actual damages suffered by the United States as a result of Defendants' conduct;

b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

c.  The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

d.  All costs and expenses of this litigation, including attorneys' fees and costs of court; and

e.  All other relief that the Court deems just and proper.

**B.    District of Columbia Procurement Reform Amendment Act
(D.C. CODE §§ 2-381.01 *et seq.*)**

284.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

285.    This is a *qui tam* action brought by Relator and the District of Columbia to recover treble damages and civil penalties under the District of Columbia Procurement Reform Amendment Act ("DCFCA"), D.C. Code §§ 2-381.01–2-381.10.

286.    The DCFCA provides that any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] . . .

(7) conspires to commit a violation of [the DCFCA,]

D.C. Code § 2-381.02(a), is liable to the District of Columbia ("the District") for a civil penalty for each false or fraudulent claim, plus three times the amount of damages which the District of Columbia sustains because of the DCFCA violation.  *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.5; D.C. Code §§ 2-381.02(a), 2-381.10.

**1.    Presentment of False and/or Fraudulent Claims (D.C. Code § 2-381.02(a)(1))**

287.    From at least 2016 to the present, Defendants Microsoft Corporation and Dell Marketing, L.P. knowingly presented, or caused to be presented, false and/or fraudulent claims to the District.

288.    The above-named Defendants fraudulently induced the District to enter into contracts and agreements for cloud computing services by making false statements regarding GCC's government exclusivity and security in marketing and advertising materials and/or in the

contracts and agreements themselves.  The above-named Defendants then submitted claims for payment under the contracts and agreements at issue, which were both fraudulently induced.

289.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the District's payment decision and was material to the District's decision to pay the claims.

290.    The above-named Defendants' misrepresentations regarding the cloud services at issue are material because they went to the very essence of the bargain for which the District contracted.  Had the District known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, the District would not have paid the claims.

291.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the DCFCA.

292.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the District was a foreseeable factor in the District's loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the District has suffered damages.

**2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (D.C. Code § 2-381.02(a)(2))**

293.    From at least 2016 to the present, Defendants Microsoft Corporation and Dell Marketing, L.P. knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the District.  These false records or statements include those made on websites and in other marketing materials.

294.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the District to enter into the contracts and

agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the District

295.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the District's payment decision and were material to the District's decision to pay the claims.

296.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the District contracted.  Had the District known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the District would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

297.    By creating and carrying out their fraudulent scheme, Defendants Microsoft Corporation and Dell Marketing, L.P. knowingly and repeatedly violated the DCFCA.

298.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the District's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the District has suffered damages.

**3.    Conspiracy (D.C. Code § 2-381.02(a)(7))**

299.    From at least 2016 to the present, Defendant Dell Marketing, L.P. conspired together with Defendant Microsoft Corporation to:  (1) fraudulently induce the District to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the District.

300.    Defendant Microsoft Corporation entered into agreements with the District that are part and parcel of Defendant Dell Marketing, L.P.'s contracts with the District for the cloud services at issue.

301.    Defendant Dell Marketing, L.P., having issued all invoices for the specific products at issue, knew that cloud services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

302.    The above-named Defendants' conspiracy had the potential to influence the District's payment decision because the District would not have entered into the contracts and agreements at issue or paid claims under them had it known that it was not receiving true "government cloud" services.

303.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants Microsoft Corporation and Dell Marketing, L.P., and award the following:

a.    Three times the amount of damages sustained by the District of Columbia as a result of Defendants' fraudulent and illegal practices;

b.    Civil penalties against Defendants up to the maximum allowed by law for each violation of the DCFCA;

c.    The maximum award Relator may recover pursuant to D.C. CODE § 2-381.03(f) and/or any other applicable provision of law;

d.    All costs and expenses of this litigation including reasonable attorney's fees and costs of court; and

e.    Such further relief as this Court deems equitable and just.

**C.    California False Claims Act (CAL. GOV'T CODE §§ 12650 *et seq.*)**

304.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

305.    This is a *qui tam* action brought by Relator and the State of California to recover treble damages and civil penalties under the California False Claims Act ("California FCA"), Cal. Gov't Code §§ 12650–12656.

306.    The California FCA provides that any person who:

(1) knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

(3) conspires to commit a violation of [the California FCA]

Cal. Gov't Code § 12651(a), is liable to the State of California (or the applicable political subdivision thereof) for a civil penalty for each violation of the California FCA, plus three times the amount of damages which the State of California or political subdivision sustains because of the violation.  *See* 28 C.F.R. §§ 85.3, 85.5; Cal Gov't Code § 12651(a).

### 1.    Presentment of False and/or Fraudulent Claims (Cal. Gov't Code § 12651(a)(1))

307.    From 2012 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of California and its political subdivisions:  Microsoft Corporation; CDW Corporation; CompuCom Systems, Inc.; Crayon Software Experts LLC; Dell Marketing, L.P.; En Pointe Technologies Sales, LLC; Insight Public Sector, Inc.; Lilien, LLC; PCM, Inc.; PCMG, Inc.; Planet Technologies, Inc.; ProSum Inc.; Software One, Inc.; Solid Networks Inc.; and Sysorex Government Services, Inc.

308.    The above-named Defendants fraudulently induced the State of California and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security.

Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

309.   The above-named Defendants also made false certifications in the contracts and agreements at issue as to:  (1) the truth, completeness, and accuracy of information provided; (2) compliance with laws; and (3) compliance with specified cloud computing standards.

310.   The above-named Defendants submitted claims for payment to the State of California and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

311.   By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the California FCA.

312.   The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of California and its political subdivisions' payment decision and was material to the State of California and its political subdivisions' decision to pay the claims.

313.   The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of California and its political subdivisions contracted.  Had the State of California and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

314.   The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of California and its political subdivisions was a foreseeable factor in the State of California and its political subdivisions' loss and a consequence of

Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of California and its political subdivisions have suffered damages.

### 2. Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Cal. Gov't Code § 12651(a)(2))

315.    From 2012 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of California and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

316.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of California and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the State of California and its political subdivisions.

317.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of California and its political subdivisions' payment decision and were material to the State of California and its political subdivisions' decision to pay the claims.

318.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of California and its political subdivisions contracted. Had the State of California and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of California and its political

subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

319.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the California FCA.

320.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of California's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of California and its political subdivisions have suffered damages.

**3.    Conspiracy (Cal. Gov't Code § 12651(a)(3))**

321.    From 2012 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of California and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of California and its political subdivisions.

322.    Microsoft entered into agreements with the State of California and its political subdivisions that are part and parcel of the Reseller Defendants' contracts with the State of California and its political subdivisions for the cloud services at issue.

323.    The Reseller Defendants named above, having issued all invoices for the specific products at issue, knew that cloud services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

324.    The above-named Defendants' conspiracy had the potential to influence the State of California and its political subdivisions' payment decision because State of California and its

political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

325.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a.  Three times the amount of damages sustained by the State of California as a result of Defendants' fraudulent and illegal practices;

    b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of CAL. GOV'T CODE § 12651;

    c.  The maximum amount Relator may recover pursuant to CAL. GOV'T CODE § 12652 and/or any other applicable provision of law;

    d.  All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

    e.  Such further relief as this Court deems equitable and just.

## D.    Delaware False Claims and Reporting Act (6 DEL. CODE ANN. §§ 1201 *et seq.*)

326.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

327.    This is a *qui tam* action brought by Relator and the State of Delaware to recover treble damages and civil penalties under the Delaware False Claims and Reporting Act ("DFCA"), 6 Del. Code Ann. §§ 1201–1211.

328.    The DFCA provides that any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; [or]

(2) Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

(3) Conspires to commit a violation of [the above paragraphs,]

6 Del Code Ann. § 1201(a), is liable to the State of Delaware for a civil penalty for each violation of the DFCA, plus three times the amount of damages which the State of Delaware sustains because of the violation.  *See* 28 C.F.R. §§ 85.3, 85.5; 6 Del. Code Ann. § 1201(a).

### 1.    Presentment of False and/or Fraudulent Claims (Del. Code Ann. § 1201(a)(1))

329.    From at least 2013 to the present, Defendants Microsoft Corporation and SHI International Corporation ("SHI") knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Delaware and its political subdivisions for payment or approval.

330.    The above-named Defendants fraudulently induced the State of Delaware and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

331.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to:  (1) the truth, completeness, and accuracy of information provided; and (2) compliance with laws.

332.    The above-named Defendants submitted claims for payment to the State of Delaware and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

333.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the DFCA.

334.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Delaware and its political subdivisions' payment decision and was material to the State of Delaware and its political subdivisions' decision to pay the claims.

335.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Delaware and its political subdivisions contracted.  Had the State of Delaware and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

336.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Delaware and its political subdivisions was a foreseeable factor in the State of Delaware and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Delaware and its political subdivisions have suffered damages.

### 2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Del. Code Ann. § 1201(a)(2))

337.    From at least 2013 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Delaware and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

338.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Delaware and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the State of Delaware and its political subdivisions.

339.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Delaware and its political

subdivisions' payment decision and were material to the State of Delaware and its political subdivisions' decision to pay the claims.

340.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Delaware and its political subdivisions contracted. Had the State of Delaware and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Delaware and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

341.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the DFCA.

342.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Delaware's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Delaware and its political subdivisions have suffered damages.

**3.    Conspiracy (Del. Code Ann. § 1201(a)(3))**

343.    From at least 2013 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Delaware and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Delaware and its political subdivisions.

344.     Microsoft entered into agreements with the State of Delaware and its political subdivisions that are part and parcel of Defendant SHI's contracts with the State of Delaware and its political subdivisions for the cloud services at issue.

345.     Defendant SHI, having issued all invoices for the specific products at issue, knew that cloud services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

346.     The above-named Defendants' conspiracy had the potential to influence the State of Delaware and its political subdivisions' payment decision because State of Delaware and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

347.     WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

a.   Three times the amount of damages that the State of Delaware has sustained as a result of Defendants' fraudulent and illegal practices;

b.   Civil penalties against Defendants up to the maximum allowed by law for each violation of DEL. CODE ANN. tit. 6, § 1201(a);

c.   The maximum amount Relator may recover pursuant to DEL. CODE ANN. tit. 6, § 1205(a) and/or any other applicable provision of law;

d.   All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

e.   Such further relief as this Court deems equitable and just.

**E.     Florida False Claims Act (FLA. STAT. §§ 68.081 *et seq.*)**

348.     Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

349.    This is a *qui tam* action brought by Relator and the State of Florida to recover treble damages and civil penalties under the Florida False Claims Act ("FFCA"), Fla. Stat. §§ 68.081–68.092.

350.    The FFCA provides that any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; [or]

(b) Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

(c) Conspires to commit a violation of [the FFCA];

Fla. Stat. § 68.082(2), is liable to the State of Florida for a civil penalty for each violation of the FFCA, plus three times the amount of damages which the State of Florida sustains because of the violation. *Id.*

### 1.    Presentment of False and/or Fraudulent Claims (Fla. Stat. § 68.082(2)(a))

351.    From at least 2012 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Florida and its political subdivisions for payment or approval:  Microsoft Corporation; Microsoft Licensing, G.P.; CDW Government, LLC; Champion Solutions Group, Inc.; Cornerstone IT, Inc.; Imager Software, Inc.; Insight Public Sector, Inc.; Planet Technologies, Inc.; and SHI International Corporation.

352.    The above-named Defendants fraudulently induced the State of Florida and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

353.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to:  (1) the truth, completeness, and accuracy of information provided; and (2) compliance with laws.

354.    The above-named Defendants submitted claims for payment to the State of Florida and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

355.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the FFCA.

356.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Florida and its political subdivisions' payment decision and was material to the State of Florida and its political subdivisions' decision to pay the claims.

357.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Florida and its political subdivisions contracted.  Had the State of Florida and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

358.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Florida and its political subdivisions was a foreseeable factor in the State of Florida and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Florida and its political subdivisions have suffered damages.

### 2. Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Fla. Stat. § 68.082(2)(b))

359.   From at least 2012 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Florida and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

360.   The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Florida and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the State of Florida and its political subdivisions.

361.   The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Florida and its political subdivisions' payment decision and were material to the State of Florida and its political subdivisions' decision to pay the claims.

362.   The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Florida and its political subdivisions contracted.  Had the State of Florida and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Florida and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

363.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the FFCA.

364.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Florida's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Florida and its political subdivisions have suffered damages.

### 3.    Conspiracy (Fla. Stat. § 68.082(2)(c))

365.    From at least 2012 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Florida and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Florida and its political subdivisions.

366.    Microsoft entered into agreements with the State of Florida and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Florida and its political subdivisions for the cloud services at issue.

367.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

368.    The above-named Defendants' conspiracy had the potential to influence the State of Florida and its political subdivisions' payment decision because State of Florida and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

369.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a.  Three times the amount of damages that the State of Florida has sustained as a result of Defendants' fraudulent and illegal practices;

    b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of FLA. STAT. § 68.082(2);

    c.  The maximum amount Relator may recover pursuant to FLA. STAT. § 68.085 and/or any other applicable provision of law;

    d.  All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

    e.  Such further relief as this Court deems equitable and just.

**F.   Hawaii False Claims Acts**
**(HAW. REV. STAT. §§ 661-21 *et seq.*; 46-171 *et seq.*)**

370.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

371.    This is a *qui tam* action brought by Relator and the State of Hawaii to recover treble damages and civil penalties under the Hawaii False Claims Act to the State, Haw. Rev. Stat. §§ 661-21–661-31, and the Hawaii False Claims Act to the Counties, Haw. Rev. Stat. §§ 46-171–46-181 (collectively, "HFCAs").

372.    The Hawaii False Claims Act to the State provides that any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] . . .

(8) Conspires to commit any of the conduct described [above];

Haw. Rev. Stat. § 661-21(a), is liable to the State of Hawaii for a civil penalty for each violation of the Hawaii False Claims Act to the State, plus three times the amount of damages which the State of Hawaii sustains due to the violation. *See id.*; 28 C.F.R. § 85.5.

373.    The Hawaii False Claims Act to the Counties provides that any person who:

(1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] . . .

(8) Conspires to commit any of the conduct described [above];

Haw. Rev. Stat. § 46-171(a), is liable to the State of Hawaii for a civil penalty for each violation, plus three times the amount of damages the State of Hawaii sustains because of the violation. *Id.*

### 1.    Presentment of False and/or Fraudulent Claims
### (Haw. Rev. Stat. §§ 661-21(a)(1); 46-171(a)(1))

374.    From at least 2016 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Hawaii and its political subdivisions[33] for payment or approval:  Microsoft Corporation; En Pointe Technologies Sales, LLC; Intraprise TechKnowlogies LLC; and PCM, Inc.

375.    The above-named Defendants fraudulently induced the State of Hawaii and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials and/or in the contracts and agreements themselves.

376.    The above-named Defendants submitted claims for payment to the State of Hawaii and its political subdivisions under the contracts and agreements at issue, which were fraudulently induced.

377.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the HFCAs.

---

[33] Including, but not limited to, the Counties of Hawaii, Honolulu, and Maui.

378.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Hawaii and its political subdivisions' payment decision and was material to the State of Hawaii and its political subdivisions' decision to pay the claims.

379.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Hawaii and its political subdivisions contracted.  Had the State of Hawaii and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

380.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Hawaii and its political subdivisions was a foreseeable factor in the State of Hawaii and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Hawaii and its political subdivisions have suffered damages.

## 2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Haw. Rev. Stat. §§ 661-21(a)(2); 46-171(a)(2))

381.    From at least 2016 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Hawaii and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

382.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Hawaii and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent

claims made pursuant to those contracts paid or approved by the State of Hawaii and its political subdivisions.

383.   The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Hawaii and its political subdivisions' payment decision and were material to the State of Hawaii and its political subdivisions' decision to pay the claims.

384.   The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Hawaii and its political subdivisions contracted.  Had the State of Hawaii and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Hawaii and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

385.   By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the HFCAs.

386.   The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Hawaii's and its political subdivisions' loss and a consequence of Defendants' scheme. By virtue of Defendants' actions, the State of Hawaii and its political subdivisions have suffered damages.

**3.   Conspiracy (Haw. Rev. Stat. §§ 661-21(a)(8); 46-171(a)(8))**

387.   From 2012 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Hawaii and its political subdivisions to enter into contracts and

agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Hawaii and its political subdivisions.

388.    Microsoft entered into agreements with the State of Hawaii and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Hawaii and its political subdivisions for the cloud services at issue.

389.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

390.    The above-named Defendants' conspiracy had the potential to influence the State of Hawaii and its political subdivisions' payment decision because State of Hawaii and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

391.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a. Three times the amount of damages that the State of Hawaii and the Counties of Hawaii, Honolulu, and Maui have each sustained as a result of Defendants' fraudulent and illegal practices;

    b. Civil penalties against Defendants up to the maximum allowed by law for each violation of HAW. REV. STAT. §§ 661-21; 46-171(a);

    c. The maximum amount Relator may recover pursuant to HAW. REV. STAT. § 661-27 and/or any other applicable provision of law;

    d. All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

    e. Such further relief as this Court deems equitable and just.

**G.    Illinois False Claims Act (740 ILL. COMP. STAT. §§ 175/1 *et seq.*)**

392.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

393.    This is a *qui tam* action brought by Relator and the State of Illinois to recover treble damages and civil penalties under the Illinois False Claims Act ("Illinois FCA"), 740 Ill. Comp. Stat. §§ 175/1–175/8.

394.    The Illinois FCA provides that any person who:

(A) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) Knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

(C) Conspires to commit a violation of [the above paragraphs];

740 Ill. Comp. Stat. § 175/3(a)(1), is liable to the State of Illinois for a civil penalty for each violation of the Illinois FCA, plus three times the amount of damages which the State of Illinois sustains because of the violation.  *See* 28 C.F.R. §§ 85.3, 85.5; 740 Ill. Comp. Stat. § 175/3(a)(1).

**1.    Presentment of False and/or Fraudulent Claims**
**(740 Ill. Comp. Stat. § 175/3(a)(1)(A))**

395.    From 2012 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Illinois and its political subdivisions: Microsoft Corporation; Microsoft Licensing, G.P.; and CDW Government, LLC.

396.    The above-named Defendants fraudulently induced the State of Illinois and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

397.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to compliance with applicable laws.

398.    The above-named Defendants submitted claims for payment to the State of Illinois and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

399.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Illinois FCA.

400.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Illinois and its political subdivisions' payment decision and was material to the State of Illinois' and its political subdivisions' decision to pay the claims.

401.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Illinois and its political subdivisions contracted.  Had the State of Illinois and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

402.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Illinois and its political subdivisions was a foreseeable factor in the State of Illinois and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Illinois and its political subdivisions have suffered damages.

2.    **Making or Using False Records or Statements Material to False and/or Fraudulent Claims (740 Ill. Comp. Stat. § 175/3(a)(1)(B))**

403.    From 2012 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Illinois and its political subdivisions. These false records or statements include those made on websites and in other marketing materials.

404.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Illinois and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the State of Illinois and its political subdivisions.

405.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Illinois and its political subdivisions' payment decision and were material to the State of Illinois and its political subdivisions' decision to pay the claims.

406.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Illinois and its political subdivisions contracted. Had the State of Illinois and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Illinois and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

407.   By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Illinois FCA.

408.   The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Illinois' loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Illinois and its political subdivisions have suffered damages.

**3.     Conspiracy (740 Ill. Comp. Stat. § 175/3(a)(1)(C))**

409.   From 2012 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Illinois and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Illinois and its political subdivisions.

410.   Microsoft entered into agreements with the State of Illinois and its political subdivisions that are part and parcel of CDW Government, LLC's contracts with the State of Illinois and its political subdivisions for the cloud services at issue.

411.   Defendant CDW Government, LLC, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

412.   The above-named Defendants' conspiracy had the potential to influence the State of Illinois and its political subdivisions' payment decision because State of Illinois and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

413.   WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a.   Three times the amount of damages that the State of Illinois has sustained as a result of Defendants' fraudulent and illegal practices;

    b.   Civil penalties against Defendants up to the maximum allowed by law for each violation of 740 ILL. COMP. STAT. § 175/3(a)(1);

    c.   The maximum amount Relator may recover pursuant to 740 ILL. COMP. STAT. § 175/4(d) and/or any other applicable provision of law;

    d.   All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

    e.   Such further relief as this Court deems equitable and just.

**H.    Indiana False Claims and Whistleblower Protection Act (IND. CODE §§ 5-11-5.5-1 *et seq.*)**

414.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

415.    This is a *qui tam* action brought by Relator and the State of Indiana to recover treble damages and civil penalties under the Indiana False Claims and Whistleblower Protection Act ("Indiana FCA"), Ind. Code §§ 5-11-5.5-1–5-11-5.5-18.

416.    The Indiana FCA provides that any person who knowingly or intentionally:

(1) presents a false claim to the state for payment or approval; [or]

(2) makes or uses a false record or statement to obtain payment or approval of a false claim from the state; [or] . . .

(8) conspires with another person to perform an act described [above,]

Ind. Code § 5-11-5.5-2(b), is liable to the State of Indiana for a civil penalty for each violation of the Indiana FCA, plus three times the amount of damages which the State of Indiana sustains because of the violation. *See id.*

1.    **Presentment of False Claims (Ind. Code. § 5-11-5.5-2(b)(1))**

417.    From at least 2014 to the present, the following Defendants knowingly or intentionally presented false claims to the State of Indiana and its political subdivisions for payment or approval:  Microsoft Corporation; CDW Corporation; and Dell Marketing, L.P.

418.    The above-named Defendants fraudulently induced the State of Indiana and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials and in the contracts and agreements themselves.

419.    The above-named Defendants submitted claims for payment to the State of Indiana and its political subdivisions under the contracts and agreements at issue, which were fraudulently induced.

420.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Indiana FCA.

421.    The above-named Defendants' knowing or intentional submission of false claims had the potential to influence the State of Indiana and its political subdivisions' payment decision and was material to the State of Indiana and its political subdivisions' decision to pay the claims.

422.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Indiana and its political subdivisions contracted.  Had the State of Indiana and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

423.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Indiana and its political subdivisions was a foreseeable factor in the State of Indiana and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Indiana and its political subdivisions have suffered damages.

### 2.    Making or Using False Records or Statements to Obtain Payment or Approval of False Claims (Ind. Code § 5-11-5.5-2(b)(2))

424.    From at least 2014 to the present, the above-named Defendants knowingly made or used false records or statements to get false claims paid or approved by the State of Indiana and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

425.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Indiana and its political subdivisions to enter into the contracts and agreements at issue and to get false claims made pursuant to those contracts paid or approved by the State of Indiana and its political subdivisions.

426.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Indiana and its political subdivisions' payment decision and were material to the State of Indiana and its political subdivisions' decision to pay the claims.

427.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Indiana and its political subdivisions contracted.  Had the State of Indiana and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false

claims for payment, then the State of Indiana and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

428.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Indiana FCA.

429.    The above-named Defendants' use or creation of false records and statements was a foreseeable factor in the State of Indiana's and its political subdivisions' loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Indiana and its political subdivisions have suffered damages.

### 3.    Conspiracy (Ind. Code § 5-11-5.5-2(b)(8))

430.    From at least 2014 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Indiana and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false claims under those contracts and agreements to the State of Indiana and its political subdivisions.

431.    Microsoft entered into agreements with the State of Indiana and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Indiana and its political subdivisions for the cloud services at issue.

432.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

433.    The above-named Defendants' conspiracy had the potential to influence the State of Indiana and its political subdivisions' payment decision because State of Indiana and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

434.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a.   Three times the amount of damages that the State of Indiana has sustained as a result of Defendants' fraudulent and illegal practices;

    b.   Civil penalties against Defendants up to the maximum allowed by law for each violation of IND. CODE § 5-11-5.5-2(a);

    c.   The maximum amount Relator may recover pursuant to IND. CODE § 5-11-5.5-6 and/or any other applicable provision of law;

    d.   All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

    e.   Such further relief as this Court deems equitable and just.

## I.    Iowa False Claims Act (IOWA CODE §§ 685.1 *et seq.*)

435.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

436.    This is a *qui tam* action brought by Relator and the State of Iowa to recover treble damages and civil penalties under the Iowa False Claims Act ("Iowa FCA"), Iowa Code §§ 685.1– 685.7.

437.    The Iowa FCA provides that any person who:

    (a) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

    (b) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

    (c) Conspires to commit a violation of [the above paragraphs,]

Iowa Code § 685.2(1), is liable to the State of Iowa for a civil penalty for each violation of the Iowa FCA, plus three times the amount of damages which the State of Iowa sustains because of the violation.  *See* 28 C.F.R. § 85.5; Iowa Code § 685.2(1).

### 1.    Presentment of False and/or Fraudulent Claims (Iowa Code § 685.2(1)(a))

438.    From at least 2016 to the present, Defendants Microsoft Corporation and Insight Public Sector, Inc. knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Iowa and its political subdivisions for payment or approval.

439.    The above-named Defendants fraudulently induced the State of Iowa and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

440.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to compliance with applicable laws.

441.    The above-named Defendants submitted claims for payment to the State of Iowa and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

442.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Iowa FCA.

443.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Iowa and its political subdivisions' payment decision and was material to the State of Iowa's and its political subdivisions' decision to pay the claims.

444.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Iowa and its political subdivisions contracted.  Had the State of Iowa and its political subdivisions known of Defendants'

fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

445.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Iowa and its political subdivisions was a foreseeable factor in the State of Iowa and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Iowa and its political subdivisions have suffered damages.

### 2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Iowa Code § 685.2(1)(b))

446.    From at least 2016 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Iowa and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

447.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Iowa and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims paid or approved by the State of Iowa and its political subdivisions.

448.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Iowa and its political subdivisions' payment decision and were material to the State of Iowa and its political subdivisions' decision to pay the claims.

449.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Iowa and its political subdivisions contracted.  Had

the State of Iowa and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Iowa and its political subdivisions would not have entered into or paid claims under the contracts and agreements at issue.

450.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Iowa FCA.

451.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Iowa's loss and a consequence of Defendants' scheme. By virtue of Defendants' actions, the State of Iowa and its political subdivisions have suffered damages.

### 3.    Conspiracy (Iowa Code § 685.2(1)(c))

452.    From at least 2016 to the present, the above-named Defendants conspired together to: (1) fraudulently induce the State of Iowa and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Iowa and its political subdivisions.

453.    Microsoft entered into agreements with the State of Iowa and its political subdivisions that are part and parcel of Insight Public Sector, Inc.'s contracts with the State of Iowa and its political subdivisions for the cloud services at issue.

454.    Defendant Insight Public Sector, Inc., having issued all invoices for the specific products at issue, knew that cloud services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

455.    The above-named Defendants' conspiracy had the potential to influence the State of Iowa and its political subdivisions' payment decision because State of Iowa and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

456.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a.  Three times the amount of damages that the State of Iowa has sustained as a result of Defendants' fraudulent and illegal practices;

    b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of IOWA CODE § 685.2(1);

    c.  The maximum amount Relator may recover pursuant to IOWA CODE § 685.3(4) and/or any other applicable provision of law;

    d.  All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

    e.  Such further relief as this Court deems equitable and just.

**J.    Massachusetts False Claims Act (MASS. GEN. LAWS ANN. ch. 12, §§ 5A *et seq.*)**

457.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

458.    This is a *qui tam* action brought by Relator and the Commonwealth of Massachusetts to recover treble damages and civil penalties under the Massachusetts False Claims Act ("MAFCA"), Mass. Gen. Laws Ann. ch. 12, §§ 5A–5O.

459.    The MAFCA provides that any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

(3) conspires to commit a violation of [the above paragraphs]; [or] . . .

(8) enters into an agreement, contract or understanding with an official of the commonwealth or a political subdivision thereof knowing the information contained therein is false[,]

Mass. Gen. Laws Ann. ch. 12, § 5B(a), is liable to the Commonwealth of Massachusetts for a civil penalty for each violation of the MAFCA, plus three times the amount of damages which the Commonwealth of Massachusetts sustains because of the violation.  *See* 28 C.F.R. § 85.5; Mass. Gen. Laws Ann. ch. 12, § 5B(a).

### 1.    Presentment of False and/or Fraudulent Claims (Mass. Gen. Laws Ann. ch. 12, § 5B(a)(1))

460.    From at least 2015 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the Commonwealth of Massachusetts and its political subdivisions for payment or approval:  Microsoft Corporation; CDW Government, LLC; Dell Marketing, L.P.; and SHI International Corporation.

461.    The above-named Defendants fraudulently induced the Commonwealth of Massachusetts and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security.  Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

462.    The above-named Defendants submitted claims for payment to the Commonwealth of Massachusetts and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

463.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the MAFCA.

464.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the Commonwealth of Massachusetts

and its political subdivisions' payment decision and was material to the Commonwealth of Massachusetts' and its political subdivisions' decision to pay the claims.

465.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the Commonwealth of Massachusetts and its political subdivisions contracted.  Had the Commonwealth of Massachusetts and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

466.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the Commonwealth of Massachusetts and its political subdivisions was a foreseeable factor in the Commonwealth of Massachusetts and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the Commonwealth of Massachusetts and its political subdivisions have suffered damages.

## 2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Mass. Gen. Laws Ann. ch. 12, § 5B(a)(2))

467.    From at least 2015 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the Commonwealth of Massachusetts and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

468.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the Commonwealth of Massachusetts and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or

fraudulent claims made pursuant to those contracts paid or approved by the Commonwealth of Massachusetts and its political subdivisions.

469.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the Commonwealth of Massachusetts and its political subdivisions' payment decision and were material to the Commonwealth of Massachusetts and its political subdivisions' decision to pay the claims.

470.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the Commonwealth of Massachusetts and its political subdivisions contracted.  Had the Commonwealth of Massachusetts and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the Commonwealth of Massachusetts and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

471.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the MAFCA.

472.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the Commonwealth of Massachusetts' loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the Commonwealth of Massachusetts and its political subdivisions have suffered damages.

**3.    Conspiracy (Mass. Gen. Laws Ann. ch. 12, § 5B(a)(3))**

473.    From at least 2015 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the Commonwealth of Massachusetts and its political subdivisions to

enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the Commonwealth of Massachusetts and its political subdivisions.

474. Microsoft entered into agreements with the Commonwealth of Massachusetts and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the Commonwealth of Massachusetts and its political subdivisions for the cloud services at issue.

475. The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

476. The above-named Defendants' conspiracy had the potential to influence the Commonwealth of Massachusetts and its political subdivisions' payment decision because the Commonwealth of Massachusetts and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

### 4. False Contracts/Agreements (Mass. Gen. Laws Ann. ch. 12, § 5B(a)(8))

477. From at least 2015 to the present, the above-named Defendants entered into agreements and contracts with the Commonwealth of Massachusetts and its political subdivisions, knowing that information contained therein was false.

478. The contracts and agreements at issue contained false certifications as to Defendants' compliance with applicable laws, and false statements regarding GCC's government exclusivity.

479. WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

a. Three times the amount of damages that the Commonwealth of Massachusetts has sustained as a result of Defendants' fraudulent and illegal practices;

b. Civil penalties against Defendants up to the maximum allowed by law for each violation of MASS. GEN. LAWS ANN. ch. 12 § 5B;

c. The maximum amount Relator may recover pursuant to MASS. GEN. LAWS ANN. ch. 12 § 5F and/or any other applicable provision of law;

d. All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

e. Such further relief as this Court deems equitable and just.

## K.    Minnesota False Claims Act (MINN. STAT. ANN. §§ 15C.01 *et seq.*)

480.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

481.    This is a *qui tam* action brought by Relator and the State of Minnesota to recover treble damages and civil penalties under the Minnesota False Claims Act ("MNFCA"), Minn. Stat. Ann. §§ 15C.01–15C.16.

482.    The MNFCA provides that any person who:

(1) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes or uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(3) knowingly conspires to commit a violation of [the above paragraphs,]

Minn. Stat. Ann. § 15C.02(a), is liable to the State of Minnesota for a civil penalty for each violation of the MNFCA, plus three times the amount of damages which the State of Minnesota sustains because of the violation.  *See id.*; 28 C.F.R. §§ 85.3, 85.5.

### 1.    Presentment of False and/or Fraudulent Claims
(Minn. Stat. Ann. § 15C.02(a)(1))

483.    From at least 2015 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Minnesota and its political

subdivisions for payment or approval: Microsoft Corporation; CDW Corporation; CDW Government, LLC; PCM, Inc.; PCMG, Inc.; SHI International Corporation; and T4 Technologies.

484.    The above-named Defendants fraudulently induced the State of Minnesota and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

485.    The above-named Defendants submitted claims for payment to the State of Minnesota and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

486.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the MNFCA.

487.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Minnesota and its political subdivisions' payment decision and was material to the State of Minnesota and its political subdivisions' decision to pay the claims.

488.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Minnesota and its political subdivisions contracted.  Had the State of Minnesota and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

489.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Minnesota and its political subdivisions was a foreseeable factor in the State of Minnesota and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Minnesota and its political subdivisions have suffered damages.

### 2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Minn. Stat. Ann. § 15C.02(a)(2))

490.    From at least 2015 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Minnesota and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

491.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Minnesota and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims paid or approved by the State of Minnesota and its political subdivisions.

492.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Minnesota and its political subdivisions' payment decision and were material to the State of Minnesota and its political subdivisions' decision to pay the claims.

493.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Minnesota and its political subdivisions contracted. Had the State of Minnesota and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false

and/or fraudulent claims for reimbursement, then the State of Minnesota and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

494.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the MNFCA.

495.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Minnesota's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Minnesota and its political subdivisions have suffered damages.

### 3.    Conspiracy (Minn. Stat. Ann. § 15C.02(a)(3))

496.    From at least 2015 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Minnesota and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts to the State of Minnesota and its political subdivisions.

497.    Microsoft entered into agreements with the State of Minnesota and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Minnesota and its political subdivisions for the cloud services at issue.

498.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

499.    The above-named Defendants' conspiracy had the potential to influence the State of Minnesota and its political subdivisions' payment decision because the State of Minnesota and

its political subdivisions would not have entered into the contracts and agreements at issue or paid

claims under them had they known that they were not receiving true "government cloud" services.

    500.    WHEREFORE, Relator respectfully requests that the Court enter judgment against

Defendants, and award the following:

    a.    Three times the amount of damages that the State of Minnesota has sustained as a result of Defendants' fraudulent and illegal practices;

    b.    Civil penalties against Defendants up to the maximum allowed by law for each violation of MINN. STAT. ANN. § 15C.02(a);

    c.    The maximum amount Relator may recover pursuant to MINN. STAT. ANN. § 15C.13 and/or any other applicable provision of law;

    d.    All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

    e.    Such further relief as this Court deems equitable and just.

## L.    Montana False Claims Act (MONT. CODE ANN. §§ 17-8-401 *et seq.*)

    501.    Relator realleges and hereby incorporates by reference each and every allegation

contained in paragraphs 163-257 of this First Amended Complaint.

    502.    This is a *qui tam* action brought by Relator and the State of Montana to recover

treble damages and civil penalties under the Montana False Claims and Reporting Act ("Montana

FCA"), Mont. Code Ann. §§ 17-8-401–17-8-416.

    503.    The Montana FCA provides that any person who:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval; [or]

(b) Knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim; [or]

(c) Conspires to commit a violation of [the above paragraphs,]

Mont. Code Ann. § 17-8-403(1), is liable to the State of Montana for a civil penalty for each violation of the Montana FCA, plus three times the amount of damages which the State of Montana sustains because of the violation.  *See* 28 C.F.R. § 85.5; Mont. Code Ann. § 1201(1), (8).

**1.    Presentment of False and/or Fraudulent Claims**
**(Mont. Code Ann. § 17-8-403(1)(a))**

504.    From at least 2015 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Montana and its political subdivisions for payment or approval:  Microsoft Corporation; Dell Marketing, L.P.; and SHI International Corporation.

505.    The above-named Defendants fraudulently induced the State of Montana and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

506.    The above-named Defendants submitted claims for payment to the State of Montana and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

507.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Montana FCA.

508.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Montana and its political subdivisions' payment decision and was material to the State of Montana and its political subdivisions' decision to pay the claims.

509.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Montana and its political subdivisions contracted.  Had the State of Montana and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

510.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Montana and its political subdivisions was a foreseeable factor in the State of Montana and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Montana and its political subdivisions have suffered damages.

**2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Mont. Code Ann. § 17-8-403(1)(b))**

511.    From at least 2015 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Montana and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

512.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Montana and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims paid or approved by the State of Montana and its political subdivisions.

513.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Montana and its political

subdivisions' payment decision and were material to the State of Montana and its political subdivisions' decision to pay the claims.

514.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Montana and its political subdivisions contracted. Had the State of Montana and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Montana and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

515.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Montana FCA.

516.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Montana's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Montana and its political subdivisions have suffered damages.

### 3.    Conspiracy (Mont. Code Ann. § 17-8-403(1)(c))

517.    From at least 2015 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Montana and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Montana and its political subdivisions.

518.    Microsoft entered into agreements with the State of Montana and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Montana and its political subdivisions for the cloud services at issue.

519.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

520.    The above-named Defendants' conspiracy had the potential to influence the State of Montana and its political subdivisions' payment decision because the State of Montana and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

521.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

   a.   Three times the amount of damages that the State of Montana has sustained as a result of Defendants' fraudulent and illegal practices;

   b.   Civil penalties against Defendants up to the maximum allowed by law for each violation of MONT. CODE ANN. § 17-8-403(1);

   c.   The maximum amount Relator may recover pursuant to MONT. CODE ANN. § 17-8-410 and/or any other applicable provision of law;

   d.   All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

   e.   Such further relief as this Court deems equitable and just.

**M.   Nevada False Claims Act (NEV. REV. STAT. §§ 357.010 *et seq.*)**

522.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

523.    This is a *qui tam* action brought by Relator and the State of Nevada to recover treble damages and civil penalties under the Nevada False Claims Act ("NFCA"), Nev. Rev. Stat. §§ 357.010–357.250.

524.    The NFCA provides that any person who, with or without specific intent to defraud:

(a) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[; or]

(b) Knowingly makes or uses, or causes to be made or used, a false record or statement that is material to a false or fraudulent claim[; or . . .]

(i) Conspires to commit any of the acts set forth [above,]

Nev. Rev. Stat. § 357.040(1), is liable to the State of Nevada for a civil penalty for each violation of the NFCA, plus three times the amount of damages which the State of Nevada sustains because of the violation. *See* 28 C.F.R. § 85.5; Nev. Rev. Stat. § 357.040(2)(c).

### 1.    Presentment of False and/or Fraudulent Claims (Nev. Rev. Stat. § 357.040(1)(a))

525.    From at least 2016 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Nevada and its political subdivisions for payment or approval:  Microsoft Corporation; Microsoft Licensing, G.P.; En Pointe Technologies Sales, LLC; PCM, Inc.; and SHI International Corporation.

526.    The above-named Defendants fraudulently induced the State of Nevada and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

527.    The above-named Defendants submitted claims for payment to the State of Nevada and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

528.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to compliance with applicable laws.

529.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the NFCA.

530.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Nevada and its political subdivisions' payment decision and was material to the State of Nevada and its political subdivisions' decision to pay the claims.

531.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Nevada and its political subdivisions contracted.  Had the State of Nevada and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

532.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the State of Nevada and its political subdivisions was a foreseeable factor in the State of Nevada and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Nevada and its political subdivisions have suffered damages.

2. **Making or Using False Records or Statements Material to**
**False and/or Fraudulent Claims (Nev. Rev. Stat. § 357.040(1)(b))**

533.    From at least 2016 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements that were material to false and/or fraudulent claims paid or approved by the State of Nevada and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

534.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Nevada and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims paid or approved by the State of Nevada and its political subdivisions.

535.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Nevada and its political subdivisions' payment decision and were material to the State of Nevada and its political subdivisions' decision to pay the claims.

536.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Nevada and its political subdivisions contracted.  Had the State of Nevada and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Nevada and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

537.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the NFCA.

538.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Nevada's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Nevada and its political subdivisions have suffered damages.

### 3.    Conspiracy (Nev. Rev. Stat. § 357.040(1)(i))

539.    From at least 2016 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Nevada and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Nevada and its political subdivisions.

540.    Microsoft entered into agreements with the State of Nevada and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Nevada and its political subdivisions for the cloud services at issue.

541.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

542.    The above-named Defendants' conspiracy had the potential to influence the State of Nevada and its political subdivisions' payment decision because the State of Nevada and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

543.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

     a.    Three times the amount of damages that the State of Nevada has sustained as a result of Defendants' fraudulent and illegal practices;

     b.    Civil penalties against Defendants up to the maximum allowed by law for each violation of NEV. REV. STAT. § 357.040(1);

  c. The maximum amount Relator may recover pursuant to NEV. REV. STAT. § 357.210 and/or any other applicable provision of law;

  d. All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

  e. Such further relief as this Court deems equitable and just.

**N. New Jersey False Claims Act (N.J. STAT. ANN. §§ 2A:32C-1 *et seq.*)**

544. Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

545. This is a *qui tam* action brought by Relator and the State of New Jersey to recover treble damages and civil penalties under the New Jersey False Claims Act ("NJFCA"), N.J. Stat. Ann. §§ 2A:32C-1–2A:32C-18.

546. The NJFCA provides that any person who:

(a) Knowingly presents or causes to be presented to an employee, officer or agent of the State, or to any contractor, grantee, or other recipient of State funds, a false or fraudulent claim for payment or approval; [or]

(b) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; [or]

(c) Conspires to defraud the State by getting a false or fraudulent claim allowed or paid by the State[,]

N.J. Stat. Ann. § 2A:32C-3, is liable to the State of New Jersey for a civil penalty for each violation of the NJFCA, plus three times the amount of damages which the State of New Jersey sustains because of the violation. *See* 28 C.F.R. §§ 85.3, 85.5; N.J. Stat. Ann. § 2A:32C-3.

**1. Presentment of False and/or Fraudulent Claims (N.J. Stat. Ann. § 2A:32C-3(a))**

547. From at least 2016 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of New Jersey and its political

subdivisions for payment or approval:  Microsoft Corporation; CDW Government, LLC; Dell Marketing, L.P.; The Henson Group, Inc.; and Planet Technologies, Inc.

548.    The above-named Defendants fraudulently induced the State of New Jersey and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials and in the contracts and agreements themselves.

549.    The above-named Defendants submitted claims for payment to the State of New Jersey and its political subdivisions under the contracts and agreements at issue, which were fraudulently induced.

550.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the NJFCA.

551.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of New Jersey and its political subdivisions' payment decision and was material to the State of New Jersey and its political subdivisions' decision to pay the claims.

552.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of New Jersey and its political subdivisions contracted.  Had the State of New Jersey and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

553.    The above-named Defendants' presentment or causation of presentment, of false and/or fraudulent claims to the State of New Jersey and its political subdivisions was a foreseeable factor in the State of New Jersey and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of New Jersey and its political subdivisions have suffered damages.

### 2.    Making or Using False Records or Statements to Get False and/or Fraudulent Claims Paid (N.J. Stat. Ann. § 2A:32C-3(b))

554.    From at least 2016 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements to get false and/or fraudulent claims paid or approved by the State of New Jersey and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

555.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of New Jersey and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims paid or approved by the State of New Jersey and its political subdivisions.

556.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of New Jersey and its political subdivisions' payment decision and were material to the State of New Jersey and its political subdivisions' decision to pay the claims.

557.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of New Jersey and its political subdivisions contracted. Had the State of New Jersey and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false

and/or fraudulent claims for reimbursement, then the State of New Jersey and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

558.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the NJFCA.

559.    The above-named Defendants' submission, or causation of submission, of false records and statements to get false and/or fraudulent claims paid or approved was a foreseeable factor in the State of New Jersey's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of New Jersey and its political subdivisions have suffered damages.

### 3.    Conspiracy (N.J. Stat. Ann. § 2A:32C-3(c))

560.    From at least 2016 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of New Jersey and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State and its political subdivisions.

561.    Microsoft entered into agreements with the State of New Jersey and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of New Jersey and its political subdivisions for the cloud services at issue.

562.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

563.    The above-named Defendants' conspiracy had the potential to influence the State of New Jersey and its political subdivisions' payment decision because the State of New Jersey

and its subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

564.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

      a.  Three times the amount of damages that the State of New Jersey has sustained as a result of Defendants' fraudulent and illegal practices;

      b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of N.J. STAT. ANN. § 2A:32C-3;

      c.  The maximum amount Relator may recover pursuant to N.J. STAT. ANN. § 2A:32C-7 and/or any other applicable provision of law;

      d.  All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

      e.  Such further relief as this Court deems equitable and just.

**O.    New Mexico Fraud Against Taxpayers Act (N.M. STAT. ANN. §§ 44-9-1 *et seq.*)**

565.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

566.    This is a *qui tam* action brought by Relator and the State of New Mexico to recover treble damages and civil penalties under the New Mexico Fraud Against Taxpayers Act ("FATA"), N.M. Stat. Ann. §§ 44-9-1–44-9-14.

567.    FATA provides that a person shall not:

(1) knowingly present, or cause to be presented, to an employee, officer or agent of the state or a political subdivision or to a contractor, grantee or other recipient of state or political subdivision funds a false or fraudulent claim for payment or approval; [or]

(2) knowingly make or use, or cause to be made or used, a false, misleading or fraudulent record or statement to obtain or support the approval of or the payment on a false or fraudulent claim; [or]

(3) conspire to defraud the state or a political subdivision by obtaining approval or payment on a false or fraudulent claim[.]

N.M. Stat. Ann. § 44-9-3(A).  Anyone who commits one of the above violations is liable to the State of New Mexico for a civil penalty for each violation of FATA, plus three times the amount of damages which the State of New Mexico sustains because of the violation.  *See* N.M. Stat. Ann. § 44-9-3(C)(1)–(2).

### 1.     Presentment of False and/or Fraudulent Claims (N.M. Stat. Ann. § 44-9-3(A)(1))

568.    From at least 2014 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of New Mexico and its political subdivisions for payment or approval:  Microsoft Corporation; Microsoft Licensing, G.P.; and SHI International Corporation.

569.    The above-named Defendants fraudulently induced the State of New Mexico and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

570.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to compliance with applicable laws.

571.    The above-named Defendants submitted claims for payment to the State of New Mexico and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

572.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated FATA.

573.    The above-named Defendants' knowing submission or causation of submission of false and/or fraudulent claims had the potential to influence the State of New Mexico and its

political subdivisions' payment decision and was material to the State of New Mexico and its political subdivisions' decision to pay the claims.

574.  The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of New Mexico and its political subdivisions contracted.  Had the State of New Mexico and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

575.  The above-named Defendants' presentment or causation of presentment, of false and/or fraudulent claims to the State of New Mexico and its political subdivisions was a foreseeable factor in the State of New Mexico and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of New Mexico and its political subdivisions have suffered damages.

### 2.  Making or Using False, Misleading, and/or Fraudulent Records or Statements to Get False and/or Fraudulent Claims Paid (N.M. Stat. Ann. § 44-9-3(A)(2))

576.  From at least 2014 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false, misleading, and/or fraudulent records or statements to get false and/or fraudulent claims paid or approved by the State of New Mexico and its political subdivisions.  These false, misleading, and/or fraudulent records or statements include those made on websites and in other marketing materials.

577.  The above-named Defendants knowingly and fraudulently used the false, misleading, and/or fraudulent statements in their marketing materials and websites both to induce the State of New Mexico and its political subdivisions to enter into the contracts and agreements

at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the State of New Mexico and its political subdivisions.

578.    The above-named Defendants' false, misleading, and/or fraudulent statements or records, or causation of false statements or records, had the potential to influence the State of New Mexico and its political subdivisions' payment decision and were material to the State of New Mexico and its political subdivisions' decision to pay the claims.

579.    The above-named Defendants' false, misleading, and/or fraudulent statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of New Mexico and its political subdivisions contracted.  Had the State of New Mexico and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of New Mexico and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

580.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated FATA.

581.    The above-named Defendants' submission, or causation of submission, of false records and statements to get false and/or fraudulent claims paid or approved was a foreseeable factor in the State of New Mexico's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of New Mexico and its political subdivisions have suffered damages.

### 3.    Conspiracy (N.M. Stat. Ann. § 44-9-3(A)(3))

582.    From at least 2014 to the present, the above-named Defendants conspired together to defraud the State of New Mexico by obtaining payment or approval of false claims.  Defendants

accomplished this by: (1) fraudulently inducing the State of New Mexico and its political subdivisions to enter into contracts and agreements with them; and (2) submitting or causing the submission of false and/or fraudulent claims under those contracts and agreements to the State of New Mexico and its political subdivisions.

583. Microsoft entered into agreements with the State of New Mexico and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of New Mexico and its political subdivisions for the cloud services at issue.

584. The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

585. The above-named Defendants' conspiracy had the potential to influence the State of New Mexico and its political subdivisions' payment decision because the State of New Mexico and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

586. WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

a. Three times the amount of damages that the State of New Mexico has sustained as a result of Defendants' fraudulent and illegal practices;

b. Civil penalties against Defendants up to the maximum allowed by law for each violation of N.M. STAT. ANN. § 44-9-3(A);

c. The maximum amount Relator may recover pursuant to N.M. STAT. ANN. § 44-9-7 and/or any other applicable provision of law;

d. All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

e. Such further relief as this Court deems equitable and just.

**P.**    **North Carolina False Claims Act (N.C. GEN. STAT. ANN. §§ 1-605 *et seq.*)**

587.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

588.    This is a *qui tam* action brought by Relator and the State of North Carolina to recover treble damages and civil penalties under the North Carolina False Claims Act ("NCFCA"), N.C. Gen. Stat. Ann. §§ 1-605–1-618.

589.    The NCFCA provides that any person who:

(1) Knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[; or]

(2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[; or]

(3) Conspires to commit a violation of [the above paragraphs,]

N.C. Gen. Stat. Ann. § 1-607(a), is liable to the State of North Carolina for a civil penalty for each violation of the NCFCA, plus three times the amount of damages which the State of North Carolina sustains because of the violation.  *See* 28 C.F.R. § 85.5; N.C. Gen. Stat. Ann. § 1-607(a).

**1.**    **Presentment of False and/or Fraudulent Claims**
**(N.C. Gen. Stat. Ann. § 1-607(a)(1))**

590.    From at least 2014 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of North Carolina and its subdivisions for payment or approval: Microsoft Corporation; Dell Marketing, L.P.; PCM, Inc.; PCMG, Inc.; Planet Technologies; SHI International Corporation; and Software One, Inc.

591.    The above-named Defendants fraudulently induced the State of North Carolina and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security.

Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

592.    The above-named Defendants submitted claims for payment to the State of North Carolina and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

593.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to compliance with applicable laws.

594.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the NCFCA.

595.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of North Carolina and its political subdivisions' payment decision and was material to the State of North Carolina and its political subdivisions' decision to pay the claims.

596.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of North Carolina and its political subdivisions contracted.  Had the State of North Carolina and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

597.    The above-named Defendants' presentment or causation of presentment, of false and/or fraudulent claims to the State of North Carolina and its political subdivisions was a foreseeable factor in the State of North Carolina and its political subdivisions' loss and a

consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of North Carolina and its political subdivisions have suffered damages.

     **2.**     **Making or Using False Records or Statements Material to False and/or Fraudulent Claims (N.C. Gen. Stat. Ann. § 1-607(a)(2))**

598.    From at least 2014 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims paid or approved by the State of North Carolina and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

599.    The above-named Defendants knowingly and fraudulently used the false records or statements in their marketing materials and websites both to induce the State of North Carolina and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the State of North Carolina and its political subdivisions.

600.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of North Carolina and its political subdivisions' payment decision and were material to the State of North Carolina and its political subdivisions' decision to pay the claims.

601.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of North Carolina and its political subdivisions contracted.  Had the State of North Carolina and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of North Carolina

and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

602.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the NCFCA.

603.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of North Carolina's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of North Carolina and its political subdivisions have suffered damages.

**3.    Conspiracy (N.C. Gen. Stat. Ann. § 1-607(a)(3))**

604.    From at least 2014 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of North Carolina and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of North Carolina and its political subdivisions.

605.    Microsoft entered into agreements with the State of North Carolina and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of North Carolina and its political subdivisions for the cloud services at issue.

606.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

607.    The above-named Defendants' conspiracy had the potential to influence the State of North Carolina and its political subdivisions' payment decision because the State of North Carolina and its political subdivisions would not have entered into the contracts and agreements at

issue or paid claims under them had they known that they were not receiving true "government cloud" services.

608.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

 a. Three times the amount of damages that the State of North Carolina has sustained as a result of Defendants' fraudulent and illegal practices;

 b. Civil penalties against Defendants up to the maximum allowed by law for each violation of N.C. GEN. STAT. ANN. § 1-607(a);

 c. The maximum amount Relator may recover pursuant to N.C. GEN. STAT. ANN. § 1-610 and/or any other applicable provision of law;

 d. All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

 e. Such further relief as this Court deems equitable and just.

## Q. Rhode Island False Claims Act (R.I. GEN. LAWS ANN. §§ 9-1.1-1 *et seq.*)

609.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

610.    This is a *qui tam* action brought by Relator and the State of Rhode Island to recover treble damages and civil penalties under the Rhode Island False Claims Act ("RIFCA"), R.I. Gen. Laws Ann. §§ 9-1.1-1–9-1.1.-9.

611.    The RIFCA provides that any person who:

 (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

 (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

 (3) Conspires to commit a violation of [the above paragraphs,]

R.I. Gen. Laws Ann. § 9-1.1-3(a), is liable to the State of Rhode Island for a civil penalty for each violation of the RIFCA, plus three times the amount of damages which the State of Rhode Island sustains because of the violation.  *See* 28 C.F.R. § 85.5; R.I. Gen. Laws Ann. § 9-1.1.-3(a).

### 1.   Presentment of False and/or Fraudulent Claims (R.I. Gen. Laws Ann. § 9-1.1-3(a)(1))

612.    From at least 2015 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Rhode Island and its political subdivisions for payment or approval:  Microsoft Corporation; Dell Marketing, L.P.; En Pointe Technologies Sales, LLC; and PCM, Inc.

613.    The above-named Defendants fraudulently induced the State of Rhode Island and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

614.    The above-named Defendants submitted claims for payment to the State of Rhode Island and its political subdivisions under the contracts and agreements at issue, which were fraudulently induced and/or contain false statements and certifications.

615.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the RIFCA.

616.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the State of Rhode Island and its political subdivisions' payment decision and was material to the State of Rhode Island and its political subdivisions' decision to pay the claims.

617.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Rhode Island and its political subdivisions contracted.  Had the State of Rhode Island and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

618.    The above-named Defendants' presentment or causation of presentment, of false and/or fraudulent claims to the State of Rhode Island and its political subdivisions was a foreseeable factor in the State of Rhode Island and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Rhode Island and its political subdivisions have suffered damages.

**2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (R.I. Gen. Laws Ann. § 9-1.1-3(a)(2))**

619.    From at least 2015 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims paid or approved by the State of Rhode Island and its political subdivisions.  These false records or statements include those made on websites and in other marketing materials.

620.    The above-named Defendants knowingly and fraudulently used the false records or statements in their marketing materials and websites both to induce the State of Rhode Island and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the State of Rhode Island and its political subdivisions.

621.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Rhode Island and its political

subdivisions' payment decision and were material to the State of Rhode Island and its political subdivisions' decision to pay the claims.

622.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Rhode Island and its political subdivisions contracted. Had the State of Rhode Island and its political subdivisions known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the State of Rhode Island and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

623.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the RIFCA.

624.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Rhode Island's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Rhode Island and its political subdivisions have suffered damages.

**3.    Conspiracy (R.I. Gen. Laws Ann. § 9-1.1-3(a)(3))**

625.    From at least 2015 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Rhode Island and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Rhode Island and its political subdivisions.

626.    Microsoft entered into agreements with the State of Rhode Island and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Rhode Island and its political subdivisions for the cloud services at issue.

627.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

628.    The above-named Defendants' conspiracy had the potential to influence the State of Rhode Island and its political subdivisions' payment decision because the State of Rhode Island and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

629.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

   a.  Three times the amount of damages that the State of Rhode Island has sustained as a result of Defendants' fraudulent and illegal practices;

   b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of R.I. GEN. LAWS ANN. § 9-1.1-3;

   c.  The maximum amount Relator may recover pursuant to R.I. GEN. LAWS ANN. § 9-1.1-4(d) and/or any other applicable provision of law;

   d.  All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

   e.  Such further relief as this Court deems equitable and just.

**R.    Tennessee False Claims Act (TENN. CODE ANN. §§ 4-18-101 *et seq.*)**

630.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

631.    This is a *qui tam* action brought by Relator and the State of Tennessee to recover treble damages and civil penalties under the Tennessee False Claims Act ("TFCA"), Tenn. Code Ann. §§ 4-18-101–4-18-108.

632.    The TFCA provides that any person who:

(1) Knowingly presents or causes to be presented to an officer or employee of the state or of any political subdivision thereof, a false or fraudulent claim for payment or approval; [or]

(2) Knowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision; [or]

(3) Conspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or by any political subdivision; [or . . .]

(9) Knowingly makes, uses, or causes to be made or used any false or fraudulent conduct, representation, or practice in order to procure anything of value directly or indirectly from the state or any political subdivision[,]

Tenn. Code Ann. § 4-18-103(a), is liable to the State of Tennessee for a civil penalty for each violation of the TFCA, plus three times the amount of damages which the State of Tennessee sustains because of the violation. *See id.*

**1.    Presentment of False and/or Fraudulent Claims**
**(Tenn. Code Ann. § 4-18-103(a)(1))**

633.    From at least 2016 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Tennessee and its political subdivisions for payment or approval:  Microsoft Corporation; Dell Marketing, L.P.; and Liftoff, LLC.

634.    The above-named Defendants fraudulently induced the State of Tennessee and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security.

Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

635.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to compliance with applicable laws.

636.    The above-named Defendants submitted claims for payment to the State of Tennessee and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

637.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the TFCA.

638.    The above-named Defendants' knowing submission or causation of submission of false and/or fraudulent claims had the potential to influence the State of Tennessee and its political subdivisions' payment decision and was material to the State of Tennessee and its political subdivisions' decision to pay the claims.

639.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Tennessee and its political subdivisions contracted.  Had the State of Tennessee and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

640.    The above-named Defendants' presentment or causation of presentment, of false and/or fraudulent claims to the State of Tennessee and its political subdivisions was a foreseeable factor in the State of Tennessee and its political subdivisions' loss and a consequence of

Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Tennessee and its political subdivisions have suffered damages.

2.      **Making or Using False Records or Statements to Get False Claims Paid or Approved (Tenn. Code Ann. § 4-18-103(a)(2))**

641.    From at least 2016 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements to get false claims paid or approved by the State of Tennessee and its political subdivisions.  These false, misleading, and/or fraudulent records or statements include those made on websites and in other marketing materials.

642.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Tennessee and its political subdivisions to enter into the contracts and agreements at issue and to get false claims made pursuant to those contracts paid or approved by the State and its political subdivisions.

643.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Tennessee and its political subdivisions' payment decision and were material to the State of Tennessee and its political subdivisions' decision to pay the claims.

644.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Tennessee and its political subdivisions contracted. Had the State of Tennessee and its political subdivisions known of Defendants' false statements regarding the cloud services at issue, which resulted in the submission of false claims for payment, then the State of Tennessee and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

645. By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the TFCA.

646. The above-named Defendants' submission, or causation of submission, of false records and statements to get false claims paid or approved was a foreseeable factor in the State of Tennessee's loss and a consequence of Defendants' scheme. By virtue of Defendants' actions, the State of Tennessee and its political subdivisions have suffered damages.

### 3. Conspiracy (Tenn. Code Ann. § 4-18-103(a)(3))

647. From at least 2016 to the present, the above-named Defendants conspired together to defraud the State of Tennessee by getting false claims paid or allowed by the State and its political subdivisions. Defendants accomplished this by: (1) fraudulently inducing the State of Tennessee and its political subdivisions to enter into contracts and agreements with them; and (2) submitting or causing the submission of false and/or fraudulent claims under those contracts and agreements to the State of Tennessee and its political subdivisions.

648. Microsoft entered into agreements with the State of Tennessee and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Tennessee and its political subdivisions for the cloud services at issue.

649. The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that cloud services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

650. The above-named Defendants' conspiracy had the potential to influence the State of Tennessee and its political subdivisions' payment decision because the State of Tennessee and

its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

### 4.   False and/or Fraudulent Conduct, Representations, or Practices (Tenn. Code Ann. § 4-18-103(a)(9))

651.   From at least 2016 to the present, the above-named Defendants knowingly made, used, or caused to be made or used false and/or fraudulent conduct, representations, and practices in order to procure contracts and the payment of claims from the State of Tennessee and its political subdivisions.

652.   The above-named Defendants fraudulently induced the State of Tennessee and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements and misrepresentations regarding the cloud services' government exclusivity and security.   Defendants made these false statements and misrepresentations in marketing and advertising materials as well as in the contracts and agreements themselves.

653.   Defendants perpetuated this fraudulent scheme by failing to amend the contracts and agreements to reflect the true nature of the cloud services at issue—*i.e.*, that they were not entirely government-exclusive.

654.   The above-named Defendants' fraudulent conduct had the potential to influence the State of Tennessee and its political subdivisions' payment decision because the State of Tennessee and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

655.   WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

   a.   Three times the amount of damages that the State of Tennessee has sustained as a result of Defendants' fraudulent and illegal practices;

b. Civil penalties against Defendants up to the maximum allowed by law for each violation of TENN. CODE ANN. § 4-18-103(a);

c. The maximum amount Relator may recover pursuant to TENN. CODE ANN. § 4-18-104(g) and/or any other applicable provision of law;

d. All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

e. Such further relief as this Court deems equitable and just.

## S. Vermont False Claims Act (VT. STAT. ANN. TIT. 32, §§ 630 *et seq.*)

656. Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

657. This is a *qui tam* action brought by Relator and the State of Vermont to recover treble damages and civil penalties under the Vermont False Claims Act ("VTFCA"), Vt. Stat. Ann. tit. 32, §§ 630–642.

658. The VTFCA provides that no person shall:

(1) knowingly present, or cause to be presented, a false or fraudulent claim for payment or approval; [or]

(2) knowingly make, use, or cause to be made or used, a false record or statement material to a false or fraudulent claim; [or] . . .

(8) enter into a written agreement or contract with an official of the State [of Vermont] or its agent knowing the information contained therein is false; [or]

(12) conspire to commit a violation of [the VFCA,]

Vt. Stat. Ann., tit. 32, § 631(a), is liable to the State of Vermont for a civil penalty for each violation of the VTFCA, plus three times the amount of damages which the State of Vermont sustains because of the violation. *See* 28 C.F.R. § 85.5; Vt. Stat. Ann., tit. 32, § 631(b).

### 1. Presentment of False and/or Fraudulent Claims (Vt. Stat. Ann., tit. 32, § 631(a)(1))

659. From at least 2016 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the State of Vermont and its political

subdivisions for payment or approval: Microsoft Corporation; Aerie Consulting, LLC; CDW Corporation; and CDW Government, LLC.

660.    The above-named Defendants fraudulently induced the State of Vermont and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials and in the contracts and agreements themselves.

661.    The above-named Defendants submitted claims for payment to the State of Vermont and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

662.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the VFCA.

663.    The above-named Defendants' knowing submission or causation of submission of false and/or fraudulent claims had the potential to influence the State of Vermont and its political subdivisions' payment decision and was material to the State of Vermont and its political subdivisions' decision to pay the claims.

664.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the State of Vermont and its political subdivisions contracted. Had the State of Vermont and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

665.    The above-named Defendants' presentment or causation of presentment, of false and/or fraudulent claims to the State of Vermont and its political subdivisions was a foreseeable factor in the State of Vermont and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the State of Vermont and its political subdivisions have suffered damages.

**2.    Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Vt. Stat. Ann., tit. 32, § 631(a)(2))**

666.    From at least 2016 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims.  These false, misleading, and/or fraudulent records or statements include those made on websites and in other marketing materials.

667.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the State of Vermont and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims paid or approved by the State of Vermont and its political subdivisions.

668.    The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the State of Vermont and its political subdivisions' payment decision and were material to the State of Vermont and its political subdivisions' decision to pay the claims.

669.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the State of Vermont and its political subdivisions contracted. Had the State of Vermont and its political subdivisions known of Defendants' false statements regarding the cloud services at issue, which resulted in the submission of false claims for payment,

then the State of Vermont and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

670.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the VFCA.

671.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the State of Vermont's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the State of Vermont and its political subdivisions have suffered damages.

**3.    Conspiracy (Vt. Stat. Ann., tit. 32, § 631(a)(12))**

672.    From at least 2016 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the State of Vermont and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the State of Vermont and its political subdivisions.

673.    Microsoft entered into agreements with the State of Vermont and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the State of Vermont and its political subdivisions for the cloud services at issue.

674.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

675.    The above-named Defendants' conspiracy had the potential to influence the State of Vermont and its political subdivisions' payment decision because the State of Vermont and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

676.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

   a.  Three times the amount of damages that the State of Vermont has sustained as a result of Defendants' fraudulent and illegal practices;

   b.  Civil penalties against Defendants up to the maximum allowed by law for each violation of VT. STAT. ANN., tit. 32, § 631(a);

   c.  The maximum amount Relator may recover pursuant to VT. STAT. ANN., tit. 32, § 635 and/or any other applicable provision of law;

   d.  All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

   e.  Such further relief as this Court deems equitable and just.

**T.    Virginia Fraud Against Taxpayers Act (VA. CODE ANN. §§ 8.01-216.1 *et seq.*)**

677.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

678.    This is a *qui tam* action brought by Relator and the Commonwealth of Virginia to recover treble damages and civil penalties under the Virginia Fraud Against Taxpayers Act ("VFATA"), Va. Code Ann. §§ 8.01-216.1–8.01-216.19.

679.    VFATA provides that any person who:

   (1) Knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

   (2) Knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

   (3) Conspires to commit a violation of [the above paragraphs,]

Va. Code Ann. § 8.01-216.3(A), is liable to the Commonwealth of Virginia for a civil penalty for each violation of VFATA, plus three times the amount of damages which the Commonwealth of Virginia sustains because of the violation.  *See* 28 C.F.R. § 85.5; Va. Code Ann. § 8.01-216.3(A).

1.    **Presentment of False and/or Fraudulent Claims
        (Va. Code Ann. § 8.01-216.3(A)(1))**

680.    From at least 2012 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to the Commonwealth of Virginia and its political subdivisions for payment or approval:  Microsoft Corporation; Insight Public Sector, Inc.; Liftoff, LLC; and SHI International Corporation.

681.    The above-named Defendants fraudulently induced the Commonwealth of Virginia and its political subdivisions to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials and in the contracts and agreements themselves.

682.    The above-named Defendants submitted claims for payment to the Commonwealth of Virginia and its political subdivisions under the contracts and agreements at issue, which were both fraudulently induced and/or contain false statements and certifications.

683.    Defendants also made false certifications in the contracts and agreements at issue as to their compliance with applicable laws.

684.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated VFATA.

685.    The above-named Defendants' knowing submission or causation of submission of false and/or fraudulent claims had the potential to influence the Commonwealth of Virginia and its political subdivisions' payment decision and was material to the Commonwealth of Virginia and its political subdivisions' decision to pay the claims.

686.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because

they went to the very essence of the bargain for which the Commonwealth of Virginia and its political subdivisions contracted. Had the Commonwealth of Virginia and its political subdivisions known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, they would not have paid the claims.

687. The above-named Defendants' presentment or causation of presentment, of false and/or fraudulent claims to the Commonwealth of Virginia and its political subdivisions was a foreseeable factor in the Commonwealth of Virginia and its political subdivisions' loss and a consequence of Defendants' fraudulent scheme. By virtue of the above-named Defendants' actions, the Commonwealth of Virginia and its political subdivisions have suffered damages.

### 2. Making or Using False Records or Statements Material to False and/or Fraudulent Claims (Va. Code Ann. § 8.01-216.3(A)(2))

688. From at least 2012 to the present, the above-named Defendants knowingly made, used, or caused to be made or used, false records or statements material to false and/or fraudulent claims. These false, misleading, and/or fraudulent records or statements include those made on websites and in other marketing materials.

689. The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the Commonwealth of Virginia and its political subdivisions to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the Commonwealth of Virginia and its political subdivisions.

690. The above-named Defendants' false statements or records, or causation of false statements or records, had the potential to influence the Commonwealth of Virginia and its political subdivisions' payment decision and were material to the Commonwealth of Virginia and its political subdivisions' decision to pay the claims.

691.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the Commonwealth of Virginia and its political subdivisions contracted.    Had the Commonwealth of Virginia and its political subdivisions known of Defendants' false statements regarding the cloud services at issue, which resulted in the submission of false claims for payment, then the Commonwealth of Virginia and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under those contracts and agreements.

692.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated VFATA.

693.    The above-named Defendants' submission, or causation of submission, of false records and statements material to false and/or fraudulent claims was a foreseeable factor in the Commonwealth of Virginia's loss and a consequence of Defendants' scheme.    By virtue of Defendants' actions, the Commonwealth and its political subdivisions have suffered damages.

**3.    Conspiracy (Va. Code Ann. § 8.01-216.3(A)(3))**

694.    From at least 2012 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce the Commonwealth of Virginia and its political subdivisions to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to the Commonwealth of Virginia and its political subdivisions.

695.    Microsoft entered into agreements with the Commonwealth of Virginia and its political subdivisions that are part and parcel of the above-named Reseller Defendants' contracts with the Commonwealth of Virginia and its political subdivisions for the cloud services at issue.

696.    The above-named Reseller Defendants, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

697.    The above-named Defendants' conspiracy had the potential to influence the Commonwealth of Virginia and its political subdivisions' payment decision because the Commonwealth of Virginia and its political subdivisions would not have entered into the contracts and agreements at issue or paid claims under them had they known that they were not receiving true "government cloud" services.

698.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

a.    Three times the amount of damages that the Commonwealth of Virginia has sustained as a result of Defendants' fraudulent and illegal practices;

b.    Civil penalties against Defendants up to the maximum allowed by law for each violation of VA. CODE ANN. § 8.01-216.3;

c.    The maximum amount Relator may recover pursuant to VA. CODE ANN. § 8.01-216.7 and/or any other applicable provision of law;

d.    All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

e.    Such further relief as this Court deems equitable and just.

**U.    Chicago False Claims Act (Chicago, Ill. Mun. Code §§ 1-21-010 *et seq.*)**

699.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

700.    This is a *qui tam* action brought by Relator and the City of Chicago to recover treble damages and civil penalties under the Chicago False Claims Act ("Chicago FCA"), Chicago, Ill. Mun. Code §§ 1-21-010–1-22-060.

701.    The Chicago FCA provides:

> Any person who knowingly makes a false statement of material fact to the city in violation of any statute, ordinance or regulation, or who knowingly makes a false statement of material fact to the city in connection with any application, report, affidavit, oath, or attestation, including a statement of material fact made in connection with a bid, proposal, contract or economic disclosure statement or affidavit, is liable to the city for a civil penalty of not less than $500.00 and not more than $1,000.00, plus up to three times the amount of damages which the city sustains because of the person's violation[.]

Chicago, Ill. Mun. Code § 1-21-010(a). The Chicago FCA also provides that any person who:

(1) knowingly presents, or causes to be presented, to an official or employee of the city a false or fraudulent claim for payment or approval; [or]

(2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the city; [or]

(3) conspires to defraud the city by getting a false or fraudulent claim allowed or paid[,]

Chicago, Ill. Mun. Code § 1-22-020(a), is liable to the City of Chicago for a civil penalty plus three times the amount of damages that the City of Chicago sustains because of the violation. *Id.*

### 1. False Statements of Fact (Chicago, Ill. Mun. Code § 1-21-020(a)).

702. From at least 2012 to the present, Defendants Microsoft Corporation and CDW Government, LLC knowingly made false statements of material fact to the City of Chicago ("the City") in connection with procuring their contract to provide Microsoft cloud services, including GCC, to the City.

703. The above-named Defendants fraudulently induced the City to enter into contracts and agreements for cloud computing services by making materially false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials and in the contracts and agreements themselves. Defendants also made false certifications in the contracts at issue as to their compliance with applicable laws, rules, ordinances, and regulations.

704.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Chicago FCA.

705.    The above-named Defendants' materially false statements had the potential to influence the City's payment decision and was material to the City's decision to pay the claims.

706.    The above-named Defendants' false statements of fact regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the City contracted.  Had the City known of Defendants' false statements, it would not have entered into the contracts at issue nor paid claims made under those contracts.

707.    The above-named Defendants' materially false statements were a foreseeable factor in the City's loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the City has suffered damages.

### 2.    Presentment of False and/or Fraudulent Claims (Chicago, Ill. Mun. Code § 1-22-020(a)(1)).

708.    From at least 2012 to the present, Defendants Microsoft Corporation and CDW Government, LLC knowingly presented, or caused to be presented, false and/or fraudulent claims to the City for payment or approval.

709.    The above-named Defendants submitted claims for payment to the City under the contracts and agreements at issue, which were fraudulently induced.

710.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Chicago FCA.

711.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence the City's payment decision and was material to the County's decision to pay the claims.

712.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which the City contracted.  Had the City known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, it would not have paid the claims.

713.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to the City was a foreseeable factor in the City's loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, the City has suffered damages.

### 3.    Making or Using False Records or Statements to Get False and/or Fraudulent Claims Paid or Approved (Chicago, Ill. Mun. Code § 1-22-020(a)(2))

714.    From at least 2012 to the present, the above-named Defendants knowingly made or used, or caused to be made or used, false records or statements in order to get false and/or fraudulent claims paid or approved by the City.  These false records or statements include those made on websites and in other marketing materials.

715.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce the City to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the City.

716.    The above-named Defendants' false statements or records had the potential to influence the City's payment decision and were material to the City's decision to pay the claims.

717.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which the City contracted.  Had the City known of Defendants'

fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then the City would not have entered into or paid claims under the contracts and agreements at issue.

718.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the Chicago FCA.

719.    The above-named Defendants' creation and/or use of false records and statements were a foreseeable factor in the City's loss and a consequence of Defendants' scheme.  By virtue of Defendants' actions, the City has suffered damages.

### 4.    Conspiracy (Chicago, Ill. Mun. Code § 1-22-020(a)(3))

720.    From at least 2012 to the present, the above-named Defendants conspired together to defraud the City by getting false and/or fraudulent claims paid or allowed.  The above-named Defendants accomplished this by:  (1) fraudulently inducing the City to enter into contracts and agreements with them; and (2) submitting or causing the submission of false and/or fraudulent claims under those contracts and agreements to the City.

721.    Microsoft entered into agreements with the City that are part and parcel of Defendant CDW Government, LLC's contracts with the City for the cloud services at issue.

722.    Defendant CDW Government, LLC, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

723.    Defendants' conspiracy had the potential to influence the City's payment decision because the City would not have entered into the contracts and agreements at issue or paid claims under them had it known that it was not receiving true "government cloud" services.

724.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a.    Three times the amount of damages that the City of Chicago has sustained as a result of Defendants' fraudulent and illegal practices;

    b.    Civil penalties against Defendants up to the maximum allowed by law for each violation of Chicago, Ill. Mun. Code §§ 1-21-020(a) and 1-22-020(a);

    c.    The maximum amount Relator may recover pursuant to Chicago, Ill. Mun. Code § 1-22030(d) and/or any other applicable provision of law;

    d.    All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

    e.    Such further relief as this Court deems equitable and just.

## V.    False Claims Ordinance of Broward County, Florida
## (Code of Broward County, Florida, §§ 1-276 *et seq.*)

725.    Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

726.    This is a *qui tam* action brought by Relator and the County of Broward to recover treble damages and civil penalties under the False Claims Ordinance of Broward County, Florida ("BCFCO"), Code of Broward County, Florida, §§ 1-276–1-287.

727.    The BCFCO provides that:

(1) Any person who knowingly presents or causes to be presented to the County, or to any officer, employee, agent, or consultant of the County, a false or fraudulent claim for payment or approval; [or]

(2) Any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false, fraudulent, or inflated claim paid or approved by the County; [or]

(3) Any person who conspires to defraud the County by facilitating the payment of a false, fraudulent, or inflated claim allowed or paid by the County[,]

Code of Broward County, FL, § 1-279(a), is liable to the County of Broward for three times the part of the claim which is false, fraudulent, or inflated.  Code of Broward County, FL, § 1-

279(c)(1).  The violator must also forfeit the entire amount of the claim and is subject to debarment from Broward County contracting for up to five years.  *See* Code of Broward County, FL, § 1-279(c).

**1.      Presentment of False and/or Fraudulent Claims
           (Code of Broward County, FL § 1-279(a)(1)).**

728.      From at least 2016 to the present, Defendants Microsoft Corporation and SHI International Corporation knowingly presented, or caused to be presented, false and/or fraudulent claims to Broward County for payment or approval.

729.      The above-named Defendants fraudulently induced Broward County to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security.  Defendants made these false statements in marketing and advertising materials and in the contracts and agreements themselves.  Defendants also made false certifications in the contracts at issue as to their compliance with applicable laws, rules, and regulations.

730.      The above-named Defendants submitted claims for payment to Broward County under the contracts and agreements at issue, which were fraudulently induced.

731.      By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the BCFCO.

732.      The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence Broward County's payment decision and was material to the County's decision to pay the claims.

733.      The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which Broward County contracted.  Had Broward

County known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, it would not have paid the claims.

734.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to Broward County was a foreseeable factor in Broward County's loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, Broward County has suffered damages.

2.    **Making or Using False Records or Statements to Get False, Fraudulent, and/or Inflated Claims Paid or Approved by the County (Code of Broward County, FL § 1-279(a)(2))**

735.    From at least 2016 to the present, the above-named Defendants knowingly made or used, or caused to be made or used, false records or statements in order to get false, fraudulent, or inflated claims paid or approved by Broward County.  These false records or statements include those made on websites and in other marketing materials.

736.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce Broward County to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the County.

737.    The above-named Defendants' false statements or records had the potential to influence Broward County's payment decision and were material to the County's decision to pay the claims.

738.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very essence of the bargain for which Broward County contracted.  Had Broward County known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in

the submission of false and/or fraudulent claims for reimbursement, then Broward County would not have entered into or paid claims under the contracts and agreements at issue.

739.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the BCFCO.

740.    The above-named Defendants' creation and/or use of false records and statements were a foreseeable factor in Broward County's loss and a consequence of Defendants' scheme. By virtue of Defendants' actions, Broward County has suffered damages.

### 3.    Conspiracy (Code of Broward County, FL § 1-279(a)(3))

741.    From at least 2016 to the present, Defendants Microsoft Corporation and SHI International Corporation conspired together to defraud Broward County by facilitating the payment of false, fraudulent, and/or inflated claims allowed or paid by the County.  The above-named Defendants accomplished this by:  (1) fraudulently inducing Broward County to enter into contracts and agreements with them; and (2) submitting or causing the submission of false and/or fraudulent claims under those contracts and agreements to Broward County.

742.    Microsoft entered into agreements with Broward County that are part and parcel of Defendant SHI International Corporation's contracts with the County for the services at issue.

743.    Defendant SHI International Corporation, having issued all invoices for the specific products at issue, knew that services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

744.    Defendants' conspiracy had the potential to influence Broward County's payment decision because the County would not have entered into the contracts and agreements at issue or paid claims under them had it known that it was not receiving true "government cloud" services.

745. WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

    a. Three times the amount of claims Defendants submitted to Broward County that are false, fraudulent, and/or inflated;

    b. Civil penalties against Defendants up to the maximum allowed by law for each violation of the Code of Broward County, Florida § 1-279(a);

    c. The maximum amount Relator may recover pursuant the Code of Broward County, Florida § 1-282 and/or any other applicable provision of law;

    d. All costs and expenses of this litigation, including reasonable attorney's fees and costs of court; and

    e. Such further relief as this Court deems equitable and just.

## W.    Miami-Dade County False Claims Ordinance (Code of Miami-Dade County, Florida §§ 21-255 *et seq.*)[34]

746. Relator realleges and hereby incorporates by reference each and every allegation contained in paragraphs 163-257 of this First Amended Complaint.

747. This is a *qui tam* action brought by Relator and Miami-Dade County, Florida to recover treble damages under the Miami-Dade County False Claims Ordinance ("MDFCO"), Code of Miami-Dade County, Florida §§ 21-255–21-266.

748. The MDFCO provides:

(a) Any person who knowingly presents or causes to be presented to the County, or to any office, employee, agent, or consultant of the County, a false or fraudulent claim for payment or approval; [or]

(b) Any person who knowingly makes, uses, or causes to be made or used, a false record or statement to get a false, fraudulent, or inflated claim paid or approved by the County; [or]

(c) Any person who conspires to defraud the County by facilitating the payment of a false, fraudulent, or inflated claim paid or approved by the County[,]

---

[34] *Available at* http://www.miamidade.gov/govaction/matter.asp?matter=992791&file=false&yearFolder=Y1999.

Code of Miami-Dade County, FL § 21-258(1), is liable to Miami-Dade County ("the County") for an amount equal to three times that part of the claim which is false, fraudulent, or inflated, as well as all costs and fees incurred by the County in reviewing, defending, and evaluating the claim. Code of Miami-Dade County, FL § 21-258(3). The violator is also required to "immediately, fully, and irrevocably forfeit the entire amount of the claim" and will be debarred from contracting with the County for five years or less. *Id.*

### 1. Presentment of False and/or Fraudulent Claims (Code of Miami-Dade County, FL § 21-258(1)(a)).

749.    From at least 2016 to the present, the following Defendants knowingly presented, or caused to be presented, false and/or fraudulent claims to Miami-Dade County: Microsoft Corporation; Insight Public Sector, Inc.; and SHI International Corporation.

750.    The above-named Defendants fraudulently induced Miami-Dade County to enter into contracts and agreements for cloud computing services by making false statements regarding the cloud services' government exclusivity and security. Defendants made these false statements in marketing and advertising materials as well as in the contracts and agreements themselves.

751.    The above-named Defendants submitted claims for payment to Miami-Dade County under the contracts and agreements at issue, which were fraudulently induced.

752.    The above-named Defendants also made false certifications in the contracts and agreements at issue as to their compliance with applicable laws.

753.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the MDFCO.

754.    The above-named Defendants' knowing submission, or causation of submission, of false and/or fraudulent claims had the potential to influence Miami-Dade County's payment decision and was material to the County's decision to pay the claims.

755.    The above-named Defendants' misrepresentations regarding the cloud services at issue and their compliance with the applicable standards for cloud computing are material because they went to the very essence of the bargain for which Miami-Dade County contracted.  Had Miami-Dade County known of Defendants' fraudulent non-compliance, which resulted in the submission of false claims for payment, it would not have paid the claims.

756.    The above-named Defendants' presentment, or causation of presentment, of false and/or fraudulent claims to Miami-Dade County was a foreseeable factor in Miami-Dade County's loss and a consequence of Defendants' fraudulent scheme.  By virtue of the above-named Defendants' actions, Miami-Dade County has suffered damages.

**2.    Making or Using False Records or Statements to Get False and/or Fraudulent Claims Paid or Approved by the County (Code of Miami-Dade County, FL § 21-258(1)(b))**

757.    From at least 2016 to the present, the above-named Defendants knowingly made or used false records or statements in order to get false and/or fraudulent claims paid or approved by Miami-Dade County.  These false records or statements include those made on websites and in other marketing materials.

758.    The above-named Defendants knowingly and fraudulently used the false statements in their marketing materials and websites both to induce Miami-Dade County to enter into the contracts and agreements at issue and to get false and/or fraudulent claims made pursuant to those contracts paid or approved by the County.

759.    The above-named Defendants' false statements or records had the potential to influence Miami-Dade County's payment decision and were material to the County's decision to pay the claims.

760.    The above-named Defendants' false statements regarding the exclusivity and deployment models of the cloud services at issue were material because they went to the very

164

essence of the bargain for which Miami-Dade County contracted.  Had Miami-Dade County known of Defendants' fraudulent misrepresentations regarding the cloud services at issue, which resulted in the submission of false and/or fraudulent claims for reimbursement, then Miami-Dade County would not have entered into or paid claims under the contracts and agreements at issue.

761.    By creating and carrying out their fraudulent scheme, the above-named Defendants knowingly and repeatedly violated the MDFCO.

762.    The above-named Defendants' creation and/or use of false records and statements were a foreseeable factor in Miami-Dade County's loss and a consequence of Defendants' scheme. By virtue of Defendants' actions, Miami-Dade County has suffered damages.

### 3.    Conspiracy (Code of Miami-Dade County, FL § 21-258(1)(c))

763.    From at least 2016 to the present, the above-named Defendants conspired together to:  (1) fraudulently induce Miami-Dade County to enter into contracts and agreements with them; and (2) submit or cause the submission of false and/or fraudulent claims under those contracts and agreements to Miami-Dade County.

764.    Microsoft entered into agreements with Miami-Dade County that are part and parcel of the Reseller Defendants' contracts with Miami-Dade County for the services at issue.

765.    Defendants Insight Public Sector, Inc. and SHI International Corporation, having issued all invoices for the specific products at issue, knew that cloud services marketed as "for Government" which utilized Microsoft's "fake SKU" included Azure Commercial, and were therefore not actually "for Government."

766.    Defendants' conspiracy had the potential to influence Miami-Dade County's payment decision because the County would not have entered into or paid claims under the

contracts and agreements at issue had it known that it was not receiving true "government cloud" services.

767.    WHEREFORE, Relator respectfully requests that the Court enter judgment against Defendants, and award the following:

a.    Three times the amount of damages that Miami-Dade County has sustained as a result of Defendants' fraudulent and illegal practices;

b.    Civil penalties against Defendants up to the maximum allowed by law for each violation of the Code of Miami-Dade County, Florida § 21-258(1);

c.    The maximum amount Relator may recover pursuant to the Code of Miami-Dade County, Florida § 21-261 and/or any other applicable provision of law;

d.    All costs and expenses of this litigation, including reasonable attorney's fees and costs; and

e.    Such further relief as this Court deems equitable and just.

## X.    DEMAND FOR JURY TRIAL

768.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

Dated: November 14, 2023                    Respectfully submitted,


**BROWN, LLC**

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode
Jason T. Brown
Paul Shehadi
111 Town Square Place, Suite 400
Jersey City, NJ 07310
(877) 561-0000 (office)
(855) 582-5297 (fax)
*patalmonrode@jtblawgroup.com*
*jtb@jtblawgroup.com*
*paul.shehadi@jtblawgroup.com*

*Attorneys for Relator John Kurzman*

## **<u>Certificate of Service</u>**

I hereby certify that on November 14, 2023, this First Amended Complaint was filed using the Court's CM/ECF system, delivering a true and correct copy of same to all counsel of record.

I further certify that on November 14, 2023, pursuant to FRCP 4(d), I sent requests for waiver of service to the following by email:

Eric Sitarchuk
Jaclyn Unis Whitaker
Morgan, Lewis & Bockius LLP,
1701 Market Street
Philadelphia, PA 19103
*eric.sitarchuk@morganlewis.com*
*jaclyn.whittaker@morganlewis.com*

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode

## GLOSSARY OF ACRONYMS

**AAD**:  Azure Active Directory.  Manages user identities (usernames and passwords) for all Azure cloud services, including the Government Community Cloud ("GCC") services at issue.  The GCC iteration of AAD operates in the commercial cloud.

**AADP**:  Azure Active Directory Premium.  An "upgrade" to standard AAD (AAD Basic) which GCC customers paid more to receive.

**AIP**:  Azure Information Protection.  Secure Islands product acquired by Microsoft

**AzGov**:  Microsoft Azure Government.

**CAS**:  Cloud Application Security.  Adallom product acquired by Microsoft.

**CJIS**:  Criminal Justice Information Systems.  A division of the FBI that issues standard protocol for evaluating security for cloud services.  Microsoft has signed CJIS agreements (certifying compliance) with many states, including the Government Plaintiff states of California, Florida, Hawaii, Illinois, Indiana, Iowa, Minnesota, Montana, New Jersey, Nevada, North Carolina, Rhode Island, Tennessee, and Vermont, as well as the Commonwealths of Massachusetts and Virginia.

**CMS**:  Centers for Medicare and Medicaid Services, a U.S. federal government agency.

**DoD**:  United States Department of Defense, a U.S. federal government agency.

**EMS**:  Enterprise Mobility & Security Suite.  Includes AIP and CAS, among other products and services.

**FCA**:  federal False Claims Act

**FCC**:  Federal Communications Commission, a U.S. federal government agency.

**FED**:  Federal business sector (Microsoft internal terminology).

**FedRAMP**:  Federal Risk and Authorization Management Program.  Federal government-wide program providing a standardized approach to assessing security for cloud services.  Has two relevant categories of certification, "High" and "Moderate" – each is for different risk categories of information.

**GBB**:  Global Black Belt (Microsoft internal terminology) – an "expert" on a specific product or product suite.

**GCC**:  Government Community Cloud.  The "fake" government cloud services at issue, which partially operate and store data in the commercial cloud.

**GOV**:  Abbreviation used to denote government products at Microsoft (i.e. AZUREGOV, AZGOV, etc.).

**HUD**:  United States Department of Housing and Urban Development, a U.S. federal government agency.

**MAG**:  Microsoft Azure Government.

**NIST**:  National Institute of Standards and Technology.  Government agency that, among other things, sets out standardized definitions and guidelines for cloud computing.

**O365**:  Microsoft Office 365.

**PANYNJ**:  Port Authority of New York and New Jersey.

**RMS**:  Rights Management System.  Microsoft's encryption technology; used by AIP to perform encryption.  Operates outside of the government cloud, in the Azure commercial cloud.

**SLG**:  State & Local Government business sector (Microsoft internal terminology).

**SPE**:  Secure Productive Enterprise.  This is a "suite" of products and services that consists of Microsoft Azure, EMS, and Windows 10.

**USAID**:  United States Agency for International Development, a U.S. federal government agency.

**USPS**:  United States Postal Service, a U.S. federal government agency.

**VITA**:  Virginia Information Technology Agency, a government agency of the Commonwealth of Virginia.